**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| THOMAS STABILE, derivatively on behalf of AMAZON.COM, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. |
| JEFFREY P. BEZOS, ANDREW R. JASSY, BRIAN T. OLSAVSKY, DAVID ZAPOLSKY, DAVE FILDES, SHELLEY L. REYNOLDS, NATE SUTTON, KEITH B. ALEXANDER, ROSALIND G. BREWER, EDITH W. COOPER, JAMIE S. GORELICK, DANIEL P. HUTTENLOCHER, JUDITH A. MCGRATH, INDRA K. NOOYI, JONATHAN J. RUBINSTEIN, THOMAS O. RYDER, PATRICIA Q. STONESIFER, and WENDELL P. WEEKS, | ) ) ) ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants, | ) ) ) | |
| – and – | ) ) | |
| AMAZON.COM, INC., a Delaware Corporation, | ) ) | |
| Nominal Defendant. | ) | |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff Thomas Stabile ("Plaintiff"), by and through his undersigned attorneys, brings this stockholder derivative complaint for the benefit of nominal defendant, Amazon.com, Inc. ("Amazon" or the "Company"), against current and/or former members of its Board of Directors (the "Board") and certain of its current and/or former executive officers (the "Individual Defendants", defined herein), seeking to remedy the Individual Defendants' breaches of fiduciary duties. Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, such as filings by Amazon with the

U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and other matters of public record.

## I.      INTRODUCTION

1.      This is a stockholder derivative action brought for the benefit of nominal defendant Amazon against the Individual Defendants, all of whom are current and/or former officers and directors of Amazon, based on their non-exculpable breaches of fiduciary duty and other serious misconduct from approximately February 2019 to the present (the "Relevant Period"), as alleged in detail herein.

2.      Headquartered in Seattle, Washington, Amazon is a global technology company with multiple business lines, including its prominent e-commerce business. This derivative action arises from breaches of fiduciary duties and other violations of state law by the Individual Defendants relating to misrepresentations made to stockholders: (i) concerning the way Amazon sells third-party merchandise and Amazon's own private-label products on its e-commerce platform; (ii) pertaining to Amazon's over-expansion of the infrastructure and fulfillment network for its e-commerce business and (iii) Amazon's compliance with state biometric privacy laws.

3.      First, on the Company's Amazon.com e-commerce platform, Amazon sells both third-party merchandise and Amazon's own private-label products. As the owner and operator of the Amazon.com e-commerce platform, Amazon has access to certain non-public data of the third-party sellers that use the Amazon.com platform. On or around June 3, 2019, the U.S. House Committee on the Judiciary (the "House Judiciary Committee") initiated a bipartisan investigation into the state of competition online. The investigation, led by the Subcommittee on Antitrust, Commercial and Administrative Law (the "Subcommittee"), examined the business practices and

market dominance of Facebook, Google, Apple, and, of particular relevance, Amazon (the "Subcommittee Investigation").

4.      During the course of the Subcommittee Investigation, the Subcommittee held several oversight hearings in which various officers of the above referenced companies, including their respective Chief Executive Officers ("CEOs"), offered witness testimony on topics such as the effect of market power on the press, innovation, and privacy, and the market dominance of the firms under investigation. *See* Online Platforms and Market Power hearings before the Subcommittee ("Subcommittee Hearings").

5.      After each of the hearings, members of the Subcommittee submitted questions for the record to the witnesses. The Subcommittee concluded in a written report, inter alia, that Amazon had grown to be such a dominant force in the online retail market that it had monopoly power over third-party sellers on its Marketplace. Lawmakers also concluded that Amazon's dual role selling products on its own website and running a Marketplace for third-party sellers "creates an inherent conflict of interest" that encourages Amazon to exploit its access to competing sellers' data and information. It noted that Amazon publicly describes these sellers as "partners," but "behind closed doors, the company refers to them as 'internal competitors.'"

6.      The Individual Defendants withheld from stockholders that: (i) Amazon engaged in anticompetitive conduct in its private-label business practices, including giving Amazon products preference over those of its competitors and using third-party sellers' non-public data to compete with them; (ii) the foregoing conduct exposed Amazon to a heightened risk of regulatory scrutiny and/or enforcement actions; and (iii) Amazon's revenues derived from its private-label business were in part the product of impermissible conduct and thus unsustainable.

7.      As the truth regarding Amazon's business practices with third parties came to light,

the Company's share price declined precipitously. On April 28, 2020, *CNBC* published an article reporting that Senator Josh Hawley had asked the U.S. Department of Justice ("DOJ") to open a criminal antitrust investigation into the Company regarding "predatory and exclusionary data practices to build a monopoly" in connection with reports that Amazon used third-party seller data to develop products for its private label business. On this news, Amazon's stock price fell $61.92 per share, or 2.61%, to close at $2,314.08 per share on April 28, 2020.

8.     A few days later, on May 1, 2020, the first headline for a Bloomberg article titled "Amazon's Bezos Faces Call to Testify Before House Panel," went live at 10:34 a.m. That article reported that the members of an antitrust panel for the House Judiciary Committee had requested that defendant Bezos testify regarding concerns that Amazon used data from third-party sellers on its website to develop competing products, in contradiction to representations the Company previously made under oath to Congress in July 2019. On this news, Amazon's stock price fell from $2,323.00 per share to close at $2,286.04, a decline of $36.96 per share or 1.59%.

9.     On July 23, 2020, *The Wall Street Journal* published an article titled "Amazon Met With Startups About Investing, Then Launched Competing Products," which reported, in relevant part, that Amazon had engaged in the practice of making initial investments or meetings with start-ups for the purpose of securing their proprietary information before launching Amazon's own competing products. On this news, Amazon's stock price fell $113.36 per share, or 3.66%, to close at $2,986.55 per share on July 23, 2020.

10.     On August 3, 2020, *Bloomberg* published an article titled "Amazon's Market Power to Be Investigated by New York AG." That article reported that the New York and California Attorneys Generals were joining an antitrust probe into Amazon being conducted by the Federal Trade Commission ("FTC"). That same day, *Business Insider* similarly reported that "Amazon is

4

reportedly facing a new antitrust investigation into its online Marketplace led by the FTC and attorneys general in New York and California." *Business Insider* further stated that the joint probe related to Amazon's treatment of third-party sellers and competition with its own products. On this news, Amazon's stock price fell $52.79 per share, or 1.67%, to close at $3,111.89 per share on August 3, 2020.

11.     On October 6, 2020, following the publication of news reports discussing the above-referenced Subcommittee report, Amazon's stock price fell $99.24 per share, or 3.1%, to close at $3,099.96 per share on October 6, 2020.

12.     Then, *The Wall Street Journal* published an article on April 6, 2022, entitled "SEC Is Investigating How Amazon Disclosed Business Practices." The article reported, inter alia, that the SEC's probe has been underway for more than a year and focuses on Amazon's disclosures regarding its use of third-party seller data for its own private-label business. On this news, Amazon's stock price fell $105.98 per share, or 3.2%, to close at $3,175.12 per share on April 6, 2022.

13.     Prior to the onset of the pandemic in early 2020, a key priority for Amazon was providing customers with faster delivery times, including same-day delivery. To meet that goal, Amazon invested significant capital to aggressively expand its infrastructure and fulfillment networks. Fast delivery is, and has long been, fundamental to Amazon's retail model. As Amazon explains, it is a company focused on "delivering as many items as fast as possible." Amazon's value proposition to both its customers—and to its stockholders—is significantly premised on its ability to offer a cost-effective alternative to both brick-and-mortar stores and alternative online retailers. That value is inherently linked to fast delivery.

14.     In addition, although Amazon reported substantial profits leading up to and

throughout much of 2019 through the present, the Company since its founding has invested in building market share and capacity—even when doing so caused losses. By 2019, after years of massive profitability, stockholders expected continued success and growth. Those expectations were reinforced by the Company's public statements, including assurances that the short-term costs of growing fulfillment capacity were justified by Amazon's overall business strategy, and that investment in fulfillment infrastructure would fuel fast shipping, crowding out competitors, taking market share and delivering future profit. Yet by July 2021, the Individual Defendants and others at Amazon knew the opposite: Amazon's fulfillment and high-speed delivery capacity had already grown far beyond what could be justified based on that strategy and had become a drag on profitability. The infrastructure expansion needed to be scaled back, imposing a massive financial hit to the Company and reflecting a reversal of prior public statements made during the Relevant Period regarding fulfillment expansion.

15.     Throughout the Relevant Period, the Individual Defendants repeatedly and consistently told stockholders that the Company's investments in expanding infrastructure and fulfillment network capacity were sound and appropriate decisions for the long term. For example, after the market closed on July 29, 2021, defendant Olsavsky, Amazon's Chief Financial Officer, represented to stockholders that "a significant amount of investment in our fulfillment network," "at a rapid rate," was needed to meet "strong multiyear demand." Olsavsky assured stockholders that "we have a lot of growth to do here," which is why the Company was "moving as quickly as possible" to grow. On February 3, 2022, defendant Olsavsky represented that "we continue to see an increase in customer demand and sales during the remainder of 2021" and "[w]e've invested significantly to keep pace with this demand, including nearly doubling our operations capacity in the past two years, expanding our fulfillment center footprint." These and similar statements made

during the Relevant Period were false. In reality, the Individual Defendants knew or recklessly disregarded that the Company's infrastructure and fulfillment network investments had already substantially outpaced Amazon's business needs, and that those investments were a massive, self-imposed, undue drain on Amazon's financial condition. Indeed, contrary to the Individual Defendants' public statements during the Relevant Period and as later confirmed by *The Wall Street Journal*, by July 2021, the Individual Defendants had implemented cutbacks to Amazon's fulfillment capacity without disclosing that critical information to stockholders.

16.    The truth emerged on April 28, 2022, when Amazon reported a $3.8 billion net quarterly loss—its first reported net quarterly loss since 2015. After months of falsely representing that Amazon's expansion of its e-commerce fulfillment network and infrastructure was necessary and appropriate, the Individual Defendants disclosed that Amazon was "no longer chasing physical or staffing capacity." The Individual Defendants disclosed $6 billion of "incremental costs" to Amazon, including $2 billion due to "overcapacity" in the Company's "fulfillment and transportation network." The Individual Defendants further disclosed that they "expect[ed] the expected effects of these . . . to persist for the next several quarters as we grow into this capacity." On this news, the price of Amazon stock fell $406.30 per share, or more than 14%, from a close of $2,891.93 per share on April 28, 2022, to close at $2,485.63 per share on April 29, 2022.

17.    While the Individual Defendants were implementing the incredibly successful anti-competitive scheme discussed above, they were also allowing and/or causing Amazon to regularly, consistently and routinely violation state information privacy laws, one of which was the Illinois Biometric Information Privacy Act, 740 ILCS 14/1 *et seq*. ("BIPA"). These violations of state biometric privacy laws would eventually lead to hundreds of lawsuits/arbitrations and millions of dollars in damages to Amazon.

## II.       JURISDICTION AND VENUE

18.    This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332. Plaintiff and the Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

19.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

20.    This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the district courts permissible under traditional notions of fair play and substantial justice.

21.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because: (a) one or more of the defendants either resides in or maintains offices in this District; and (b) a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## III.       PARTIES

**Plaintiff**

22.    Plaintiff Thomas Stabile is the owner of shares of Amazon common stock and has owned such shares continuously since at least May of 2016. Plaintiff is a citizen of Florida.

**The Individual Defendants**

23.    Defendant Jeffrey P. Bezos ("Bezos") founded Amazon in 1994 and has served as Executive Chair since July 2021. He has served as Chair of the Board since 1994 and previously served as Chief Executive Officer ("CEO") from May 1996 until July 2021, and as President from 1994 until June 1999 and again from October 2000 to July 2021. Upon information and belief, defendant Bezos is a citizen of Washington.

24.     Defendant Andrew R. Jassy ("Jassy") is the current President, CEO, and a director of Amazon. He has held these positions since July 5, 2021. Since joining Amazon in 1997, Jassy has held numerous leadership roles across the Company. He previously served as Senior Vice President of Amazon Web Services ("AWS") from its inception in April 2006 until April 2016, when he became the CEO of AWS. He was the CEO of AWS until July 2021 when he succeeded Bezos as the President and CEO of Amazon. Upon information and belief, defendant Jassy is a citizen of Washington.

25.     Defendant Brian T. Olsavsky ("Olsavsky") has served as Senior Vice President and Chief Financial Officer ("CFO") of Amazon since June 2015. He served as Vice President, Finance for the Global Consumer Business from December 2011 to June 2015 and has held numerous financial leadership roles across Amazon with global responsibility since April 2002. Upon information and belief, defendant Olsavsky is a citizen of Washington.

26.     Defendant David A. Zapolsky ("Zapolsky") has served as Senior Vice President, General Counsel, and Secretary since May 2014. From September 2012 to May 2014, he held the title of Vice President, General Counsel, and Secretary and, between April 2002 and September 2012, he was the Vice President and Associate General Counsel for Litigation and Regulatory matters. Upon information and belief, defendant Zapolsky is a citizen of Washington.

27.     Defendant Dave Fildes ("Fildes") served as Amazon's Director of Investor Relations during the Relevant Period. Upon information and belief, defendant Fildes is a citizen of Washington.

28.     Defendant Shelley L. Reynolds ("Reynolds") served as Amazon's Vice President, Worldwide Controller and Principal Accounting Officer during the Relevant Period. Upon information and belief, defendant Reynolds is a citizen of Washington.

29.     Defendant Nate Sutton ("Sutton") served as Amazon's Associate General Counsel during the Relevant Period. Upon information and belief, defendant Sutton is a citizen of Washington.

30.     Defendant Keith B. Alexander ("Alexander") has served on Amazon's Board since September 2020. Alexander is a member of the Audit Committee. Upon information and belief, defendant Alexander is a citizen of Michigan.

31.     Defendant Rosalind G. Brewer ("Brewer") served on Amazon's Board between February 2019 and February 16, 2021. Upon information and belief, defendant Brewer is a citizen of Washington.

32.     Defendant Edith W. Cooper ("Cooper") has served on Amazon's Board since September 2021. Cooper is a member of the Leadership Development and Compensation Committees. Upon information and belief, defendant Cooper is a citizen of Connecticut.

33.     Defendant Jamie S. Gorelick ("Gorelick") has served on Amazon's Board since February 2012. Gorelick is the chair of the Nominating and Corporate Governance Committee. Upon information and belief, defendant Gorelick is a citizen of Maryland.

34.     Defendant Daniel P. Huttenlocher ("Huttenlocher") has served on Amazon's Board since September 2016. Huttenlocher is a member of the Leadership Development and Compensation Committees. Upon information and belief, defendant Huttenlocher is a citizen of New York.

35.     Defendant Judith A. McGrath ("McGrath") has served on Amazon's Board since July 2014. McGrath is chair of the Leadership Development and Compensation Committee. Upon information and belief, defendant McGrath is a citizen of California.

36.     Defendant Indra K. Nooyi ("Nooyi") has served on Amazon's Board since

February 2019. Nooyi is the chair of the Audit Committee. Upon information and belief, defendant Nooyi is a citizen of Connecticut.

37.     Defendant Jonathan J. Rubinstein ("Rubinstein") has served on Amazon's Board since December 2019. Rubenstein is a member of the Nominating and Corporate Governance Committee. Upon information and belief, defendant Rubinstein is a citizen of California.

38.     Defendant Thomas O. Ryder ("Ryder") served on Amazon's Board between 2002 and December 2021. Upon information and belief, defendant Ryder is a citizen of Washington.

39.     Defendant Patricia Q. Stonesifer ("Stonesifer") has served on Amazon's Board since February 1997. Stonesifer is a member of the Nominating and Governance Committee. Upon information and belief, defendant Stonesifer is a citizen of Washington, D.C.

40.     Defendant Wendell P. Weeks ("Weeks") has served on Amazon's Board since February 2016. Weeks is a member of the Audit Committee. Upon information and belief, defendant Weeks is a citizen of New York.

41.     Defendants Bezos, Jassy, Olsavsky, Zapolsky, Fildes, Reynolds, Sutton, Alexander, Brewer, Cooper, Gorelick, Huttenlocher, McGrath, Nooyi, Rubinstein, Ryder, Stonesifer and Weeks are referred to herein as the "Individual Defendants".

**<u>Nominal Defendant</u>**

42.     Nominal Defendant Amazon is a multinational technology company with multiple business lines, including e-commerce services and distribution, website development and hosting, inventory and supply chain management, and fulfillment and logistics. Amazon is a Delaware corporation with its principal corporate offices in Seattle, Washington. The Company's common stock trades on the Nasdaq Global Select Markets ("NASDAQ") under the ticker symbol "AMZN." As of April 20, 2022, Amazon had approximately 508.72 million shares of common

stock outstanding, owned by at least hundreds or thousands of stockholders.

### IV.      THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

43.      By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interests or benefit.  Each director and officer owed to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

44.      The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

45.      At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

46.      To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

a.    manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

b.    neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

c.    establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d.    neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e.    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f.    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g.    ensure that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

h.    remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

47.    Each Individual Defendant, by virtue of his or her position as a director and/or

officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants.

V.     FACTS

A.     Amazon's Background and its Business

48.     Founded by Jeff Bezos in 1994, Amazon is now one of the largest companies in the world. Its history is a story of relentless growth, acquisition, expansion into new business lines, and driving competitors out of markets through aggressive price-cutting. As described in author Brad Stone's book, The Everything Store: Jeff Bezos and the Age of Amazon, detailing Amazon's growth and developments, Bezos used the Internet's infinite space to create "the merchandiser's dream of the everything store—a store with infinite selection." A drive for efficiency and scale has allowed the Company to drive down prices and offer discounts and free shipping to customers, further driving growth. Over time, the Company has grown to rival Internet giants like Alphabet and Apple.

49.     The Company began as an online bookstore in Seattle, with Bezos and his employees working out of his garage. Amazon went public in 1997 at $18 a share, with a valuation of $300 million. During the dot-com boom of the late 1990s, Amazon expanded into selling CDs, DVDs, electronics, and toys. After mastering what Stone's book called "the physics of its own

complex distribution network," the Company further expanded into clothing, jewelry, sporting goods, automotive parts, and endless other categories of goods, becoming the country's largest online retailer.

50.     In 1999, Amazon patented the ability to purchase an item online with a single click of the mouse, encouraging customers to buy more with even greater convenience. Also in 1999, Amazon launched its third party-seller marketplace, now known as the Marketplace, where third parties can sell new or used goods through Amazon. The Marketplace is at issue in this action.

51.     In 2003, Amazon launched Amazon Web Services, licensing its platform to other e-commerce sites and positioning the Company as a business-to-business technology company. This cloud hosting business is currently one of the Company's biggest revenue drivers.

52.     In 2005, the Company launched Amazon Prime, a subscription-based loyalty program that (at launch) included free two-day shipping on any order. Amazon has since offered deliveries through Prime that includes delivery speeds as fast as same day.  With more than 100 million members worldwide, Prime is considered one of Amazon's most valuable assets.

53.     Amazon has both introduced many of its own products, including the Kindle e-reader and smart-speaker Echo devices using the Company's Alexa virtual personal assistant, and has also made multiple acquisitions over the last 15 years to expand the breadth and depth of its business offerings, including buying the grocery chain Whole Foods Market.

54.     Amazon reached a $1 trillion market cap in September 2018, driven in large part by investor enthusiasm for growing profits tied to its ever-expanding retail and delivery footprint. In 2019, the Company had nearly 700,000 employees, 288 million square feet of real estate, and accounted for nearly half of online retail in the United States. Currently, Amazon has a market cap of $1.3 trillion, reported 2021 revenue of $386 billion and profits of $21 billion, and 1.6 million

employees.

55.     Amazon operates an enormous range of businesses, including cloud services, e-commerce and distribution, fulfillment and logistics, entertainment, television and film production, and groceries. Through its Amazon.com e-commerce and fulfillment platforms, the Company offers products to retail consumers from 1.7 million businesses. Its membership program, Amazon Prime, offers free delivery and access to Prime Video, Amazon Music, Amazon Photos, Prime Wardrobe, Prime Reading, and grocery delivery. Amazon sells groceries and prepared foods through its ownership of Whole Foods Market and its Amazon Go stores and Amazon Fresh online grocery platform.

56.     Amazon's vast array of consumer offerings is founded on its delivery and logistics systems, which includes its network of warehouses; Amazon Air, a fleet of aircraft; a fleet of vans for "last mile" delivery; Prime Air, a network of drones; and Amazon Scout, a fully electronic unmanned delivery vehicle system.

57.     Amazon introduced its Marketplace platform in 2000, offering a centralized website through which third- party sellers could sell their goods, which it called "Fulfilled by Amazon" ("FBA"). Third-party sellers increasingly availed themselves of Amazon's centralized FBA Marketplace as Amazon became a ubiquitous online seller of goods, replacing individual websites across the Internet.

58.     Amazon's third-party sellers sell their products on the Amazon Marketplace and pay fees to Amazon. On the Amazon Marketplace, consumers can buy items directly from the Company or they can purchase from independent third-party sellers offering their own products for sale. However, in exchange for giving the parties access to its platform to sell their products, Amazon gathered sales data from those third parties and used it to introduce its own competing

products.

59.     Former Amazon employees have confirmed that Amazon used sales data gleaned from the Company's Marketplace as a sales platform to obtain an anticompetitive and unfair advantage in competing with other sellers on the platform. As reported in *The Capitol Forum* on November 5, 2018, an Amazon employee speaking on the condition of anonymity revealed, "[e]verybody [at Amazon] has access to all the seller data," including "who purchased what, what products were selling." This Amazon employee further explained that Amazon employees can "data mine all the best-selling products and go make a private label."

60.     As noted elsewhere herein, an April 23, 2020 *Wall Street Journal* report confirmed that Amazon, through its executives, intentionally violated corporate policies that had were meant to create a wall between the Company's private-label business and its Marketplace business. Based on interviews with former Company employees, *The Wall Street Journal* reported that the use of data obtained through Amazon's Marketplace was common practice and discussed openly in meetings the employees attended. Moreover, executives had access to data containing proprietary information that they used to research best-selling items Amazon was interested in competing with. The reporting by *The Wall Street Journal*—and other media outlets—laid bare Amazon's systemic improper and anticompetitive practices, including its treatment of third-party sellers. It was thus hardly surprising when Congress opted to investigate, among other issues, how Amazon was utilizing competitively sensitive information about competitors' products to boost its own retail activities, at the expense of the third-party sellers on its Marketplace.

61.     In June 2019, the House Judiciary Committee initiated a bipartisan investigation into the state of competition online, spearheaded by the Subcommittee. As part of a top-to-bottom review of the market, the Subcommittee examined the market dominance of Amazon, Apple,

Facebook, and Google (and their business practices) to determine how their power affects the U.S. economy and democracy in general. Over the course of its investigation, the Subcommittee held seven congressional hearings; reviewed nearly 1.3 million internal documents and communications from the investigated companies; analyzed submissions from 38 antitrust experts; and conducted interviews with more than 240 market participants, former employees of the investigated firms, and other individuals. Only a small amount of the internal Amazon documents reviewed by the Subcommittee are publicly available.[1]

62.   A year after initiating the investigation, the Subcommittee received testimony from defendant Bezos. The Subcommittee pressed for answers about Amazon's business practices and the extent to which Amazon has exploited, entrenched, and expanded its power over digital markets in anticompetitive and abusive ways. According to the Subcommittee, Bezos's answers were often evasive and non-responsive.

63.   On October 2, 2020, the Subcommittee released an initial report finding that Amazon exploited third-party sellers on its platform.[2] The Subcommittee published its final report in July 2022.[3] The Subcommittee's investigation uncovered substantial evidence that Amazon: (i) routinely exploited the third-party sellers on its platform; (ii) routinely misappropriated third-party seller data in order to manufacture and market its own private-label products; (iii) engaged in self-preferencing whereby it directed customers to its own products as opposed to third party sellers; and (iv) tied and bundled its products by forcing third-party sellers to pay for fulfillment and logistics services in order to have a chance to compete on the platform and get preferential

---

[1] https://judiciary.house.gov/online-platforms-and-market-power/amazon-documents.htm.
[2] The House Committee on the Judiciary, Investigation of Competition in Digital Markets https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf?utm_campaign=4493-519 (Oct. 2, 2020).
[3] https://www.govinfo.gov/content/pkg/CPRT-117HPRT47832/pdf/CPRT-117HPRT47832.pdf.

treatment in search rankings and the "Buy Box." The Buy Box is displayed prominently on Amazon and allows customers to add items from a specific retailer directly into their shopping carts. Winning the Buy Box is key for Marketplace sellers as the vast majority of transactions are conducted through the Buy Box.

64.     Amazon downplayed the Subcommittee's findings, stating that:

> All large organizations attract the attention of regulators, and we welcome that scrutiny. But large companies are not dominant by definition, and the presumption that success can only be the result of anti-competitive behavior is simply wrong. And yet, despite overwhelming evidence to the contrary, those fallacies are at the core of this regulatory spit-balling on antitrust. This flawed thinking would have the primary effect of forcing millions of independent retailers out of online stores, thereby depriving these small businesses of one of the fastest and most profitable ways available to reach customers. For consumers, the result would be less choice and higher prices. Far from enhancing competition, these uninformed notions would instead reduce it.[4]

65.     Throughout the Relevant Period, the Individual Defendants denied any wrongdoing, telling stockholders, for example, that: "We helped independent sellers compete against our first-party business by investing in and offering them the very best selling tools we could imagine and build"; "[Amazon] do[es] not use any of that specific seller data in creating our own private brand products."; "We do not favor . . . products that use FBA over others"; and "[o]ur algorithms, such as the buy box, is [sic] aimed to predict what customers want to buy . . . [a]nd we apply the same criteria whether you're a third-party seller or Amazon to that because we want customers to make the right purchase regardless of whether it's a seller or Amazon."

66.     The Subcommittee found that one of the ways in which Amazon treats third-party

---

[4] Annie Palmer, Jordan Novet, *Amazon Bullies Partners and Vendors, Says Antitrust Committee*, CNBC (Oct. 6, 2020). https://www.cnbc.com/2020/10/06/amazon-bullies-partners-and-vendors-says-antitrust-subcommittee.html.

sellers unfairly centers on Amazon's asymmetric access to and use of third-party seller data.7 During its investigation, the Subcommittee uncovered significant evidence that Amazon leverages its access to third-party sellers' data to identify and replicate popular and profitable products from among the hundreds of millions of listings on its Marketplace.8 Armed with the third-party competitors' data, Amazon: (1) copies the product to create a competing private-label product;9 or (2) identifies and sources the product directly from the manufacturer to free ride off the seller's efforts, and then cuts that seller out of the equation.[5] As the Institute for Local Self-Reliance's Stacy Mitchell told the Subcommittee, "Amazon's power as a gatekeeper allows it to maintain a God-like view of the transactions of rival businesses and customers, and use this data to move into new markets with a built-in advantage."

67.     The Company claims that third-party listings far outnumber Amazon's first-party listings.11 In a 2018 shareholder letter, defendant Bezos wrote, "Third-party sellers are kicking our first-party butt. Badly."12 In response to a question from the Subcommittee, however, Amazon admitted that by percentage of sales—a more telling measure than listings—Amazon's first-party sales are significant and growing in a number of categories. For example, in books, Amazon owns 74 percent of sales, whereas third-party sellers account for only 26 percent of sales.13 At the category level, it does not appear that third-party sellers are "kicking" Amazon's first party "butt."

68.     Amazon claimed in response that it has taken and continues to take steps "to protect seller data by instituting its voluntarily-adopted Seller Data Protection Policy, which prohibits Amazon Retail teams from using non-public seller- specific data to compete against third-party

_____

[5] *See, e.g.*, Submission from Nat'l Ass'n of Wholesaler-Distributors, to H. Comm. on the Judiciary (July 22, 2020) (on file with Comm.).

sellers."[6] However, an internal Amazon document from 2014, titled "Frequently Asked Questions," indicates that Amazon was aware that the Seller Data Protection Policy had significant loopholes. For example, the document indicates that even seller-specific data can be used for "strategic business decision at the category level or above."[7]

69.    Following up on public reporting and information collected during the investigation evidencing that Amazon was abusing its access to third-party sellers' data, Representative Pramila Jayapal (D–WA) asked defendant Sutton about this precise issue at a Subcommittee hearing in July 2019. Defendant Sutton testified unequivocally that "We do not use [third-party sellers'] individual data when we're making decisions to launch private brands."[8]

70.    *The Wall Street Journal* reported on April 23, 2020, that executives in Amazon's private-label division "had access to data containing proprietary information that they used to research bestselling items they might want to compete against, including on individual sellers on Amazon's website."[9] According to the sources, "[i]f access was restricted, managers sometimes would ask an Amazon business analyst to create reports featuring the information . . . including one who called the practice 'going over the fence.'" In other cases, "supposedly aggregated data was derived exclusively or almost entirely from one seller." Thus, while Amazon claimed that it did not use individual third-party seller data, it could still gain critical information from a third-

---

[6] Submission from Amazon, to H. Comm. on the Judiciary, AMAZON–HJC–00142724 (on file with Comm.); CEO Hearing at 281 (response to Questions for the Record of Jeff Bezos, CEO, Amazon. com, Inc.).

[7] Submission from Amazon, to H. Comm. on the Judiciary, AMAZON–HJC–00221869 (June 30, 2014) (on file with Comm.).

[8] Innovation and Entrepreneurship Hearing at 42 (statement of Nate Sutton, Assoc. Gen. Couns., Competition, Amazon.com, Inc.).

[9] Dana Mattioli, Amazon Scooped Up Data from Its Own Sellers to Launch Competing Products, WALL ST. J. (Apr. 23, 2020). https://www.wsj.com/articles/amazon-scooped-up-datafrom-its-own-sellers-to-launch-competing-products-11587650015.

party seller by combining its data with another much smaller seller and gleaning all the information it needed from this supposedly "aggregated" data. *The Wall Street Journal* staff conducted interviews with more than 20 former employees and at least one current employee of Amazon's private-label business and also reviewed Amazon documents for the report. The employees relayed that Amazon's use of individual third-party seller's data was a "common practice that was discussed openly in meetings they attended." According to the sources, pulling data on competitors, including individual sellers, for example, was "standard operating procedure" when making products such as electronics, suitcases, sporting goods, or other lines. "We knew we shouldn't," said one former employee who accessed the data and described a pattern of using it to launch and benefit Amazon products. "But at the same time, we are making Amazon branded products, and we want them to sell."

71.     Amazon claimed that it was using only "aggregated" data—data compiled from a multitude of third-party sellers, but even this later representation was misleading. In many instances, the "aggregated" data actually derived exclusively or almost entirely from one seller. In one case, for example, Amazon employees reportedly used non-public sales data about a third-party seller of car-trunk organizers named "Fortem" to develop an Amazon private-label version of the very same product. Fortem accounted for 99.95% of total sales in the car-trunk organizer product category.  But because Fortem did not account for 100% of total sales, Amazon employees were allowed to misappropriate Fortem's confidential information.  In other instances, if there was only one seller of an item, and Amazon was selling returned or damaged versions of that item through its Amazon Warehouse Deals clearance account, Amazon considered that "aggregate" data—and hence permissible for its employees to use.

72.     In a written statement issued in response to *The Wall Street Journal* article, Amazon

said only that "we strictly prohibit our employees from using nonpublic, seller-specific data to determine which private label products to launch."

73. In light of the April 2020 *Wall Street Journal* report, the Subcommittee requested that Bezos testify to address the possibility that defendant Sutton had misled Congress.[10] Despite numerous references to them in Amazon's internal documents, Bezos claimed to be unaware of these practices. According to Bezos, "Amazon first learned about the alleged violations of Amazon's voluntarily adopted Seller Data Protection Policy recently reported in *The Wall Street Journal* from *The Wall Street Journal*."[11]

74. Representative Ken Buck (R–CO) similarly raised this issue with defendant Bezos, stating, "I'm concerned that you've used Amazon's dominant market position to unfairly harm competition. We've heard from a number of companies that Amazon uses proprietary data from third-party companies to launch its own private-label products." Later in the hearing, Representative Kelly Armstrong (R–ND) described this as an "important issue," and asked whether "Amazon is conducting an internal investigation into the use of third-party data," to which defendant Bezos answered in the affirmative.

75. In October 2020, approximately six months after Amazon said that it had initiated

---

[10] Letter from Hon. Jerrold Nadler, Chair, H. Comm. on the Judiciary, Hon. David N. Cicilline, Chair, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, Hon. Joe Neguse, Vice Chair, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, Hon. Pramila Jayapal, Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. On the Judiciary, Hon. Ken Buck, Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. On the Judiciary & Hon. Matt Gaetz, Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, to Jeff Bezos, CEO, Amazon.com, Inc. (May 1, 2020) (on file with Comm.).
[11] CEO Hearing at 280 (response to Questions for the Record of Jeff Bezos, CEO, Amazon. com, Inc.).

the investigation, the Company informed the Committee of its completion.[12] According to Amazon's Vice President of Public Policy, Brian Huseman, "Amazon's records of past data queries related to the two products cited in *The Wall Street Journal* report show that a single former employee pulled and analyzed only aggregate data for both products in compliance with the Seller Data Protection Policy." But that claim is at odds with the evidence uncovered by the Subcommittee. For example, in a submission to the Subcommittee, a former employee said:

> In 2010, I started working on the Amazon marketplace team . . . . It was widely known that many (10+) of my peers were running very successful [third-party] accounts, where they were pulling private data on Amazon seller activity, so they could figure out market opportunity, etc. Totally not legitimate, but no one monitored or seemed to care.[13]

76.     Referring to accessibility of third-party seller data, the same individual told the Subcommittee, "It's a candy shop, everyone can have access to anything they want," and added, "There's a rule, but there's nobody enforcing or spot-checking. They just say, don't help yourself to the data . . . it was 'wink, wink don't access.'"

77.     As reported in its final July 2022 report, the Subcommittee also interviewed another third-party seller who described how Amazon uses a request for proof of authenticity to collect proprietary information about a seller's business. According to the seller, Amazon will submit a

---

[12] Letter from Brian Huseman, Vice President, Pub. Pol'y, Amazon.com, Inc., to Hon. Jerrold Nadler, Chair, H. Comm. on the Judiciary, Hon. David N. Cicilline, Chair, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary & Hon. Jim Jordan, Ranking Member, H. Comm. on the Judiciary (Oct. 4, 2020) (on file with Comm.).

[13] *See* Submission from Nat'l Ass'n of Wholesaler-Distributors, to H. Comm. on the Judiciary (July 22, 2020) (on file with Comm.) (describing a member's experience in which Amazon allowed a distributor to sell a product for about a year, "then went out and replicated the product and began selling their own branded product, terminating the distributor Amazon became the winner and the distributor was left empty handed.").

product authenticity claim to sellers, forcing the retailer to submit their original sales receipts as proof that the items are authentic. Although a seller is supposed to be able to black out price information, sometimes the platform will reject a submission on the basis that it is an "altered document." With insight into the seller's costs and supplier, combined with its knowledge of the seller's retail price among a virtually unfathomable amount of other data, Amazon Retail can easily replicate the seller's listing to offer a competing product.

78.     One former third-party seller and retired U.S. Marine told the Subcommittee about several instances—over seventeen years—when Amazon had leveraged his work, undercut him on price, and eventually drove him out of business. In each instance, he had to change his business model after Amazon took over the Buy Box for his listings, "killing" his sales.[14] On at least two different occasions, his company did all the legwork to create a new, top-selling product or product line, as well as creating the product listings, only to have Amazon copy the idea and offer a competing product. Amazon used different tactics each time, but the result was always the same: Amazon profited from his work and made it impossible for him to fairly compete.

79.     As part of his last attempt to sell on Amazon, his business created its own line of table game products with a unique design and color palette. Once these products became top sellers, Amazon again swooped in to reap the rewards of his work. Amazon copied his designs, down to the color palette, and started selling their competing products at unsustainable prices. Ultimately, he exited his seller business, gave up on trying to bring new products to consumers, and founded a consulting agency for Amazon sellers.

---

[14] The Subcommittee explains how the Buy Box works: "When a shopper lands on a product detail page, Amazon chooses one seller whose details appear in the Buy Box—the white box on the right-hand side of the page. When a customer clicks on the 'Add to Cart' button, the sale goes to the seller in this box." https://www.govinfo.gov/content/pkg/CPRT-17HPRT47832.pdf at 209.

80.    In addition to its private-label business, Amazon also uses third-party seller data to benefit its Amazon Retail business, where the Company functions more like a retailer. At the Subcommittee's July 29, 2020 hearing, Chair David N. Cicilline (D–RI) asked defendant Bezos about this conduct, recounting the story that a former third-party seller shared with the Subcommittee:

> During this investigation, we have heard so many heartbreaking stories of small businesses who sunk significant time and resources into building a business and selling on Amazon, only to have Amazon poach their best-selling items and drive them out of business.
>
> So, I want to talk to you about one company that really stood out from the rest. I want you to pay close attention to how they described your partnership, Mr. Bezos. We heard from a small apparel company that makes and sells what they call "useful apparel" for people who work on their feet and with their hands, like construction workers and firefighters.
>
> This particular business discovered and started selling a unique item that had never been a top seller for the brand. They were making about $60,000 a year on just this one item. One day, they woke up and found that Amazon had started listing the exact same product, causing their sales to go to zero overnight. Amazon had undercut their price, setting it below what the manufacturer would generally allow it to be sold so that, even if they wanted to, they couldn't match the price.[15]

81.    In addition to collecting data relating to sales, Amazon can also reverse engineer third-party sellers' cost structures through the tools that it offers sellers to track profits, costs, ad spend, and other expenses, as well as fulfillment services through FBA. An internal Amazon document made public recently by the Subcommittee shows that Amazon can use its FBA service

---

[15] CEO Hearing at 116 (question of Rep. David N. Cicilline (D–RI), Chair, Subcomm. On Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary), https://www.govinfo.gov/content/pkg/CHRG 116hhrg41317/html/CHRG-116hhrg41317.htm (July 29, 2020).

as an avenue to identify popular third-party seller items and gather competitively sensitive information about them.[16] Defendant Olsavsky was copied on this correspondence. Thus, FBA provides another avenue for Amazon to access competing sellers' third-party data.

82.    The Subcommittee is not the only governmental body that investigated Amazon and found evidence of theft and other misconduct by Amazon vis-à-vis its third-party sellers. The European Commission ("EU" or the "Commission") also began scrutinizing Amazon about its treatment of third-party sellers as far back as September 2018.

83.    On July 17, 2019, the EU issued a press release announcing that it had opened a formal antitrust investigation to assess whether Amazon had breached the Commission's competition rules by using non-public data from independent retailers who sell on its Marketplace. The Commission announced that, "[a]s part of its in-depth investigation," it would look into:

- the standard agreements between Amazon and marketplace sellers, which allow Amazon's retail business to analyze and use third party seller data. In particular, the Commission will focus on whether and how the use of accumulated marketplace seller data by Amazon as a retailer affects competition; and

- the role of data in the selection of the winners of the 'Buy Box' and the impact of Amazon's potential use of competitively sensitive marketplace seller information on that selection. The 'Buy Box' is displayed prominently on Amazon and allows customers to add items from a specific retailer directly into their shopping carts. Winning the 'Buy Box' seems key for marketplace sellers as a vast majority of transactions are done through it.

84.    As part of their investigation, EU regulators obtained a massive data set from

---

[16] *See, e.g., id.* at AMAZON–HJC–00207035 to –00207036 (Sept. 19, 2013) (on file with Comm.) ("On the top selling Owl necklace . . . we should go deep and see what we can learn including how much it would costs [sic] to manufacture this?").

Amazon—covering over 80 million transactions and more than 100 million product listings on its European marketplaces—to analyze how its business uses merchant data.

85.     On November 10, 2020, news agencies reported that, as a result of its investigation, the Commission laid out a first set of antitrust charges against Amazon focused on its dual role as a platform for other sellers but also a retailer itself on its own platform—and its cumulative use of third-party merchant data to underpin Amazon's own retail decisions.51 Competition chief Margrethe Vestager said the Commission's preliminary conclusion was that Amazon abused its market position in France and Germany, its biggest markets in the European Union, via the Company's use of big data to "illegally distort" competition into online retail markets.

86.     Vestager explained that Amazon has, "for example, access to data on the number of ordered and shipped units of sellers' products, revenues on the marketplace, the number of visits to sellers' offers, information relating to shipping—including the past performance of the seller, the consumers' claims on the sellers' products including the activated guarantees," and said that "Amazon gets this data from every seller, every listed product, every purchase on its platform." Vestager said that "Amazon is data driven. It's a highly automated company—where business decisions are based on algorithmic tools. Our investigation shows that very granular, real-time business data relating to third party sellers' listings and transactions on the Amazon platform systematically feed into the algorithm of Amazon's retail business. It is based on these algorithms that Amazon decides what new products to launch, the price of each individual offer, the management of inventories, and the choice of the best supplier for a product."

87.     The EU also concluded that Amazon had accumulated the business data of more than 800,000 active sellers in the European Union, covering more than one billion products, thus putting individual sellers on its platform who did not have access to that information trove at a

huge disadvantage.

88.     Amazon's spokesperson vociferously disagreed with the Commission's assessment that Amazon uses data from third-party sellers on its platforms to benefit Amazon's own business, stating: "We disagree with the preliminary assertions of the European Commission and will continue to make every effort to ensure it has an accurate understanding of the facts."

89.     In response to the Commission's investigations, Amazon eventually agreed to take several remedial actions. Specifically, as CNN reported on July 14, 2022, Amazon offered that day to change its business practices in Europe in order to address concerns over its use of non-public third-party seller data.[17] Under the proposed changes, Amazon has offered not to use data gathered from third-party sellers for its own retail decisions, such as determining what products to sell under Amazon's private label.[18]

90.     A separate investigation conducted by Reuters corroborates the wrongdoing uncovered by the Subcommittee and the EU. On October 13, 2021, Reuters reported that a review it conducted of internal Amazon documents shows that the Company ran a systematic campaign of creating knockoffs and manipulating search results to boost its own product lines in India, one of the Company's largest growth markets.[19] Reuters reviewed thousands of pages of internal Amazon documents, including emails, strategy papers and business plans in preparation for its report.

91.     The documents Reuters reviewed reveal how Amazon's private-brands team in India secretly exploited internal data from Amazon.in, Amazon's India website, to copy products

---

[17] Amazon      offers concessions      to      resolve EU      antitrust      probes, https://www.cnn.com/2022/07/14/tech/amazon-concessions-eu-antitrust (July 14, 2022).
[18] *See* https://ec.europa.eu/competition/antitrust/cases1/202229/AT_40462_8414012_7971_3.pdf.
[19] See https://www.reuters.com/investigates/special-report/amazon-india-rigging.

sold by other companies, and then offered them on its platform. The employees also drummed up sales of Amazon private-brand products by rigging Amazon's search results so that the Company's products would appear, as one Amazon 2016 strategy report for India put it, "in the first 2 or three . . . search results" when customers were shopping on Amazon.in.

92.     The internal documents also show that Amazon employees studied proprietary data about other brands on Amazon.in, including detailed information about customer returns, in order to identify and target goods—described as "reference" or "benchmark" products—and "replicate" them. As part of that effort, the 2016 internal report laid out Amazon's strategy for a brand the Company originally created for the Indian market called "Solimo." The Solimo strategy, according to Amazon, was simple: "use information from Amazon.in to develop products and then leverage the Amazon.in platform to market these products to our customers." The Solimo project in India has had international impact, with numerous of Solimo-branded health and household products being offered for sale on Amazon's U.S. website, Amazon.com.

93.     The 2016 report also shows that Amazon employees working on the Company's own products, known as private brands or private labels, planned to partner with the manufacturers of the products targeted for copying, because they learned that those manufacturers employ "unique processes which impact the end quality of the product." The report, entitled "India Private Brands Program," stated that: "It is difficult to develop this expertise across products and hence, to ensure that we are able to fully match quality with our reference product, we decided to only partner with the manufacturers of our reference product." It termed such manufacturer expertise "Tribal Knowledge."

94.     Reuters reported that the internal Amazon documents it reviewed showed for the first time that manipulating search results to favor Amazon's own products, as well as copying

other sellers' goods, were part of a formal, clandestine strategy at Amazon—and that high-level executives were told about it. The documents showed that at least two Amazon executives reviewed the India strategy—Senior Vice Presidents Diego Piacentini, who has since left the Company, and Russell Grandinetti, who currently runs Amazon's international consumer business. Grandinetti also served as Senior Vice President of Kindle Content at Amazon.com, Inc., reporting directly to defendant Bezos.[20] Grandinetti also reported at least directly to Jeff Wilke, CEO of Amazon's Worldwide Consumer business, who in turn reported directly to Bezos. Grandinetti and defendant Olsavsky were also part of the elite Amazon S Team, a very small, close-knit senior leadership team of Amazon executives who worked closely with Amazon's CEO, Bezos, on all important matters affecting the Company.[21]

95.     As with other allegations of wrongdoing, Amazon flatly denied Reuters' accounts, stating in a written response to the article that "We believe these claims are factually incorrect and unsubstantiated."[22] Amazon insisted that it "strictly prohibits the use or sharing of non-public, seller-specific data for the benefit of any seller, including sellers of private brands." The Company further claimed that the way it displays search results does not favor private-brand products. "We display search results based on relevance to the customer's search query, irrespective of whether such products have private brands offered by sellers or not."

96.     An internal audit report reviewed by Politico shows that Amazon's senior leadership knew at least as early as 2015 that numerous employees had access to sensitive third-party seller data. In an article published on April 30, 2021, Politico reported that an internal

---

[20] https://www.justice.gov/sites/default/files/atr/legacy/2013/07/18/px-0835.pdf.
[21] *See*  https://www.seattletimes.com/business/amazon/whos-in-charge-at-amazon-moves-on-secretive-s-team-signal-tech-giants-priorities/.
[22] https://www.reuters.com/investigates/special-report/amazon-india-rigging/.

Amazon audit report seen by Politico squarely warned Amazon's senior leadership in 2015 that 4,700 members of its workforce working on its own sales had unauthorized access to sensitive third-party seller data on the platform.[23]

97.   According to the audit report, top management at Amazon, including Jeff Wilke, the Company's number-two executive until he left the Company in March of 2021, and defendant Zapolsky knew that insufficiently robust access restrictions meant scores of insiders could inappropriately access seller-specific data. "Permissions are not adequately restricted, making it possible for unauthorized users to view Seller-specific information such as performance history and authentication keys, edit inventory levels and pricing, and manage returns," the report stated. The audit noted that Amazon left its "spoofer access" tool, a digital tool that makes improper use of third-party data possible, wide open to unauthorized access by employees across the world—including in China—to access and modify sensitive information.

98.   The report also underscored that an earlier internal audit had identified similar failings in 2010. In other words, Amazon had done little to nothing to address the issue.

99.   An Amazon spokesperson responded to Politico's revelations in generic terms, saying that like all companies, it audits its policies for compliance and makes improvements based on its findings. "This includes Amazon's internal seller data protection policy, which limits the use of seller data."

100.   Politico noted that "Amazon has long denied reports that employees access data on individual sellers to develop competing products."

101.   Amazon is also the subject of investigations by the FTC and the SEC. On June 1, 2019, *The Washington Post* reported that the FTC planned to investigate Amazon as part of a

---

[23] https://www.politico.eu/article/amazon-seller-data-company-sales/.

broader investigation into the large technology companies.[24] This followed an earlier announcement that the FTC had established a special task force to monitor the big tech companies and to investigate "any potential anticompetitive conduct in those markets, and tak[e] enforcement actions when warranted." According to Gene Kimmelman, the president of Public Knowledge, a Washington-based consumer advocacy group: "This should be a wake-up call to both Google and Amazon to behave themselves because it at least shows that the Justice Department and FTC are thinking about them."

102.   In June 2019, Vox also reported that the FTC had started questioning some of Amazon's competitors about its business practices, including how Amazon is competing against its own sellers, according to someone briefed on the discussions.[25]

103.   Bloomberg reported that FTC investigators began interviewing Amazon's third-party sellers in September 2019 as part of a "sweeping probe" to determine whether Amazon is using its market power to hurt competition.[26] Reportedly, several attorneys and an economist have been conducting interviews that typically last about 90 minutes. According to Michael Kades ("Kades"), who spent 20 years at the FTC, the length of the interviews and the manpower devoted to examining Amazon point to a serious inquiry rather than investigators merely responding to complaints and going through the motions: "Early in an investigation, that's a sign of staff doing a serious job," Kades said. "They're spending lots of time with witnesses and trying to really

---

[24] Tony Romm, Amazon could face heightened antitrust scrutiny under a new agreement between U.S. regulators, Wash. Post (June 1, 2019).

[25] Jason Del Rey, Amazon may soon face an antitrust probe. Here are 3 questions the FTC is asking about it., Vox (June 4, 2019), https://www.vox.com/recode/2019/6/4/18651694/amazon-ftc-antitrust-investigation-prime.

[26] Spencer Soper & Ben Brody, Amazon Probed by U.S. Antitrust Officials Over Marketplace, Bloomberg (Sept. 11, 2019), https://www.bloomberg.com/news/articles/2019-09-11/amazon-antitrust-probe-ftc-investigators-interview-merchants.

understand what they're saying." According to reports, regulators are skeptical that shoppers and suppliers have real alternatives to Amazon.

104.    On April 6, 2022, *The Wall Street Journal* disclosed that the "SEC Is Investigating How Amazon Disclosed Business Practices." The article reported, in relevant part, that the SEC "is probing how the technology giant . . . handled disclosures of its employees' use of data from sellers on its e-commerce platform." The SEC requested emails and communications from several senior Amazon executives.

### 1.    Amazon Tied and Bundled Its Products to the Detriment of Third-Party Sellers

105.    There is a strong link between Amazon Marketplace and Amazon's Fulfillment by Amazon (FBA) program, Amazon's paid logistics service. A draft Q&A for defendant Olsavsky before a 2018 earnings call explained the connection between Prime and FBA: "Prime and FBA reinforce each other—they are inextricably linked. FBA adds Prime eligible selection. Prime member growth and purchasing habits attract sellers to FBA." As the Subcommittee found, Amazon used its dominance in each of these markets to strengthen and reinforce its position in the other.

106.    As Amazon's e-commerce business has grown, the Company has also developed a significant logistics business providing fulfillment and delivery services to third-party sellers through its FBA program. Nearly 85 percent of the top 10,000 Amazon Marketplace sellers reportedly rely on this program to fulfill and deliver their orders. Third-party sellers that use FBA

keep their inventory in Amazon's fulfillment centers.[27]

107.   As the Company describes it, Amazon's FBA program combines warehousing, packing, and shipping services, and most importantly, access to Prime customers.[28] A recent consumer survey indicated that 75 percent of Amazon Prime customers specifically search for products flagged as Prime-eligible.  As a result, as the Online Merchant's Guild told the Subcommittee, many sellers will "say that without Prime you are dead." For a seller's products to obtain the Prime badge, which is essential to making sales on the platform because it boosts search rankings and the ability to get the Buy Box, a seller must either qualify for Amazon's Seller Fulfilled Prime ("SFP") program or use Amazon's FBA service. On August 18, 2020, Amazon informed sellers of changes to SFP, which rendered it an entirely impractical option for most sellers (by forcing them to meet intense targets for one- and two-day delivery and have nationwide delivery coverage). Even before this change, only a very small percentage of sellers could meet the onerous eligibility requirements for SFP (there were just 200 total).[29] This means that paying for FBA is functionally the only way for sellers to get the Prime badge for their product listings.[30] Due to a lack of alternatives, third-party sellers have no choice but to purchase fulfillment services from Amazon. More than 73 percent of all Marketplace sellers worldwide reportedly rely on FBA

---

[27] The House Committee on the Judiciary, Investigation of Competition in Digital Markets, https://www.govinfo.gov/content/pkg/CPRT-117HPRT47832/pdf/CPRT-117HPRT47832.pdf (July 19, 2022).

[28] Fulfillment by Amazon, AMAZON, https://sell.amazon.com/fulfillment-by-amazon.html.

[29] *See, e.g.,* Interview with Jason Boyce, Founder & CEO, Avenue7Media, LLC (Sept. 15, 2020) ("It used to be possible, but hard, to be a Seller Fulfilled Prime seller. There were only 200 sellers that were able to meet the requirements. What's changing recently is that they used to allow you to have the Prime badge in certain regions, but now they say you need the Prime badge nationally, i.e., you need to have multiple warehouses across the country plus ship on Saturdays, etc.").

[30] Regan McPhee, How to Sell on Amazon Prime in 2020, JUNGLESCOUT (May 27, 2020), https://www.junglescout.com/blog/how-to-sell-on-amazon-prime/.

services.[31] Numerous third-party sellers told the Subcommittee that they felt they have no choice but to pay for FBA to maintain a favorable search result position, to reach Amazon's more than 112 million Prime members, and to win the Buy Box—through which the vast majority of Amazon sales are made.[32] Given that FBA is effectively the only way for sellers to get a Prime badge, this indicates that Amazon does favor sellers who use FBA over those who do not for both its search rankings and the Buy Box.[33]

108.    In response to concerns about Amazon tying a seller's ability to make sales on its platform to participation in FBA, Amazon offered contradictory statements. In the Subcommittee's July 16, 2019 hearing, Representative Lucy McBath (D–GA) asked defendant Sutton, whether Amazon "privilege[d] vendors who use Amazon Fulfillment Services over those who chose not to."[34] Defendant Sutton asserted that Amazon "do[es] not favor . . . products that use FBA over others." He also falsely stated that Fulfillment by Amazon is not a factor in Amazon's ranking algorithm.

109.    At the Subcommittee's July 29, 2020 hearing, Representative Mary Gay Scanlon (D–PA) asked defendant Bezos about whether there is a connection between a seller's use of FBA and its ability to win the Buy Box.[35] In response, defendant Bezos claimed that the Buy Box may

---

[31] *See* J. Clament, Fulfillment by Amazon (FBA) Usage Among Top Marketplace Sellers Worldwide    2017–2018.

[32] *See, e.g.,* Submission from Source 43, to H. Comm. on the Judiciary, 30 (Oct. 26, 2019) (on file with Comm.).

[33] The House Committee on the Judiciary, Investigation of Competition in Digital Markets, https://www.govinfo.gov/content/pkg/CPRT-117HPRT47832/pdf/CPRT-117HPRT47832.pdf (July 19, 2022).

[34] Innovation and Entrepreneurship Hearing at 50 (question of Rep. Lucy McBath (D–GA), Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary), https://www.govinfo.gov/content/pkg/CHRG-116hhrg39901/html/CHRG-116hhrg39901.htm.

[35] CEO Hearing at 161 (question of Rep. Mary Gay Scanlon (D–PA), Vice Chair, H. Comm. on the Judiciary).

"indirectly" favor products that can be shipped with Prime. Bezos claimed that it is in the best interest of consumers for sellers to use the FBA and that Amazon "does not consider profitability as part of the Featured Merchant Algorithm." Documents reviewed by the Subcommittee, however, indicate that Amazon has, in fact, used profitability to Amazon—also referred to internally as "contribution profit" or "CP"—as a factor in awarding the Buy Box.[36]

110.    Furthermore, Amazon's own documents, revealed by the House Judiciary Committee, show that it has considered FBA participation for purposes of determining the Buy Box winner. An Amazon document that sets forth pricing rules for a pilot program favors third-party sellers that use FBA over those who do not for awarding the Buy Box:

---

[36] Submission from Amazon, to H. Comm. on the Judiciary, AMAZON–HJC–00141750 (Mar. 25, 2010) (on file with Comm.).

| From: | Wales, Chance |
| To: | VanDuine, Jason |
| Sent: | 3/25/2010 11:26:35 AM |
| Subject: | RE: SIGN OFF REQUESTED: Pre-WBR Follow-up: Healthcare Pricing Strategy |

ok

From: VanDuine, Jason
Sent: Thursday, March 25, 2010 9:46 AM
To: Wales, Chance
Cc: VanDuine, Jason
Subject: SIGN OFF REQUESTED: Pre-WBR Follow-up: Healthcare Pricing Strategy

Chance – please sign off (or provide fdbk) before I send to Doug.

Jason

Doug,

You had asked me to help you understand the 'size of the issue' with regards to diverted product as well as clarification on pricing rules/matching for the image competitor simulation in the Healthcare category. Some current data (from February):

    1. The top 25 negative CP ASINs in Health & Beauty (all Image ASINs) accounted for $265k in negative CP, 46k units and $1.6M in product revenue.
    2. The diverted product ASINs (8 of the top 25) accounted for $109k in negative CP (41% of ttl), 14k units (31% of ttl) and $366k (23% of ttl) in product revenue.
    3. Babycare products accounted for 14 of the top 25 ASINs (13 diaper and 1 wipe ASIN) and the remaining 3 ASINs are vendor or operational cost issues that are being addressed.
    4. The image competitor pilot in Healthcare will address 6 of the 8 ASINs referenced in #2 (it will not address Align and All – both in Nutrition & Wellness)

We do not plan any manipulation to pricing rules in the Healthcare category other than the setting of number of image ASINs to zero.

Use cases (for Pricing Rules): using Prilosec as the example (CP neutral = $27)

| Ref # | Use Case | Amazon Landed Cost | Comp Box Price | Comp Shipping Cost | Comp Landed Price | Amazon Match Price | Non-Prime (1% pad to FBA, 2% pad to 3P) | Prime (5% pad) |
|---|---|---|---|---|---|---|---|---|
| 1 | Walmart (Image Competitor) | $27.00 | $28.00 | $0.97 | $28.97 | $28.00 | Amzn wins buy box | Amzn wins buy box |
| 2 | DAB Nutrition (3P) + FBA | $27.00 | $26.50 | $0.00 | $26.50 | $27.00 | 3P wins buy box | Amzn wins buy box |
| 3 | DAB Nutrition (3P) + no FBA | $27.00 | $26.50 | $0.00 | $26.50 | $27.00 | Amzn wins buy box | Amzn wins buy box |
| 4 | AlltheTimeWholesale + no FBA | $27.00 | $22.00 | $4.50 | $26.50 | $27.00 | Amzn wins buy box | Amzn wins buy box |

The primary change coming is that we will now lose the buy box if 3P merchants continue to price below CP neutral unless matching to an image competitor. As long as Prilosec is priced below $27 landed price (excluding buffers), we will lose the buy box. Currently, the lowest landed is under $20.

Estimated Impact (based on simulation completed by the Pricing team) is a 6% negative impact on Healthcare category growth and a $.74/unit positive impact on CP. Using OP2 as the base, this would translate to ($750k) in revenue loss and ($775k) gain in CP. We will begin the pilot in April and will measure results on a weekly basis (with highlights in the pre-WBR as appropriate).

If you have any further questions, please let me know.

Jason

111.    One third-party seller provided the Subcommittee with evidence that Amazon favors sellers who participate in Amazon's fulfillment program over sellers who do not. The seller set up an experiment where he sold the same product, one self-fulfilled and the other fulfilled through FBA, and ran different test cases.[37] The seller found that, "Even when the consumer price of the self-fulfilled order was reduced and sold for a lower price (7% lower) than the FBA offer, the FBA still 'won' the 'Buy Box.'" The seller indicated that, without this favorable treatment for FBA, it would not choose to use FBA, as it found Amazon's fulfillment service was often slower

---

[37] Submission from Source 43, to H. Comm. on the Judiciary, 29 (Oct. 26, 2019) (on file with Comm.).

and less reliable than self-fulfillment.

112.     Although defendant Bezos told the Subcommittee that Fulfillment by Amazon "is probably the greatest invention that we ever created for sellers," and that "it's working for sellers," information that the Subcommittee reviewed indicated that the opposite is true.[38] One third-party seller told the Subcommittee, "We use both FBA and self-fulfillment, [and] all of our negative comments are on items shipped through FBA." According to another seller that uses FBA, at one point, Amazon decided to change the packaging on her products from cardboard boxes to padded envelopes, causing damage to her products in transit. When the items started arriving at her customers' homes in a damaged state, this caused a surge of negative reviews and requests for returns. When she asked Amazon to remove these bad reviews, which were caused by FBA's shipping methods, Amazon refused.

113.     A competing online marketplace described to the Subcommittee how Amazon's FBA program makes it more difficult to compete with Amazon, stating, "[T]hrough anticompetitive strategies and practices by Amazon, many . . . sellers are being pulled into Amazon's tied marketplace-and-ecommerce-fulfilment ecosystem in a manner that makes them not only less independent but directly dependent on Amazon."[39] It further explained that, because of Amazon's dominance in online commerce, "Even sellers who sell on other marketplaces are pushed into FBA, because it is the only practicable way to obtain sales on the Amazon marketplace." In addition to the Subcommittee's investigation, described more fully below, antitrust enforcement agencies are currently investigating Amazon for tying these two services

---

[38] CEO Hearing at 161 (statement of Jeff Bezos, CEO, Amazon.com, Inc.).
[39] Submission from Source 11, to H. Comm. on the Judiciary, 1 (Oct. 14, 2019) (on file with Comm.).

together.[40]

114.    The Subcommittee is not the only independent body that found Amazon has engaged in such misconduct. On April 16, 2019, the Italian Competition Authority announced it was launching a probe of Amazon over concerns that the Company was giving sellers using its logistics service a better chance to appear on the Buy Box. Competition Authority officers carried out inspections, with the support of the Special Antitrust Unit of the Guardia di Finanza, at some of Amazon's premises.

115.    Eventually, news outlets announced on December 9, 2021 that the Italian regulators hit Amazon with a €1.1 billion fine for promoting its own logistics, or fulfillment, service that ships and delivers packages, on its Italian platform to the detriment of third-party sellers who did not use it.[41] The misconduct dated from at least 2016. Based on its investigation, the Italian regulator found that third-party sellers who do not use Amazon's fulfillment service are excluded from "a set of advantages essential for obtaining visibility and better sales prospects." Those included had better access to Amazon's "most loyal and high-end customers" who use Amazon Prime, the Company's loyalty program. The regulator concluded that "Amazon has artificially combined two distinct services: the presence on the platform at remunerative conditions (possibility of not being subject to the evaluation of one's own performance, of offering products with the Prime label, of selling during special events and of having a high chance of winning the

---

[40] *See, e.g.,* Press Release, It. Competition Auth., Amazon: Investigation Launched on Possible Abuse of a Dominant Position in Online Marketplaces and Logistic Services (Apr. 15, 2019), https://en.agcm.it/en/media/press-releases/2019/4/A528 (announcing the launch of an investigation into whether "Amazon would unduly exploit its dominant position in the market for e-commerce platforms intermediary services in order to significantly restrict competition in the e- commerce logistics market, as well as—potentially—in the e-commerce platform market, to the detriment of final consumers.").
[41] https://www.france24.com/en/europe/20211209-italy-slaps-amazon-with-%E2%82%AC1-1-billion-fine-for-abusing-dominant-market-position.

BuyBox) and the FBA service for the fulfillment of orders—in order to create an illicit incentive to purchase FBA, in the absence of alternative ways of accessing the same advantages, apart from the use of FBA."[42]

116.    Additionally, the regulator found that a tough performance measurement system is reserved for sellers who do not use Amazon's logistics system, which can lead, if failed, to suspension of the seller's account.[43] In light of this misconduct, the regulator directed Amazon to grant sales privileges and visibility to all third-party sellers who meet fair and non-discriminatory standards for fulfillment, and to decide and publish such standards.

117.    Once again, Amazon denied any misconduct, stating that "We strongly disagree with the decision of the Italian Competition Authority." "The proposed fine and remedies are unjustified and disproportionate," the Company said in a statement.[44] Amazon said it would appeal the ruling, asserting that signing up for the fulfillment service was not obligatory and that vendors already access to Amazon Prime customers in Italy through other platforms.

118.    On November 10, 2020, the European Commission also announced that it opened a second formal investigation into the possible preferential treatment of Amazon's own retail offers and those of marketplace sellers that use Amazon's FBA.[45] In particular, the Commission announced it was investigating whether the criteria that Amazon sets to select the winner of the

---

[42] https://www.competitionpolicyinternational.com/the-italian-competition-authoritys-decision-in-the-amazon-logistics-case-self-preferencing-and-beyond/.

[43] https://www.france24.com/en/europe/20211209-italy-slaps-amazon-with-%E2%82%AC1-1-billion-fine-for-abusing-dominant-market-position.

[44] https://www.law.com/international-edition/2021/12/15/italian-competition-judgment-against-amazon-shows-the-future-of-big-tech-regulation-in-europe/.

[45] European Commission, Antitrust: Commission sends Statement of Objections to Amazon for the use of non-public independent seller data and opens second investigation into its e-commerce business practices, https://ec.europa.eu/commission/presscorner/detail/en/ip_20_2077 (Nov. 10, 2020).

"Buy Box" and to enable sellers to offer products to Prime users, under Amazon's Prime loyalty program, lead to preferential treatment of Amazon's retail business or of the sellers that use Amazon's logistics and delivery services. According to Vestager, "The Buy Box is essential. It prominently shows you offers for one single seller of a chosen product with the possibility for the consumer to purchase it directly. So, winning the Buy Box is crucial for the marketplace sellers as it seems that more than 80% of all transactions on Amazon are channeled through it."[46]

119.    In response to the European Commission's investigation, Amazon eventually agreed to take several remedial actions. Specifically, on July 14, 2022, Amazon offered to change its business practices in Europe to address its alleged bias in granting sellers access to its Buy Box and its Prime program.[47] Amazon has offered to treat all sellers equally when determining which product to feature in the Buy Box. As part of the Buy Box concession, Amazon proposed to offer a second seller placement in the Buy Box, which could potentially boost visibility for more sellers. Amazon also made several commitments related to sellers' relationships with Amazon Prime and said sellers under its Prime label would be able to use any shipping carrier they desire rather than Amazon's own fulfillment services.

### 2.    Amazon Exploited Its Power Over Third-Party Sellers

120.    Amazon's dual role as an operator of its Marketplace that hosts third-party sellers, and a seller in that same Marketplace, creates an inherent conflict of interest. This conflict incentivizes Amazon to exploit its access to competing sellers' data and information, among other misconduct. Knowing that stockholders were acutely focused on these issues, the Individual

---

[46] https://techcrunch.com/2020/11/10/europe-lays-out-antitrust-case-against-amazons-use-of-big-data/.

[47] Amazon offers concessions to resolve EU antitrust probes, https://www.cnn.com/2022/07/14/tech/amazon-concessions-eu-antitrust (July 14, 2022).

Defendants caused or made numerous materially false and misleading statements throughout the Relevant Period to alleviate stockholder concerns about its business practices.

121.   In its July 2022 final report on competition in the digital marketplace summarizing the investigation, the Subcommittee concluded that Amazon routinely "employ[ed] strong-arm tactics" against third-party sellers on its platforms.[48] To stockholders, Amazon described third-party sellers as "partners." But Amazon's internal documents that the Subcommittee reviewed show that, behind closed doors, the Company refers to them as "internal competitors."

122.   Indeed, while Amazon has referred to third-party sellers on its Marketplace as "partners" and "customers," numerous small- and medium-sized third-party sellers told the Subcommittee that Amazon bullied and mistreated them for its own benefit. The Online Merchants Guild, a trade association representing the interests of sellers engaged in online commerce, stated that it had "seen Amazon use their position of strength to take advantage of sellers."[49]

123.   As Stacy Mitchell, Co-Director of the Institute for Local Self-Reliance, noted during the Subcommittee's hearing on Innovation and Entrepreneurship, "Among the most egregious examples of Amazon's arbitrary treatment of sellers are its abrupt suspensions of their accounts, frequently made without explanation." Once Amazon suspends a seller's account or delists its products, the business is left with largely ineffective remedies as they watch their sales disappear. Sellers shared with the Subcommittee their experience that communications to Amazon's Seller Support Central generally prompt automated, unhelpful responses, which may be entirely unrelated to the specific case, question, or concern raised by the seller.

---

[48] The House Committee on the Judiciary, Investigation of Competition in Digital Markets, https://www.govinfo.gov/content/pkg/CPRT-117HPRT47832/pdf/CPRT-117HPRT47832.pdf (July 19, 2022).

[49] Submission from Online Merchants Guild, to H. Comm. on the Judiciary 3 (Oct. 29, 2019) (on file with Comm.).

124.     Over the course of the investigation, the Subcommittee heard from numerous sellers who described abusive tactics or mistreatment by Amazon in a variety of circumstances. For example, at the Subcommittee's January 17, 2020 hearing, CEO and Founder of PopSockets David Barnett testified about Amazon's bullying tactics, which he said were enabled by "the asymmetry in power between Amazon and its partners."[50] He stated that after the two companies decided on a minimum price at which Amazon would sell PopSockets, Amazon sold the products for a lower price and then demanded that PopSockets pay for the lost margin. As a result, PopSockets decided to end its relationship with Amazon Retail. When PopSockets communicated this to Amazon, its response was, "No, you are not leaving the relationship." PopSockets did sever its relationship with Amazon Retail for a period of time, but reestablished it about a year later. Mr. Barnett estimates that, in 2019, his company incurred losses of $10 million in revenue when he stopped selling to Amazon Retail and Amazon blocked one of his authorized distributors from selling on the Marketplace.

125.     The Subcommittee learned about numerous other instances of Amazon strong-arming its third-party sellers. One such company that conducts business with multiple divisions of Amazon described how the platform leveraged its dominance in e-commerce to force acceptance of certain terms and conditions during negotiations over a different part of its business.[51] According to this company, Amazon knows the power they have as a retailer. In the midst of negotiations, Amazon repeatedly referenced its power to destock the company's products on Amazon.com as a "bargaining chip to force terms" unrelated to retail distribution on the company.

126.     Book publishers likewise described Amazon's exploitation of its asymmetric power

---

[50] Competitors Hearing at 22 (statement of David Barnett, CEO & Founder, PopSockets LLC), https://www.congress.gov/116/chrg/CHRG-116hhrg40788/CHRG-116hhrg40788.pdf.
[51] Interview with Source 148 (Aug. 26, 2020).

dynamic with its third-party sellers. According to one publisher, "Amazon has used retaliation . . . to coerce publishers to accept contractual terms that impose substantial penalties for promoting competition" with Amazon's rivals.[52] The publisher added that the platform's retaliatory conduct shows "Amazon's ability and willingness to leverage its market power to prevent publishers from working effectively with rival e-book retailers and, thereby, maintain and enhance its dominance in e-book distribution."

127.    Amazon's retaliatory tactics against publishers include removing the "buy"' button, which blocks a customer's ability to purchase a publisher's current titles;[53] and removing the "pre-order" button, which eliminates the ability for a consumer to pre-order a publisher's forthcoming titles.[54] Another form of retaliation that Amazon reportedly engaged in was falsely showing publishers' titles as out of stock or with delayed shipping times.[55]

128.    The Subcommittee described a third-party's complaint against Amazon as follows: "From the third-party retailers' perspective, Amazon Marketplace is like Hotel California, a lovely place to start or expand an online retail business but check out from Amazon Marketplace and you can quickly find your business in bankruptcy."[56] Additional comments from sellers that the Subcommittee interviewed include, "We're stuck. We don't have a choice but to sell through

---

[52] Submission from Source 17, to H. Comm. on the Judiciary, 13 (Nov. 14, 2019) (on file with Comm.).

[53] *See, e.g.*, David Streitfeld, Amazon Pulls Thousands of E-Books in Dispute, N.Y. TIMES: BITS (Feb. 22, 2012), https://bits.blogs.nytimes.com/2012/02/22/amazon-pulls-thousands-of-ebooks-in-dispute/?hpw.

[54] *See, e.g.,* Polly Mosendz, Amazon Blocks Pre-orders of Hachette Books, THE ATLANTIC (May 23, 2014), https://www.theatlantic.com/business/archive/2014/05/amazon-blacklists-hachettebooks/371545/.

[55] *See, e.g.,* David Streitfeld, Writers Feel an Amazon-Hachette Spat, N.Y. TIMES (May 9, 2014), https://www.nytimes.com/2014/05/10/technology/writers-feel-an-amazon-hachette-spat.html.

[56] Class Action Complaint at 20, Frame-Wilson v. Amazon.com, Inc., No. 20–cv–00424 (W.D. Wash. Mar. 9, 2020).

Amazon,"[57] and, referring to Amazon, "They've never been a great partner, but you have to work with them."[58]

129.    In another example, a third-party bookseller told the Subcommittee that Amazon delisted 99 percent of his business's inventory in September 2019.[59] The bookseller requested that Amazon return its products, which were stored in Amazon's warehouses. As of July 2020, Amazon had returned only a small fraction of the bookseller's inventory and continued to charge him storage fees. Amazon blocked the bookseller both from selling its products on its Marketplace and from retrieving its inventory, precluding the seller from trying to recover some of his losses by making sales through another, albeit smaller, channel. At the Subcommittee's July 29, 2020 hearing, Representative Lucy McBath (D–GA) presented the bookseller's story to defendant Bezos, who responded that this treatment is "not the systematic approach that [Amazon] take[s]."[60] However, evidence the Subcommittee collected through extensive seller interviews shows that Amazon's poor treatment of sellers is not isolated to a handful of incidents—a fact supported both by public posts on Amazon's Seller Central forum, as well as pleas for help routinely sent directly to defendant Bezos.[61]

---

[57] Interview with Source 150 (July 11, 2020).

[58] Interview with Source 151 (July 2, 2020).

[59] Interview with Source 125 (July 7, 2020).

[60] CEO Hearing at 113 (statement of Jeff Bezos, CEO, Amazon.com, Inc.), July 29, 2020 https://www.govinfo.gov/content/pkg/CHRG-116hhrg41317/html/CHRG-116hhrg41317.htm.

[61] *See* Josh Dzieza, Prime and Punishment: Dirty Dealing in the $175 Billion Amazon Marketplace,   VERGE (Dec. 19, 2018), https://www.theverge.com/2018/12/19/18140799/amazonmarketplace-scams-seller-court-appeal-reinstatement ("Emailing the richest man in the world is actually the standard method of escalating an Amazon seller appeal. It's called a Jeff Bomb, or . . . a Jeff Letter."); Interview with Chris McCabe, Founder, ecommerceChris LLC (Dec. 30, 2019) ("Out of desperation, some sellers try to email Jeff Bezos directly."); Submission from Source 125, to H. Comm. on the Judiciary (Jan. 27, 2020) (on file with Comm.); Submission from Source 150, to H. Comm. on the Judiciary (Aug. 16, 2017) (on file with Comm.).

130.    Amazon third-party sellers are also precluded from pursuing their claims against Amazon in court and are instead forced into arbitration through forced and binding arbitration clauses.[62] This puts them at a tremendous disadvantage. Between 2014 and 2019, even as the number of Amazon sellers continued to grow by hundreds of thousands per year, only 163 initiated arbitration proceedings.[63] Because sellers are generally aware that the process is unfair and unlikely to result in a meaningful remedy, they have little incentive to bring an action.

### 3.    Amazon Routinely Favored Its Own Private-Label Products to the Detriment of Third-Party Sellers

131.    By virtue of its role as an intermediary in the Marketplace, Amazon can give itself favorable treatment relative to competing sellers. It has done so through its control over the Buy Box, as well as by granting itself access to data and tools that are off-limits to third-party sellers. Most recently, there have been reports that Amazon has given preferential treatment to its own non-essential products over competitors' non-essential products during the global pandemic.

132.    One tool that Amazon Retail uses to benefit its own business is Amazon Vine, a review-generating program.[64] In interviews the Subcommittee conducted with market participants, many sellers said that good reviews are critical for a product to be successful online.[65] Accordingly, sellers aim to obtain as many positive reviews as possible early in a product's life cycle. At one time, it was permissible for Amazon sellers to provide incentives such as free samples to reviewers.

---

[62] Amazon Services Business Solutions Agreement, https://sellercentral.amazon.com/help/hub/reference/external/G1791?locale=en-US.
[63] The House Committee on the Judiciary, Investigation of Competition in Digital Markets, https://www.govinfo.gov/content/pkg/CPRT-117HPRT47832/pdf/CPRT-117HPRT47832.pdf (July 19, 2022).
[64] Innovation and Entrepreneurship Hearing at 509 (response to Questions for the Record of Nate Sutton, Assoc. Gen. Couns., Competition, Amazon.com, Inc.).
[65] *See, e.g.,* Interview with Source 125 (July 7, 2020) (explaining that the inability to move customer reviews from Amazon to other marketplaces is a barrier to use of other marketplaces, due to the importance of customer feedback for seller reputation).

However, in 2016, it was reported that some sellers were generating fake reviews.[66] In response to these reports, Amazon announced that it would ban incentivized reviews except for those obtained through its own incentivized review program, Amazon Vine. As a result, sellers lost access to this program, regardless of whether they were engaged in bad conduct or not.

133.    For many years, including after the incentivized-reviews ban, the Amazon Vine program was not available to third-party sellers, while Amazon continued to enjoy the program's ability to "minimize marketing costs associated with generating awareness early in a product's lifecycle," among other benefits.[67] An Amazon internal document described other advantages of the program as "[d]riv[ing] conversion and sales with more insightful reviews on detail pages," and "contribute[ing] to higher order counts and sales."[68]

134.    By both banning incentivized reviews and excluding third-party sellers from the Amazon Vine program, Amazon allocated to itself a significant marketing advantage over the other businesses with which it competes on its platform.

135.    Amazon's dual position as both operator and seller on its Marketplace also provides it with the ability to disadvantage competitors that seek to sell or advertise on its platform. One way that Amazon does this is by limiting certain rivals' ability to buy Amazon.com search advertising—ads that present products at the top of the search results when consumers enter

---

[66] Elizabeth Weise, Amazon Bans "Incentivized" Reviews, USA TODAY (Oct. 3, 2016), https://www.usatoday.com/story/tech/news/2016/10/03/amazon-bans-incentivized-reviews/91488702/.

[67] Submission from Amazon, to H. Comm. on the Judiciary, AMAZON–HJC–00146732 (Dec. 14, 2017) (on file with Comm.); Spencer Soper, Amazon Doles Out Freebies to Juice Sales of Its Own Brands, BLOOMBERG NEWS (Oct. 16, 2018), https://www.bloomberg.com/news/articles/2018-10-16/amazon-doles-out-freebies-to-juice-sales-of-its-own-brands.

[68] Submission from Amazon, to H. Comm. on the Judiciary, AMAZON–HJC–00146732 (Dec. 14, 2017) (on file with Comm.); see also id. at AMAZON–HJC–0059576 (Nov. 22, 2010) (describing the program as "[g]reat for new product launches—good for seeding").

specific search terms or a product name. As *The Wall Street Journal* reported on September 20, 2020, although "search advertising is a lucrative part of the company's business," Amazon "won't let some of its own large competitors buy sponsored-product ads tied to searches for Amazon's own devices."[69]

136.    The same *Wall Street Journal* article also reported that Roku, Inc. "can't even buy [ ] Amazon ads tied to its own products." Consistent with this report, a competitor of Amazon that manufactures voice-enabled devices told the Subcommittee that Amazon prohibited it from buying ads on Amazon.com.[70] The competitor expressed concerns about the harm this could cause consumers, who may be confused or deceived when they receive ads promoting Amazon products even when they specifically search for a competitor's product on Amazon.com.

137.    The Subcommittee's investigation also uncovered internal Amazon documents showing that Amazon's executives have long understood the competitive advantage Amazon wields due to the Company's control over search advertising on Amazon.com. In an internal email that became public when the Subcommittee released its final report in July 2022, described an ad block against Groupon and other "deal site ecommerce competitors," an Amazon executive wrote that "Groupon is blocked+let's keep a clear line on this. No deal site ecommerce competitors allowed to advertise on amazon.x sites."[71]

138.    Similarly, an email also made public recently by the Subcommittee shows high-level Amazon executives discussing the possibility of implementing an ad block against

---

[69] Dana Mattioli et al., Amazon Restricts How Rival Device Makers Buy Ads on Its Site, WALL ST. J. (Sept. 22, 2020), https://www.wsj.com/articles/amazon-restricts-advertisingcompetitor-device-makers-roku-arlo-11600786638.
[70] Interview with Source 148 (Aug. 26, 2020).
[71] Submission from Amazon, to H. Comm. on the Judiciary, AMAZON–HJC–00129156 (Dec. 14, 2017) (on file with Comm.).

Diapers.com, saying:

> Do we really think it is ok that Diapers.com flipped from selling on the platform to being a large-scale user of Product Ads totally unscrrutinized [sic]? I don't . . . .
>
> We're under no obligation to allow them to advertise on our site. I'd argue we should block them from buying Product Ads immediately or at minimum price those ads so they truly reflect the opportunity cost of a lost diaper buyer (or to reflect the true value of a new customer to such a competitor []).[72]

139.    The executive suggested that Amazon should maintain a "watch list" of strategic competitors and set up "[a]n automatic trigger when a merchant on [the] watch list attempts to launch a significant quantity of product ads—with escalated approval required to allow their ads to launch."

140.    Based on discussions with Company employees, *The Wall Street Journal* reported that Amazon ultimately implemented a plan of this type. Amazon employees involved in advertising decisions said the policies for dealing with competing device makers are a deliberate part of Amazon's strategy for promoting its own products. *The Wall Street Journal* reporters also spoke with executives at rival companies and advertising firms, and those sources confirmed Amazon's practice of limiting the ability of its competitors to promote their own products.

141.    For example, Amazon competitor Roku, an entity that was competing directly with the Amazon Fire TV, was blocked from buying ads on Amazon. Netgear, a large manufacturer of Wi-Fi routers, was blocked from buying search ads keyed to Amazon's own brand of router. The same is true of Facebook and its inability to buy sponsored ads using Amazon Echo-related keywords due to a competing product, and Arlo, a competitor to Ring, which is unable to buy

---

[72] *Id*. at AMAZON–HJC–00065094 (May 28, 2009) (on file with Comm.).

keywords related to Ring.

142.    According to *The Wall Street Journal* article, "Tier 1 Competitors" are blocked from buying certain ads and employees are allegedly instructed to "mark any discussion of this practice . . . with 'privileged and confidential' to evade regulators."[73]

143.    Once again, Amazon denied these allegations, claiming that employees are instructed to mark emails as privileged only when seeking legal counsel. In response to a request for comment, Amazon also refused to directly address the question of whether or not it impedes its rivals' marketing.

144.    Amazon also unfairly discriminated against third-party sellers during the global pandemic by using the pandemic as a pretext to delay shipments of its competitors' products. In March 2020, Amazon announced that it would begin temporarily delaying shipments of all non-essential products from its warehouses, regardless of whether they were sold by Amazon or by competing third-party sellers.[74] The Company claimed it was doing so to better serve customers in need while also helping to ensure the safety of warehouse workers. The effect of this change was to block third-party sellers of items that Amazon designated "nonessential" from shipping new inventory using Fulfillment by Amazon.

145.    However, Amazon exempted itself from this policy and continued to ship non-essential items sold by Amazon Retail from its warehouses. According to a survey of Amazon workers conducted by Change to Win between April 29 and May 9, 2020, located by the Subcommittee, workers reported that Amazon had "continued to ship non-essential items such as

---

[73] Dana Mattioli et al., Amazon Restricts How Rival Device Makers Buy Ads on Its Site, WALL ST. J. (Sept. 22, 2020), https://www.wsj.com/articles/amazon-restricts-advertisingcompetitor-device-makers-roku-arlo-11600786638.
[74] CEO Hearing at 286–87 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

hammocks, fish tanks, sex toys, and pool floaties."[75] More than two-thirds of fulfillment center workers reported that 50 percent or more of the items they handled during this period were non-essential. Based on the survey results, Change to Win concluded that "Amazon has continued to place workers in danger of contracting COVID–19 in order to ship non-essential goods." A number of market participants that the Subcommittee interviewed also indicated that Amazon prioritized shipping its own items over those sold by third-party sellers.[76] As revealed in the Subcommittee's July 2022 report, Bezos eventually admitted that Amazon did give preferential treatment to its own products for a period of time, but claimed it was "unintentional."[77]

### 4. Amazon's Retail Model Has Long Relied on the Promise of Rapid Delivery

146.    Fast delivery is, and has long been, fundamental to Amazon's retail model. As Amazon explains, it is a company focused on "delivering as many items as fast as possible." Amazon's value proposition to both its customers—and to stockholders—is significantly premised on its ability to offer a cost-effective alternative to both brick-and-mortar stores and alternative online retailers. That value is inherently linked to fast delivery.

147.    In addition, although leading up to and throughout much of the Relevant Period Amazon reported substantial profits, the Company since its founding has invested in building

---

[75] CHANGE TO WIN, AMAZON COVID–19 WORKER SURVEY DATA BRIEF 3 (2020), https://static1.squarespace.com/static/5d374de8aae9940001c8ed59/t/5ec67b15a155792a0f9ef435/1590065963743/Amazon-Worker-COVID-19-Data-Brief.pdf.

[76] *See, e.g.*, Submission from Source 91, to H. Comm. on the Judiciary (Sept. 16, 2020) ("When we looked at Amazon private-label products during April/early May, they were almost all available for immediate Prime delivery, while comparable national brands were not able to get the same shipment times. Definitely preference was given to many Amazon private-label products during times of 'essential'/'non-essential' classification."); Interview with Source 152 (Sept. 18, 2020).

[77] CEO Hearing at 287 (response to Questions for the Record of Jeff Bezos, CEO, Amazon. com, Inc.) ("After instituting these changes, Amazon became aware that shipments of certain Amazon devices that did not fall into the priority categories had been inadvertently included in the list of products with faster delivery promises. This was unintentional.").

market share and capacity—even when doing so caused losses. By 2019 after years of massive profitability, stockholders expected continued success and growth.  Those expectations were reinforced by the Company's public statements, including assurances that short-term costs of growing fulfillment capacity were justified by market demand for fast delivery, and that investment in fulfillment infrastructure would fuel fast shipping, crowd out competitors, take market share, and deliver future profits. Yet by July 2021, the Individual Defendants and others at Amazon knew the opposite: Amazon's fulfillment and high-speed delivery capacity had grown too much and too fast and needed to be scaled back, imposing a massive financial hit to Amazon.

### i.   Amazon Has Long Focused on "Delivering as Many Items as Fast as Possible"

148.    In 2005, Amazon launched its Amazon Prime membership service, through which the Company offered free two-day shipping to its retail customers at a time when such quick delivery times were "virtually unheard of." Amazon's promise of free two-day delivery fueled substantial growth and in large part enabled Amazon to become the retail giant it is today. When Amazon Prime launched, it set Amazon apart from its major retail competitors, such as Walmart, Target, and Costco. As Amazon stated in response to an inquiry from Vox, reported on April 24, 2019, "Prime offers the fastest way to receive items for free." Although the Prime membership comes with many benefits, "Prime customers pay for—and expect—quick, free shipping."

149.    Amazon's aggressive focus on growth through faster shipping and increased fulfillment capacity continued. In 2004, 10 years after Amazon was founded, its annual revenue was just under $7 billion. By 2011, Amazon Prime subscriptions were increasing significantly, with membership doubling less than two years later to an estimated 10 million subscribers. At that point, Amazon was committed to making rapid delivery a critical part of its brand, from two-day, to one-day, and eventually same-day delivery in many markets. To facilitate that rapid delivery,

an extensive fulfillment network became the lynchpin of Amazon's business model. An April 2020 report, "Mapping Amazon: Where the Online Giants Locates Its Warehouses and Why," reported that, "[t]o execute rapid delivery, Amazon couldn't get away with only a handful of warehouses. It had to locate warehouses in many markets where the greatest number of Prime households are located." The strategy was effective for several years. In 2014, "Amazon became the fastest company ever to reach $100 billion in annual sales." By 2018, Amazon's revenue reached almost $233 billion.

### ii. 2015-2017: Amazon Announces and Expands Same-Day Delivery

150.    Amazon and its senior management have been focused on increasing delivery speeds for years. For example, on May 28, 2015, Amazon forever changed online delivery by announcing free same-day delivery in 14 major cities across the United States. Describing affordable same-day delivery as the "Holy Grail" of online shopping, the LA Times noted that, "[a]lthough every retailer would like to offer same-day delivery, few have the infrastructure in place to handle such a complex undertaking or the sales volume to make it worth it." A year later, Amazon expanded same-day delivery to 27 metro areas and announced a new air cargo network. In a March 9, 2016 press release, Dave Clark, Amazon's then-Senior VP of Worldwide Operations, explained that the Company "add[ed] 20 planes to ensure air cargo capacity to support one and two-day delivery for customers" for its "ultra-fast delivery promises." And in 2017, Bezos announced that Amazon was preparing a drone delivery service to get orders to customers within 30 minutes. Since then, Amazon has continued to prioritize increasing the speed and reach of its retail delivery services, including through Amazon Prime. Indeed, as Amazon explained in a June 2, 2017 press release, as the Company has opened new fulfillment centers in order to facilitate faster delivery to retail customers, the "[m]ost important []" factor has been whether the locations

of new sites would "improve Prime benefits with faster shipping speeds for customers."

### iii. 2018-2019: Amazon Increases Its Already-Aggressive Focus on Rapid Delivery

151.    By 2018, 100 million people were using Amazon's Prime service, in large part due to its promise of reliable and free two-day shipping. According to a survey by market-research firm The Diffusion Group, 79% of Prime members said that free two-day shipping was the "primary reason" they subscribed to Amazon Prime. Yet at the time, Amazon was not always able to meet customer expectations with its two-day delivery and, as Vox reported on April 24, 2019, the Company faced the problem of "weaning Prime users off the near-instantaneous shipping they've come to expect." For example, by the winter of 2018, it was "undeniable that Amazon delivery [was not] as seamless as it used to be." As Fast Company reported on December 19, 2018, "Complaints about slow Prime shipping abound across the internet." Business Insider similarly reported in May 2018 that "[s]ome Amazon Prime customers are fuming, claiming the company has repeatedly delayed their shipments and backtracked on the two-day-shipping guarantee that comes with membership. This cuts through the greatest promise of Prime. It's not just the free, two-day shipping. It's that it's so reliable, you never have to think for more than a second about buying something."

152.    As Business Insider reported, Amazon recognized that its customers expected "fast and reliable delivery." At the same time Vox reported that, as customers became less impressed by Amazon's rapid delivery promise, "more and more businesses" were adopting two-day shipping, further threatening Amazon's competitive advantage in delivery times.

### 5.    2019-2020: As Competitive Pressures Mount, Amazon Invests Massively in Expanding Fast Delivery

153.    By 2019, many of Amazon's largest competitors—including Walmart and Target— had announced their own two-day shipping promises. Combined with the alternative options that

those retailers (which had both online and brick-and-mortar presences) provided customers to buy online and pickup from numerous retail locations, even infrequent or slight shipping delays for Amazon posed a substantial threat to the Company's market dominance. With a significant portion of online shoppers hooked on quick, free shipping, Amazon was highly motivated to maintain its competitive advantage, and sought to provide even faster delivery speeds.

154.    In April of 2019, Amazon announced plans to transition free Prime delivery times from two-day shipping to one-day shipping over the next year. During Amazon's Q1 2019 earnings call on April 25, 2019, CFO Brian Olsavsky represented that it was the natural evolution of the Prime program to progress to a "free one-day offer": "We've already started down this path" and "in the past months, significantly expanded our one-day eligible selection and also expanded the number of zip codes eligible for one-day shipping." Olsavsky told stockholders on the call that "We're able to do this because we spent 20 plus years expanding our fulfillment and logistics network, but this is still a big investment and a lot of work to do ahead of us."

155.    To enable this shift to expansive one-day shipping, Amazon committed to an aggressive growth strategy, through which it would ultimately double the footprint of its warehouses and other aspects of its fulfillment networks. After announcing plans to cut the standard Prime delivery time from two days down to a single day in April 2019, Amazon expected to spend $800 million on the transition to one-day shipping, in the second quarter of 2019 alone. And Amazon additionally spent almost $1.5 billion in the fourth quarter of 2019 and $1 billion in the first quarter of 2020 on that expansion.

156.    Amazon and its senior management assured stockholders that these significant costs were worth it, and that the Company's expansion was calibrated to meet market demand for fast delivery. For example, during Amazon's Q1 2019 Earnings Call, defendant Olsavsky said that

"morphing to a one-day free shipping offer will make [Prime] even more the best deal in retail," adding that "we really think it's going to be groundbreaking for Prime customers and we're very excited to add this capability." Analysts believed those statements. For example, following Amazon's Q1 2019 Earnings Call, BMO Capital was quoted as stating, "While this is a drag on profitability near term, we believe enhancements like this should encourage incremental spending by customers and attract new Prime members." And Mizuho Securities likewise wrote that the "long-term benefit is that turnover will be faster in the warehouse so efficiency can be gained for fulfillment as a percentage of revenues."

157.    As intended, the move to one-day shipping put Amazon a full day ahead of the competition. Among other things, the day after Amazon's one-day shipping announcement, Walmart tweeted, "One-day free shipping . . . without a membership fee. Now THAT would be groundbreaking. Stay tuned." Walmart soon announced its own one-day delivery service, complementing its offer to purchase items online and pick them up in a brick-and-mortar location the same day. These moves added to the pressure on Amazon. As Alice Fournier, VP at Kantar Consulting, explained, "Amazon has been doing one-day shipping in many areas for a while now. Now they've made an announcement out of it and a commitment to it—what they're going to do is make the investments that they already were making," adding that, in contrast "Walmart has very successfully been building its store pickup, which is an online transaction that you get in one day." Similarly, Moody's analyst Charlie O'Shea described Walmart's one-day shipping option as "the latest salvo in the ongoing delivery arms race initiated and recently escalated by Amazon." Wells Fargo analysts led by Edward Kelly said in a note that Walmart's one-day shipping "helps to alleviate some concern around the impact of Amazon's recent move and is a step forward in defending share." And Matthew McClintock, Barclays retail analyst, likewise "called Amazon's

announcement 'a red herring' that creates an opportunity to invest in Target.' . . .'[Target] is already ahead of [Amazon] in same day delivery (Shipt, Drive Up, etc...) and has built a supply chain that fulfills ecommerce primarily from stores (where next-day delivery is much easier), which stands in a stark contrast to most retailers."

158.    On June 3, 2019, less than two months later, Amazon announced that it had pushed the plan forward with "free one-day shipping on over 10 million products" for Prime members—with no minimum purchase.

159.    The burdens of transitioning to one-day shipping, which Amazon had justified to stockholders as necessary to meet demand for fast delivery, continued to mount. For example, as *Supply Chain Dive*, a business journalism outlet focused on global supply-chain issues, reported on October 25, 2019, in the third quarter of 2019, Amazon's shipping costs increased 46% year-over-year, and profits fell 26% year-over-year.

160.    On October 24, 2019, during Amazon's Q3 2019 earnings call, defendant Olsavsky attributed the higher costs to Amazon's continued efforts to expand one-day delivery, stating, "It's going to be the route density and other things will improve over time and get our cost structure down, but for now, there is certainly some start-up pain in adding new capacity." Olsavsky further noted that Amazon expected those costs to further increase in Q4: "So as we head into Q4, we've added what's just nearly $1.5 billion penalty in Q4 year-over-year." As quoted in Amazon's Q3 2019 Earnings Statement, defendant Bezos maintained that "Customers love the transition of Prime from two days to one day," adding that "It's a big investment, and it's the right long-term decision for customers." As Supply Chain Dive reported, in total, Amazon's 2019 shipping costs reached $37.9 billion, increasing 43% year-over-year compared to the fourth quarter of 2018.

161.    In early 2020, before the COVID-19 pandemic caused widespread changes in

consumer needs and behavior, and as communicated on the Company's January 30, 2020 earnings call for the fourth quarter of 2019, Amazon projected another "approximately $1 billion of additional cost" for one-day delivery in the first quarter of 2020. In response to multiple questions about the continued costs of transitioning to one-day shipping, the Individual Defendants continued to assure stockholders that those costs were justified by market demand for fast delivery. After referencing defendant Olsavsky's prior statements about Amazon "becoming more efficient with . . . next- day" delivery, an analyst asked for details on both the "$1 billion of [quarterly] cost" and the impact of one-day shipping on customer demand. Defendant Olsavsky responded: Amazon "will have to scale our fulfillment center network further. We grew the square footage for fulfillment and transportation by 15% each of the last two years, and we look ahead and see a step-up in that this year as we . . . start to build more capacity for the one day." Olsavsky added that Amazon would "get efficiencies" as they "learn and grow and handle more one day volume." Stockholders rightly understood the Company's expansion of the fulfillment infrastructure as reflecting the Individual Defendants' judgment and commitment to fast delivery as necessary to Amazon's longstanding business strategy of taking market share to ensure growth.

162.    By February 2020, at the same time that the Individual Defendants were reassuring the Company's stockholders, the transition to one-day shipping raised questions inside Amazon about how it would manage such a network. As Salal Humair—a senior principal scientist with the supply chain optimization technologies team in Amazon's inventory planning and control group—explained to Supply Chain Dive, for logistics, the difference between one and two-day shipping is a lot more than just 24 hours. Humair explained that location is less relevant to two-day shipping because "You can just fly to a customer in two days" almost anywhere in the continental United States. However, the location of inventory is critical when an order is expected

in a single day or less, according to Humair. "This is a reality that made two-day shipping a much easier feat than one-day shipping... And how Amazon deals with inventory questions changed significantly when it decided to offer one-day shipping to its Prime members."

163.    To facilitate expanded same-day and next-day delivery, in early 2020, Amazon starting building "mini-fulfillment centers" closer to consumers, which the Company explained was to make its same-day delivery program "even faster." Notably, Amazon's announcement came just days after news that Walmart's Walmart+ membership program could include unlimited same-day delivery on groceries.

164.    Amazon stated on March 3, 2020 that:

> Since launching Prime in 2005, we've continued to make advancements to our delivery options in order to bring members new levels of convenience. This effort has resulted in the current evolution of Prime Two-Day Delivery to a One-Day promise, and the introduction of new programs like Amazon Day, where Prime members can choose a day of the week to receive all their orders . . . all with the goal of giving Prime members the most convenient shopping experience in retail . . . . These are first-of-their-kind buildings and serve as mini-fulfillment centers optimized for faster click-to-delivery speeds.

**B.      Amazon Aggressively Increases Its Fulfillment Capacity and Headcount During the Pandemic**

**1.      Early 2020: COVID-19 Causes a Massive Demand Surge**

165.    When the pandemic struck in early 2020, bringing with it lockdowns and other restrictions that limited shoppers' ability and willingness to shop in physical stores, consumer demand for goods purchased through Amazon's e-commerce business, with its promise of fast delivery times, skyrocketed.

166.    However, in the early days of the COVID-19 pandemic, Amazon's fulfillment network was unprepared for the sudden surge in demand. On March 16, 2020, in a Company blog

post, Amazon described demand-driven labor requirements as "unprecedented for this time of year," announcing: "We are opening 100,000 new full and part-time positions across the U.S. in our fulfillment centers and delivery network to meet the surge in demand from people relying on Amazon's service during this stressful time."

### 2.   2020-2021: Amazon Continues Its Aggressive Expansion, Which The Individual Defendants Justify as Necessary to Keep Competitors at Bay and Meet Existing Demand for Fast Delivery

167.    As discussed above, after announcing increased investments in one-day delivery, Amazon had already faced questions about the increasing cost of shipping in 2019. As reported in Amazon's 2019 annual report filed on Form 10-K, Amazon's cash capital expenditures increased from $11.3 billion in 2018 to $12.7 billion in 2019. In both years, these costs primarily reflected "additional capacity to support [Amazon's] fulfillment operations and additional investments . . . in technology infrastructure." In 2020 Amazon's spending spiked to another level as cash capital expenditures effectively tripled to $35.0 billion for the year.

168.    Analysts remained focused on Amazon's ability to protect its competitive position by resuming as much one-day delivery as possible. For example, on April 30, 2020, during the Company's Q1 2020 Earnings Call, the Individual Defendants received a question on Amazon's "fulfillment efficiencies," with an analyst asking: "how long will it take for Amazon to get back to a point where you'd have the same sort of service efficiency levels on the retail side that you had pre- COVID, how far are you away from that?" Defendant Olsavsky responded that despite some uncertainty, "we're glad we've made that investment":

On the fulfillment efficiency, I think you're talking about one-day probably is the heart of your question, when will we get back to what we had seen in levels of one day. I will explain a bit on the one-day shipping cost because it's aligned with this. So we had originally thought we would spend $1 billion roughly on one-day shipping in Q1 and what we're seeing is we pretty much spent about that same amount. So those are actually coming in – all those things are coming in very handy to us to help get more capacity out of what we currently have and we're glad we've made that investment, but we don't actually see a savings . . . we'll see a resumption of more one-day service, but, right now things are still so up in the air that I can't really project when that day will be . . . .

169.    However, as e-commerce research firm Marketplace Pulse reported on August 11, 2020, by May of 2020 Amazon had experienced "all-time high negative seller reviews" and "[f]ailed delivery promises were the most common cause." With the unprecedented demand for e-commerce and fast delivery that COVID-19 caused, Amazon faced significant fulfillment struggles when [third-party] sellers "ran out of inventory stored in Fulfillment by Amazon (FBA) and thus reduced Prime-enabled assortment." As Marketplace Pulse reported on July 14, 2020, "fulfillment operations" were a significant vulnerability for Amazon, because when "Amazon's fulfillment operations . . . breaks, as it did during the pandemic, the whole Amazon breaks." Securities analysts from Sanford C. Bernstein & Co. expressed concern that, in the wake of the pandemic, Amazon would have a "a very hard time" executing on one-day shipping and that the program would be delayed.

170.    As the pandemic progressed, the strain put on Amazon's fulfillment infrastructure caused the Individual Defendants to increasingly emphasize that they would expand their infrastructure to meet demand for fast delivery. These assurances that the expansion was consistent with Amazon's business goals and competitive pressures were expected by and well received by stockholders.

171.    As stated in Amazon's second-quarter 2020 financial reporting in the second

quarter of 2020, Amazon's net sales increased 40% year-over-year to reach $89 billion. As Supply Chain Dive reported, however, analysts and market observers noted that the Company's capital expenditures continued to outpace sales growth, increasing by 68% from the year prior.

172.    On July 30, 2020, during Amazon's Q2 2020 Earnings Call, defendant Olsavsky addressed the Company's reported strong performance, which he represented was "driven [by] increased consumer demand, led by Prime members," stating:

> We were able to meet this heightened demand because we were also able to open up more fulfillment network capacity as the quarter progressed with faster delivery across more selection. I'd point to a few capacity improvements that have allowed us to enhance throughput. First, our regular headcount grew 34% year-over-year as of the end of Q2 and continues to grow. We welcomed more than 175,000 new employees in March and April, many of whom were displaced from other jobs in the economy. As we've seen demand remain high, we are in the process of bringing 125,000 of these employees into regular full-time positions . . . . As we move toward peak in the second half of the year, we will ramp-up our space needs even further, and we'll be adding significant fulfillment center and transportation capacity in the second half of the year.

173.    During the call, as the Individual Defendants credited Amazon's Q2 2020 success to the Company's fulfillment expansion, multiple analysts inquired about Amazon's one-day delivery. Despite the sustained spending and increased capacity, defendant Olsavsky did not commit to a timeline for returning to Amazon's pre-pandemic shipping speed. However, in response a question on the status of the Company's "one-day investment," Olsavsky said, "the costs of one-day shipping are already built into our structure. We've already reconfigured our network. We've already created the capacity to be able to ship." Earlier on the call, Olsavsky had already announced plans to increase the square footage of Amazon's distribution operation by 50% by the end of 2020, with most of the expansion still to come: "This includes strong growth in new fulfillment center space as well as sort centers and delivery stations. We expect the majority of this

capacity to come online in late Q3 and into Q4."

174.    As Supply Chain Dive reported on September 21, 2019, analysts noted this meant that Amazon would be "adding three times the amount of capacity it added in 2019 . . . more than what the company added over the last three years combined," and that "Experts have long known that increasing the number of facilities will decrease transportation costs while increasing inventory and facility cost." Despite increasing scale of Amazon's continued expansion, those analysts saw numerous advantages in "Amazon's investment in its logistics network," consistent with the Individual Defendants' positive public statements.

175.    Following increased demand for fast home delivery as shoppers stayed at home due to COVID-19 restrictions and concerns, Amazon continued to focus on increasing its infrastructure and fulfillment network capacity. On October 29, 2020, during Amazon's Q3 2020 Earnings Call, defendant Olsavsky told stockholders and analysts that Amazon's fulfillment and logistics square footage would increase by 50% that year and that the Company had already spent heavily on expanding its transport capability, as part of some $30 billion in capital expenditures and leases through the third quarter. Further, Olsavsky told stockholders and analysts that the heightened transportation investment would likely continue for years to come. As companies competed for space, Amazon was understood to be a driving force behind surging industrial space rates, which financial news outlet GlobeSt.com reported included Amazon often paying 50% to 60% above market to get the space it wanted.[78]

---

[78] GlobeSt.com, Amazon Reportedly Ready to Dump Excess Warehouse Space (Mar. 5, 2022) ("Amazon has been a driving force for good rates in the hot industrial arena, often paying 50% to 60% above market to get the space they wanted. Investors were paying a 35% premium last fall when the retail giant was a tenant. Those heady days may have come to a sudden halt as a slowing of e-commerce back to pre-pandemic trends has left Amazon with a surfeit of warehouse space according to a Bloomberg report.").

176.    Defendant Olsavsky credited Amazon's ability to "meet the heightened demand" in Q3, in part, to the Company's "big year for capital investments," explaining: "We've invested nearly $30 billion in CapEx and finance leases through the first nine months of 2020, including over $12 billion in Q3. As I mentioned last quarter, we expect to grow our fulfillment and logistics network square footage by approximately 50% this year, which includes significant additions to our fulfillment centers, as well as our transportation facilities. The majority of these buildings opened in late Q3 and into Q4. About half of this square footage growth will be on the transportation side through the opening of more sort centers and delivery stations."

177.    By the end of 2020, Amazon projected quarterly revenue of over $100 billion for the first time in the Company's history.[79] Indeed, as the Associated Press reported on April 29, 2021, the Company's reported fourth-quarter 2020 revenue "blew past analyst expectations" at $125.6 billion. As online shopping continued to surge a year into the pandemic, Amazon's 2021 first-quarter profit more than tripled year-over-year. As brick-and-mortar stores around the country were forced to close, some for good, Amazon's revenue was still 44% above the prior year and well over $100 billion for the second quarter in a row—a feat that only three other U.S. companies achieved. When it reported first-quarter 2021 earnings, Amazon reported that it expected revenue to increase again, in the second quarter of 2021, with a year-over-year growth rate for the quarter of 24% to 30%.

178.    Technology news site *GeekWire* reported on February 2, 2021 that, by the end of end of 2020, Amazon had hired nearly half a million new workers. With well over a million employees by 2021, Amazon had increased in size by 63%. The Company's bullish expansion

---

[79] Amazon sees pandemic boosting holiday sales and investment in delivery (Oct. 29, 2020), https://www.reuters.com/article/uk-amazon-com-results/amazon-sees-pandemic-boosting-holiday-sales-and-investment-in-delivery-idUSKBN27E3D6.

continued into 2021. On February 2, 2021, during Amazon's Q4 2020 Earnings Call, an analyst asked how much investment was "needed" for Amazon's fulfillment going into 2021. After noting the "50% year-over-year" investment in fulfillment capacity or "$44 billion on [Capital Expenditures]" in 2020, Olsavsky turned to Amazon's plans for 2021:

> So we are going to have to build probably for multiple scenarios. And in an FC world, it's hard to turn that capacity on quickly. So it generally means you may have to overbuild to protect the customer experience. On transportation, we made large investments in our transportation network in 2020. That work is not done yet. We have a lot of continued expansion. So we see that over – definitely through 2021.

179.     In January 2021, when customers were "relying on fast, free shipping more than ever," Amazon reported that it had purchased 11 aircrafts for their delivery network to "keep pace with meeting [their] customer promises." Consistent with its aggressive expansion efforts, Amazon reported in its 2020 Annual Report, filed on February 3, 2021 on its Form 10-K:

> The increase in fulfillment costs in absolute dollars in 2020, compared to the prior year, is primarily due to variable costs corresponding with increased product and service sales volume and inventory levels, costs from expanding our fulfillment network, and the COVID-19 related impact of lower productivity, increased employee hiring and benefits, and costs to maintain safe workplaces. We expect fulfillment costs as a percentage of net sales to continue to be negatively impacted through at least Q1 2021 by COVID-19 related costs. We seek to expand our fulfillment network to accommodate a greater selection and in-stock inventory levels and to meet anticipated shipment volumes from sales of our own products as well as sales by third parties for which we provide the fulfillment services. We regularly evaluate our facility requirements.

180.     As Amazon continued to make significant investments throughout 2021 and into 2022, the connection between more expansion, faster delivery, and community investment was a

message that Amazon repeated.[80] For example, on February 18, 2021, Amazon announced a new one million-square-foot "non-sort" fulfillment center in Washington, representing that "the new fulfillment center will help enable faster shipping times on customer orders of larger items," as reported by local news outlet KHQ.

181.    Similarly, on March 30, 2021, Amazon announced four more delivery stations in Florida to "power the last mile." An Amazon spokesperson explained: "We are excited to continue our investment in Florida" which "will create hundreds of new job opportunities and provide faster and more efficient delivery for customers."

182.    On April 28, 2021, during Amazon's Q1 2021 Earnings Call, after noting that Amazon was "investing pretty aggressively to build out    last-mile fulfillment," an analyst asked at what point that expansion would be "in the right place" such that Amazon would see "the unit cost of shipping start to improve from these initiatives?" After noting that Amazon was already "investing heavily" in the last-mile fulfillment by increasing "capacity by 50%" with an 80% increase in capital expenditures from the prior 12 months, Olsavsky responded that Amazon's cost was already "very competitive," and that fulfillment investment offered "lots of advantages" in shipping logistics, including that the Individual Defendants "pretty much have perfect information." Olsavsky added that Amazon was "continuing to invest" and that stockholders would "see a large investment in this area through 2021" which could continue into 2022—all of which would put Amazon in "really good" position with capacity.

183.    An analyst also asked "particularly in markets where COVID is no longer a major

---

[80] Faster Same-Day Delivery marks milestone by adding six new cities (Aug. 4, 2021), https://www.aboutamazon.com/news/operations/faster-same-day-delivery-marks-milestone-by-adding-six-new-cities. ("In the areas where we offer faster Same-Day Delivery service, we've built brand new mini-fulfillment centers that are optimized for faster click-to-delivery speeds.").

issue, have you seen any particular declines or maybe just slowdown in e-commerce demand or a decline in growth?" Olsavsky noted international "across the board" strength, before stating, "I don't have a downside case yet. Costs were very much under control. We started to see strong leverage of our fixed assets, especially our fulfillment center and transportation assets." Later, in response to another question on demand levels, Olsavsky responded in part, "On Q2 guidance, yes, I would say, we are projecting, again, continued strength across all of our segments."

184.    Amazon continued to represent publicly that it was aggressively expanding its fulfillment capacity in order to meet demand for faster delivery. For example, on May 7, 2021, Amazon announced five new buildings in British Columbia: "Our new facilities will help us meet our customers' growing demand for great products and faster delivery times" said Sumegha Kumar, Director of Canadian Customer Fulfillment Operations, Amazon Canada.

### 3.    Analysts Covered the Expansion Favorably at the Time

185.    When the Individual Defendants said that massive spending would pay off, stockholders and the stock the market believed them. For example, previously, when Amazon reported that the extra cost of transitioning from two-day to one-day Prime delivery would increase to $1.5 billion in the fourth quarter of 2019, Patrick Moorhead, Principal Analyst at Moor Insights and Strategy, said: "Amazon is waging a war of attrition to wear out the competition It's setting the bar so high knowing competitors will follow and Amazon knows it can do it at lower costs sometime in the future. One day shipping also puts it more into competition with traditional brick and mortar stores. I think time will show it's worth it." Similarly, when Amazon announced plans to spend "the entirety" of its $4 billion profit "and perhaps a bit more" in the second quarter of 2020 on responding to the COVID-19 pandemic, JP Morgan Analyst Doug Anmuth saw it as a positive, writing, "We believe that AMZN is perhaps the only company that can service customers this well with scale & effectiveness during the crisis."

68

186.    As *The Motley Fool* reported, the market understood, consistent with the Individual Defendants' public representations, that increasing demand for e-commerce and fast delivery justified Amazon's commitment to expand its fulfillment network footprint by 50% and its workforce by more than 60% in 2020, and that more large investments were coming in 2021:

> As a result, Amazon will need a lot more workers to staff its warehouses and fulfillment centers. While the capacity issues that led to last year's bottlenecks have mostly been resolved, the company's plans imply that it expects continued strong sales growth. Further, it still has work to do to reach its goals on one-day delivery. . .. The good news for shareholders is that Amazon's hiring is an indication that it'll have plenty of demand to meet.

187.    In addition, on July 31, 2021, Credit Suisse analysts wrote that Amazon's ramp-up in capital expenditures was more important than its revenue guidance while referencing the Company's faster delivery promises: "The consumer responds positively to higher/faster service levels," they said in a note. "Unit volume accelerated following one day Prime delivery launch in 2Q19 – we believe it is only a matter of time before we see a similar impact as Amazon deploys fulfillment assets into the Holidays."

188.    It is not surprising that the market and Amazon's stockholders viewed Amazon's claims regarding demand for e-commerce and fast delivery, and increased capacity requirements, as a concrete cost benefit analysis. It has been well publicized that Amazon was a data-driven business that put extreme value on decision making based on real-time information on logistics and efficiency. For example, as Fox Business reported on January 7, 2016, Amazon's advanced use of analytic technology, for both delivery logistics and forecasting, has long been considered key to its "competitive advantage." Indeed, Amazon has long sought to optimize its efficiency in its delivery business through advanced software that ostensibly helps it set inventory levels, and even begin packing orders based on predictive algorithms. As *The Wall Street Journal* reported on

April 22, 2018, by that point Amazon had already "spent years honing its machine learning and artificial-intelligence technology to the point where it can"—among other things— "forecast demand." In fact, a 2020 report by longtime supply chain reporter Rick LeBlanc explained that the Company's "combination of sophisticated information technology, an extensive network of warehouses, multi-tier inventory management, and excellent transportation makes Amazon's supply chain the most efficient among all the major companies in the world." On February 6, 2021, *The Wall Street Journal* reported that Amazon was using software to manage, monitor, and evaluate data on a highly sophisticated level, "unlike almost any other company," especially for delivery and inventory logistics.

C.     **By Early 2021, Amazon Prepares to Overhaul Its Senior Management as Its Public Commitment to Expansion Continues**

189.    In February 2021, Amazon announced a significant change in its senior management. Specifically, defendant Bezos announced that on July 5, 2021, he would be stepping down as CEO of Amazon, the company he founded in 1994, and that he would be transitioning to the position of executive chairman. Defendant Jassy, who had been with the Company for over 24 years, would be taking his place. NPR reported that Jassy was one of Bezos' "most trusted lieutenants" and served as the CEO's "shadow," where he accompanied Bezos to all his meetings to learn the business. Since Jassy was a long-time Amazon insider, he had the institutional knowledge and experience to continue to execute Amazon's strategies without significant interruption. As executive chairman and Amazon's largest shareholder, defendant Bezos would continue to be engaged in the Company's initiatives.

190.    Defendant Jassy is also immersed in the details of Amazon's business. As reported by *The Wall Street Journal*, former Amazon employees described Jassy as having an "ultra-detail-oriented management style," often "digging into the minutiae of his division . . . sometimes to a

degree that baffled his underlings." An Amazon vice president who worked for Jassy for more than a dozen years told *The Wall Street Journal* that Jassy has "just a phenomenal focus on details . . . [his] relentless focus on detail is truly unique." Former Amazon employees agreed that "Jassy would spend enormous amounts of time on the narrowest of details if he thought it was important." For example, when an Amazon Web Services ("AWS") data center in Virginia suffered a major outage, defendant Jassy "personally got involved in figuring out the problem," prompting other employees to start "digging at that level."

191.    Even defendant Jassy has commented on his own attention to detail. During a September 2021 speech, Jassy said "[w]here the rubber meets the road is in the details. From the junior roles to the senior-most, you have to be good at executing details." He therefore demanded the same degree of focus from his employees. One employee told *The Wall Street Journal* that Jassy "ha[d] a sense of urgency that [he had] never seen in [his] life."

192.    *The Wall Street Journal* reported that at weekly "wheel" meetings, Jassy and his deputies would ask in-depth questions of managers and team members, sometimes called "the firing squad" by employees.

**D.    Amazon Executives Have Access to Real Time Data on Critical Details of the Company's Business and Rely on Such Data in Decision Making**

193.    A key component of Amazon's data-driven decision making is its Forecasting System, SCOT ("Supply Chain Optimization Technologies"), which has similarly been the subject of much public reporting. As technology news site *Technoblender* reported on June 17, 2022:

- "Part of Amazon's e-commerce challenges today stem from a piece of technology long prized during Mr. Bezos' tenure as a secret weapon, an internal forecasting system called Supply Chain Optimization Technologies, or SCOT. It was designed to incorporate a multitude of factors and spit out projections for product demand

and the growth in logistics needed to fulfill it."

- "Amazon's SCOT forecasts produced low, medium and high estimates. Because of unprecedented volume in the early days of the pandemic, Amazon executives including Mr. [Dave] Clark repeatedly chose the higher end of SCOT's estimates, said people who used the tool and worked on the SCOT team at the time. Those estimates meant that the company needed many more fulfillment centers and other infrastructure to keep up."

- "'We made a decision to build to the high side to avoid constraining consumers and sellers in any way,' said Mr. Jassy at the company's shareholder meeting in May."

- "Senior Amazon executives familiar with the forecasting technology said it wasn't equipped to process an unforeseeable event like the pandemic and caused the company to commit to building out warehouses and infrastructure early in the pandemic that take 18 months to two years to come online. When the virus receded, Amazon was left with more planned capacity than orders."

194.    Stockholders understood that Amazon's public statements were consistent with the projections and data available to the Individual Defendants from SCOT, and similar systems, and that the information provided by those systems was accurate and reliable. And regardless of what Amazon's SCOT system projected, by July 2021 the Individual Defendants were already aware of Amazon's excess capacity and had already begun to change course and pull back on the broad expansion plan—while still telling stockholders it was justified and continued apace.

**E.    By July 2021 the Individual Defendants Knew that Amazon Had Overexpanded and Decided to Reverse Course**

**1.    The Individual Defendants Assured Stockholders that Amazon's Continued Expansion was Justified by Demand for Fast Delivery**

195.    As *The Wall Street Journal* reported on June 16, 2022, following the rise in demand for e-commerce and fast delivery caused by the COVID-19 pandemic, Amazon's "revenue grew by a total of two-thirds . . . and its profit nearly tripled" across 2020 and into the first quarter of 2021. However, as stockholders belatedly learned in late-April 2022 and *The Wall Street Journal* reported in June, demand for increased fulfillment capacity and delivery speeds did not keep pace with Amazon's capacity investments, and "its setback has been among the most pronounced . . . erasing more than $600 billion in market value."

196.    In the 18 months preceding July 2021, Amazon had almost doubled its warehouse and transportation network, resulting in capital expenditures and equipment leases that *Reuters* reported increased by 74% between July 2020 and July 2021 to $54.5 billion—almost double the growth rate from the year prior. Still, as of July 2021, the public understood, consistent with Amazon's public representations, that the Company planned to continue its expansion, including by adding "517 facilities to its global distribution infrastructure in the coming years . . . 176 million square feet on top of the 402 million" it already has.

197.    Amazon announced its Q2 2021 results on July 29, 2021.  During Amazon's Q2 2021 Earnings Call, defendant Olsavsky reassured stockholders that—even as the market changed and growth slowed—the Company's aggressive expansion strategy remained sound: "As we think about the pull-forward in demand we've seen these past 18 months, it has required and will continue to require a significant amount of investment in our fulfillment network." In other words, Amazon was still investing to expand capacity, and it was justified to meet demand for e-commerce and fast delivery. Defendant Fildes, Amazon's Director of Investor Relations reiterated the message: "I'd just say our focus is really squarely on adding capacity to meet the current high customer demand."

198.    On the same call, when an analyst specifically asked about Amazon's "fulfillment costs," what was driving the higher "a per-unit" cost, and if there were "inefficiencies that went on in the quarter in fulfillment?" Olsavsky did not mention overexpanding capacity or the need to pull back. In fact, quite the opposite, Olsavsky doubled down: "So you can see there's been very strong multiyear demand here that we are still catching up with from last year. So, we're continuing to add, and most of that development is really ahead of us, in the second half of the year. [W]e've literally nearly doubled our network here in the last 18 months from a size standpoint."

199.    In response to another analyst's question regarding "growth assumptions for e-commerce," Olsavsky stressed that "[w]e've been playing catch-up pretty much since the pandemic started, but what suffered is space and space constraints. And it's gotten better, but it was a factor last year [I]n the United States, while it's improving, it still hasn't reached the pre-pandemic levels. So, we have a lot of growth to do there." Olsavsky later added that Amazon's "space planning" was "why we're building out our network so quickly in our minds. It's hard to do quickly, but we're moving as quickly as possible. And again, we have a lot of new capacity being added in the second half of the year."

200.    On October 28, 2021, the Individual Defendants caused Amazon to issue a press release announcing its financial results for third-quarter 2021. The release quoted defendant Jassy as stating that Amazon had "driven extraordinary investments across our businesses to satisfy customer needs we've nearly doubled the size of our fulfillment network since the pandemic began."

201.    During the earnings conference call that same day, defendant Olsavsky stated that "[w]e have nearly doubled our operations capacity in the past two years to keep up with customer demand," and assured stockholders that the costs of that increased capacity were still warranted.

Again, Olsavsky assured stockholders that Amazon's expansion plans were proceeding apace and remained necessary to satisfy demand. Olsavsky also reiterated the Individual Defendants' claim that demand for first delivery was driving the Company's aggressive expansion: "the incremental demand that came our way during the pandemic has remained and that we are continuing to grow on top of that."

202.    An analyst also specifically asked the Individual Defendants if on "fulfillment capacity," Amazon could "be ahead of plan for next year and kind of cut down the investment there?" Defendant Olsavsky knew that Amazon was already cutting back on expansion but still responded by saying: "We are just now getting caught up on space for inventory. . .. But we expect the long-term trends to be strong in this business. We're investing as such."

203.    Another analyst asked whether Amazon's efforts to expand same-day deliveries to customers "leverage[d] kind of your existing fulfillment center footprint." Defendant Olsavsky responded: "we're well on our way to providing ultrafast delivery for things that require ultrafast or things like groceries and others, and we see that expanding." Olsavsky added that, "you have to have a cost structure and a logistics network that will pay for the delivery over time. So, we see it as part of an offering that we offer to customers that ranges from two days to one day to two hours or one hour in some cases. So, we like to meet customers where they are, when they need things, and we're working on speed consistently."

204.    As explained above, Amazon had repeatedly told stockholders that faster delivery for more customers was the primary basis for the Company's aggressive expansion. While continuing to represent that this investment spending was justified, the Individual Defendants pointed to "cost structure and . . . logistics network" considerations while knowing that these were the very same reasons that they had already to scale back."

205.    On February 3, 2022, the Individual Defendants caused Amazon to issue another press release in which the Individual Defendants addressed the positive future of their expanding fulfillment network without mentioning that Amazon had already changed course. Jassy was quoted as stating: "we continue to feel optimistic and excited about the business as we emerge from the pandemic.  When you combine how we're staffing and scaling our fulfillment network to bring even faster delivery to more customers, . . . there's a lot to look forward to in the months and years ahead."

206.    The same day, during Amazon's Q4 2021 earnings conference call, the Individual Defendants again (for the [third] quarterly earnings call in a row) boasted about "doubling [Amazon's] operations capacity" for the Pandemic era market, with defendant Olsavsky explaining that Amazon "invested significantly to keep pace with this demand . . . expanding our fulfillment center footprint while adding significant transportation assets to ensure fast on-time delivery." Going even further, Olsavsky stated that Amazon "continued to see an increase in customer demand and sales during the remainder of 2021, even as the economy opened back up"— all with the no mention that capacity investments had already outpaced demand for fast delivery or that (at least as early as July 2021) some of those investments were already being scaled back.

207.    Additionally, in response to an analyst's question about Amazon's investments to expand the Company's same-day delivery capacity, defendant Olsavsky assured stockholders that "[w]e feel good about where we are. We're continuing to build capacity that enables us to hit those [same-day delivery] cutoffs." After repeating that Amazon had "doubled the capacity in the network . . . to handle today's volume" and "ship faster," Olsavsky further represented that "there's a lot of expansion that's been going on in the network, and we feel good about the basic contributors of profitability."

208.    Another analyst, after noting Amazon's "doubled . . . fulfillment network" and hiring spree, directly asked Olsavsky, "Where is Amazon in terms of emerging from this [2.5 year] investment cycle? Can you see a slowdown in that big investment spending this year?" In response, Olsavsky discussed the Company's capital expenditure percentages, and claimed: "If I look to the future, we're still working through some of our plans for 2022, but it's coming into focus a bit. We see CapEx for infrastructure going up. We still have a very fast-growing business that's growing globally, and we're adding regions and capacity to handle usage that still exceeds revenue growth in that business. So, we feel good about making those investments."

209.    Defendant Olsavsky failed to mention that Amazon's "big investment spending" had not only slowed on the fulfillment side, but actually required cutbacks—which had already begun in July 2021 (and likely earlier). Instead, Olsavsky added that, "On the fulfillment center side . . . [w]e see that moderating, and that will probably now match growth of our underlying businesses." On April 14, 2022, defendant Jassy wrote a Letter to Shareholders with the Company's 2021 Annual Report, repeating the Individual Defendants' story about increased demand and expansion. Defendant Jassy wrote that the fulfillment network "had to double it in the last 24 months to meet customer demand." After mentioning "short-term logistics and cost challenges" in the past tense, Jassy confirmed that one-day shipping, and the necessary investments in capacity, were still Amazon's focus:

> [J]ust before COVID started, we'd made the decision to invest billions of incremental dollars over several years to deliver an increasing number of Prime shipments in one day. This initiative was slowed by the challenges of the pandemic, but we've since resumed our focus here. . . . [W]e believe our over 200 million Prime customers, who will tell you very clearly that faster is almost always better, will love this This type of iterative innovation is never finished and has periodic peaks in investment years, but leads to better long-term customer experiences, customer loyalty, and returns for our shareholders.

2.      **Even Before July 2021, Amazon Knew That Demand For Fast Delivery Began to Decline**

210.    The Individual Defendants' statements from July 2021 through April 2022 were in conflict with the reality that, by no later than July 2021, it was clear to the Individual Defendants that Amazon's fulfillment network had excess capacity—and that Amazon had already begun to reverse course on its expansion efforts.

211.    As the Individual Defendants eventually admitted on April 28, 2022—when Amazon announced a $3.8 billion net loss for first quarter of 2022—that Amazon needed to turn to "improving productivity and cost efficiencies" in Amazon's "fulfillment network." On the Company's Q1 2022 earnings conference call that day, defendant Olsavsky disclosed $4 billion in costs resulting from "the state of the labor force and fulfillment network" in connection with Amazon "being overstaffed, resulting in lower productivity" and "overcapacity."

212.    However, as *The Wall Street Journal* reported on June 16, 2022, Amazon had been aware of the problem since at least July 2021, when Jassy began "working to cut back the excesses" from the "Bezos-Led Overexpansion" which resulted one of the "worst stretches for financial performance in Amazon's history."

213.    As *The Wall Street Journal* reported, in early 2020, following the "unprecedented" increase in purchase volume, Amazon was "short-staffed and often out of stock on key items," in some cases, pushing their delivery window from "two days to weeks." As a result, Amazon wanted "more capacity fast" with executives repeatedly relying on the higher forecasting estimates for planning, including for new buildings and "other infrastructure." These were investments that would take "18 months to two years to come online" and "[w]hen the virus receded, Amazon was left with more planned capacity than orders."

214.    When the news broke in June 2022, defendant Jassy had already closed 68 stores,

"much of the company's bricks-and-mortar retail operation," and was still looking for ways to "sublease at least 10 million square feet of excess warehouse space, defer construction of new facilities" and "end or renegotiate leases." However, problems in "Amazon's retail and logistics operation had actually begun to show before" Jassy took over, and by July 2021, Jassy and Amazon were aware that their "capacity was outpacing demand" and "made a series of intensifying cutbacks to the plans for capacity growth." Amazon "again cut back capacity growth plans in September and December of 2021."

215. The reports on Amazon's abandonment of various new facilities confirm that defendant Jassy and Amazon, despite their public statements, were already well aware of the problem, and further confirms that Amazon was already making these "intensifying cutbacks" by July 2021.

216. Despite the Individual Defendants' knowledge that Amazon's warehouse and fulfillment center network had excess capacity and far exceeded demand for fast delivery, necessitating significant cutbacks, for nearly nine months, the Individual Defendants concealed those cutbacks from the public investment community while at the same time assuring stockholders that the expansion strategy was necessary and continued apace. *CNBC* reported that, by September 2022, Amazon had closed or canceled at least 44 facilities and delayed opening an additional 25 facilities—in the United States alone—for a combined total of well over 50 million square feet of excess capacity. This is already far beyond the 10 to 30 million square feet of space that Amazon was seeking to sublet, as reported in May 2022 by Bloomberg, and not including the 68 "bricks-and-mortar retail" stores that, as *The Wall Street Journal* reported in June, Amazon had already closed.

3.      **The Individual Defendants Continued to Mislead Stockholders and Represent that Amazon was Expanding Capacity Despite the Substantial Pullback that Was Already Underway**

217.   Even though, as *The Wall Street Journal* reported, the Company had already decided to pull back significantly on its expansion plans by July 2021, the Individual Defendants nevertheless continued to publicly represent that its expansion plans continued. For example:

- On September 20, 2021, Amazon announced their first fulfillment center in North Dakota: "We are excited to have this fulfillment center up and running, which will allow us to deliver more packages, in a faster time frame, to our customers in North Dakota, Minnesota and South Dakota. We are committed to employing hundreds here in the Fargo-Moorhead region." Said John Sabo, Amazon General Manager, Fargo.).[81]

- On September 23, 2021 Amazon announced, "faster Same-Day Delivery" expansion in select cities, which required new employees for the "new fulfillment centers" that Amazon built "in each community."[82]

- On December 9, 2021, Amazon announced its first "sub-same day" delivery fulfillment warehouse in Utah, for even faster shipping. As Amazon explained, the new fulfillment center allowed Amazon to "fulfill and deliver out of one building and directly to customers" who would "go from click to delivery in five hours or

---

[81] Amazon Opens     First Fulfillment Center in North Dakota (Sept. 20, 2021), https://press.aboutamazon.com/news-releases/news-release-details/amazon-opens-first-fulfillment-center-north-dakota

[82] Faster Same-Day Delivery expansion creates new, flexible roles across the U.S. (Sept. 23, 2021), https://www.aboutamazon.com/news/operations/faster-same-day-delivery-expansion-creates-new-flexible-roles-across-the-u-s

less." [83]

- On March 18, 2022, Amazon announced that the first "same-day" fulfillment delivery center in Massachusetts would allow customers to "click purchase" and have an order on their "doorstep within hours." ("We want you to be able to get what you want and need, when you want and need it.").[84]

### 4. Amazon Delayed or Canceled the Opening of Numerous Buildings

218.   During 2021, Amazon announced or confirmed plans to launch numerous large facilities across the country. By 2022, however, many of these facilities (representing substantial square footage) were delayed or canceled entirely due to Amazon's excess capacity. But it was not until April 28, 2022 that the Individual Defendants finally admitted that Amazon was over capacity.

219.   The scope and scale of the excess capacity is staggering. As discussed above, by September 2022 Amazon had closed or canceled at least 44 facilities and delayed opening an additional 25. During the Relevant Period alone, the Individual Defendants caused Amazon to misleadingly announce the opening of multiple sites that would either never open, be delayed indefinitely or which sat idle. For example, in August 2021, Amazon announced plans for 1 million-square-foot fulfillment center to open in Clarksville, Tennessee in 2022: "Amazon is proud to be part of the Clarksville community and make this investment toward workforce and economic advancement in the area." A year later, the fulfillment center was delayed with no official opening

---

[83] Amazon unveils first sub-same day delivery station in SLC (Dec. 9, 2021), https://ksltv.com/478572/amazon-unveils-first-sub-same-day-delivery-station-in-slc/

[84] Amazon Opens First Same-Day Fulfillment Center in Massachusetts (Mar. 18, 2022), https://www.businesswire.com/news/home/20220317005938/en/Amazon-Opens-First-Same-Day-Fulfillment-Center-in-Massachusetts

date and the same misleading explanation discussed above: "While we are delaying the launch of our new facility in Clarksville, it is still a part of our future plans. Will keep you posted as those firm up down the road," said an Amazon spokesperson.

220.    On September 8, 2021, the Individual Defendants caused Amazon to announce plans to open a 1 million-square-foot facility in Delta Township, Michigan by 2022. However, the launch was delayed by over a year. As the Lansing State Journal reported on March 14, 2022, in a February email an Amazon spokesperson confirmed that the facility would not launch until 2024, but misleadingly indicated the reasons for the change were not related to a pullback on fulfillment expansion: "The only thing that's changed with our plans is the timing We are a dynamic business and have dozens of fulfillment centers, sortation centers and delivery stations that are evolving and under construction across the country."[85]

221.    On September 16, 2021, the Individual Defendants caused Amazon to announce plans to launch two 1 million-square- foot distribution centers in Pasco, Washington: "We're excited to open two new, state-of-the-art facilities in the city of Pasco . . . and we look forward to growing employment in the Tri-City region." Amazon said it would begin hiring in 2022, but in May of 2022 an Amazon spokesperson confirmed that both of the facilities would be delayed— without a specific reason or a timeframe: "We're still excited to launch in Pasco, though we've had to adjust our timing."

222.    In October 2021, the Individual Defendants caused Amazon to announce a new 1 million-square-foot fulfillment center in Canton, Ohio to open in 2022: "We're excited to be expanding our network to better serve our customers in Northeast Ohio." However, in March of

---

[85] Amazon fulfillment center in Delta Twp. won't open this fall (Mar. 14, 2022) (available on Lexis).

2022, Amazon confirmed that the facility would be delayed to 2023.[86]

223.    In November 2021, citing supply chain disruptions, Amazon delayed opening its massive 3.8 million-square-foot fulfillment facility in Clay, New York. The $350 million facility was scheduled to open in the fall 2021. In April 2022, the Individual Defendants were still misleadingly blaming supply chain issues, delayed the Clay facility for a fourth time.

224.    The scope of Amazon's efforts to reduce its fulfillment capacity has been significant, even if Amazon itself has provided little detail concerning particular facilities. By July 2022, Amazon's workforce had declined by 99,000 employees from the first to the second quarter of 2022 — what *GeekWire* reported was "the largest sequential drop" in the Company's history. And, by September 2022, Amazon canceled, delayed, or subleased at least 69 previously planned facilities, including those specifically referenced in the below chart:

| Location | Building Estimate | Location |
|---|---|---|
| Alcoa, TN | 634,000 SF fulfillment center | February 2022 – Delayed to 2023 |
| Arvada, CO | Delivery station | June 2021 – Canceled |
| Bakersfield, CA | 128,000 SF delivery station | July 2022 – Delayed opening indefinitely since 2021 |
| Bellmawr, NJ | Delivery station | June 2022 – Closed and put up for sublease |
| Bessemer, AL | Airhub/sortation center | September 2022 – Canceled |
| Bethpage, NY | Delivery station | September 2022 – Closed and put up for sublease |
| Branford, CT | Delivery station | May 2022 – Closed |
| Canton, MS | 700,000 SF fulfillment center | February 2022 – Delayed indefinitely |
| Canton, OH | 1 million SF fulfillment center | March 2022 – Delayed to 2023 |
| Chamblee, GA | 103,000 SF Delivery Station | June 2022 – Canceled |
| Churchill, PA | 3 million SF distribution | March 2022 – Canceled |

---

[86] Hexamer: Supply Issues, Aggressive Construction Schedule Cause Amazon Opening Delay (Mar. 22, 2022), https://www.whbc.com/hexamer-supply-issues-aggressive-construction-schedule-cause-amazon-opening-delay/.

| | | |
|---|---|---|
| | center | |
| Clarksville, TN | 1 million SF fulfillment center | August 2022 – Delayed to 2023 |
| Clay, NY | 3.8 million SF fulfillment center | November 2021 – Delayed to 2022 |
| Cocoa, FL | 200,000 SF delivery station | July 2022 – Opening delayed to 2023 |
| Coral Springs, FL | 250,000 SF distribution center | June 2022 – Canceled and subleased |
| Crystal Lake, IL | Delivery station | September 2022 – Canceled |
| Davenport, IA | 640,000 SF fulfillment center | May 2022 – Delayed to 2024 |
| Dayton, OH | Delivery station | September 2022 – Opening delayed to 2024 |
| Dedham, MA | Delivery station | August 2022 – Closed |
| Delta Township, MI | 1 million SF facility | March 2022 – Delayed to 2024 |
| Egg Harbor City, NJ | Delivery station | August 2022 - Canceled |
| Englewood, CO | Delivery station | September 2022 – Closed and subleased |
| Enka Village, NC | Delivery station | September 2022 – Opening delayed indefinitely |
| Essex, MD | 270,000 SF delivery station | August 2022 – Closing in October 2022 |
| Everett, MA | Delivery station | August 2022 – Closing in Q3 2022 |
| Fort Meyers, FL | 1.5 million SF fulfillment center | September 2022 – Canceled |
| Gates, NY | 2.6 million SF fulfillment center | July 2022 – Delayed to 2023 |
| Greensboro, NC | Fulfillment center | September 2022 – Canceled |
| Hamburg, NY | 181,000 SF Delivery center | August 2022 – Opening delayed to 2023 |
| Hanover, MD | 154,000 SF delivery station | August 2022 – Closing in 2022 |
| Hayward, CA | 507,000 SF delivery station | August 2022 – Canceled and subleased |
| Hoffman Estates, IL | Fulfillment center | September 2022 – Canceled and put up for sublease |
| Hudson, NH | Two 1 million SF warehouses | April 2022 – Canceled |
| Huntley, IL | 630,000 SF Cross Dock | July 2022 – delayed to 2023 |
| Kansas City, MO | 700,000 SF Fulfillment center | September 2022 – Canceled |
| Lawrence, WI | $200 million fulfillment center | May 2022 – Canceled |
| League City, TX | 180,000 SF delivery station | June 2022 – Opening delayed indefinitely |

| | | |
|---|---|---|
| Louisville, KY | Fulfillment center | September 2022 – Canceled |
| Mansfield, MA | Delivery station | August 2022 – Closing in Q3 2022 |
| Marriott- Slaterville, UT | 183,000 SF distribution center | June 2022 – Opening delayed to 2024 |
| Meridian, ID | Delivery center | August 2022 – Opening delayed indefinitely |
| Milford, MA | Delivery station | August 2022 – Closing in Q3 2022 |
| Miramar, FL | Delivery center | September 2022 – Opening delayed indefinitely |
| Montgomery, OH | Fulfillment center | September 2022 – Delayed to 2023 |
| Nashville, TN | Delivery station | July 14, 2022 – Closed |
| New York, NY | Delivery station | September 2022 – Closing and up for sublease |
| Newark, NJ | Airhub/sortation center | July 2022 – Canceled |
| Oceanside, CA | 143,000 SF delivery station | August 2022 – Canceled |
| Papillion, NE | 700,000 SF fulfillment center | July 2022 – Delayed to 2024 |
| Pasco, WA | 1 million SF distribution center | May 2022 – Delayed to 2023 |
| Peñitas, TX | 650,000 SF Fulfillment center | May 2022 – Canceled |
| Pittsfield, MI | 143,000 SF delivery station | August 2022 – Delayed indefinitely |
| Porter, TX | Delivery station | June 2022 – Delayed Indefinitely |
| Randolph, MA | Delivery station | August 2022 – Closing in Q3 2022 |
| Riviera Beach, FL | Delivery station | September – Opening delayed indefinitely |
| Round Rock, TX | $250 million fulfillment center | May 2022 – On hold indefinitely |
| Salinas, CA | 2.8 million SF fulfillment center | April 2022 – Canceled |
| San Antonio, TX | $200 million fulfillment center | June 2022 – Delayed to Q4 2023 |
| San Leandro, CA | 294,000 SF delivery station | August 2022 – Canceled and subleased |
| Shreveport, LA | 3.4 million SF fulfillment center | June 2022 – Delayed to 2023 |
| Sioux Falls, SD | 600,000 SF fulfillment center | June 2022 – Delayed to 2024 |
| Slidell, LA | Delivery center | July 2, 2022 – Opening delayed indefinitely |
| Sonoma, CA | 250,000 SF delivery station | August 2022 – Canceled |
| Sturtevant, WI | Distribution center | February, 2022 – Closed |

| Valparaiso, IN | Delivery station | April 28, 2022 – Opening delayed indefinitely |
| Waco, TX | 700,000 SF fulfillment center | June 2022 – Delayed Indefinitely |
| West Covina, CA | 177,000 SF delivery station | March 2022 – Canceled |
| Wilmington, NC | Delivery station | September, 2022 Delayed Indefinitely |
| Woodward, IA | 1 million SF fulfillment center | November 2021 – Canceled |
| Ypsilanti, MI | 183,000 SF delivery station | August 2022 – Canceled |

### F.    The Individual Defendants Permit Numerous Violations of State Biometric Safety Laws

#### 1.    Amazon's History With Biometrics

225.    In 2002, Amazon launched its cloud-computing subsidiary, Amazon Web Services ("AWS"). AWS provides a range of services to business and individuals including web hosting, storage, distributed computing, and analytics. Amazon is now the largest cloud computing service provider in the world. As part of the more than 200 services provided to its customers, AWS regularly receives, processes, and stores personal information of various individuals that provide this information to its customers.

226.    In 2014, Amazon began its foray into being an active presence in its customers' homes with its Alexa virtual assistant. Amazon's Alexa is now found on countless devices in millions of households, including on smartphones, televisions, speakers, as well as in Amazon's Echo products. As part of its services, Amazon's Alexa recognizes and stores details related to voice patterns and makes and stores recordings of its interactions with users. Biometrics is the technical term for measurements used to identify people's unique physical characteristics. Examples of biometric identifiers include an individual's DNA, fingerprints, irises or retinas, voiceprints, and facial geometry. The uniqueness and potential permanence of biometric identifiers present an advantage for businesses to accurately identify and distinguish individuals. Businesses

presently use biometrics in a wide variety of applications, including data collection.

227.     One technological application of biometrics is facial recognition software. Facial recognition software uses biometrics to map facial features from a photograph or video. In particular, the software uses an algorithm that calculates a unique digital representation of the face based on the geometric relationship of a person's facial features (such as the distance between their eyes, ears, and nose), creating a face signature or map. The software then compares the information with a database of known faces to find a match.

228.     Facial recognition technology has been in use for many decades and is one of the most widely used biometrics. Facial recognition technology uses the layout of facial features and their distance from one another for identification against a "gallery" of faces with similar characteristics. These characteristics can be derived from either a still or video images. Using statistics, facial recognition algorithms can measure the differences between the face being searched and the enrolled faces in a gallery. The smaller the difference, the more likely those faces match.

229.     Facial recognition technology is primarily used for three different types of applications: first, facial recognition technology can anonymously characterize faces. This allows for counting unique faces presented to the sensor over a period of time (sometimes called a "people counter"). Other functions include estimating the age, gender, ethnic origin, and even body mass index of each unique face thus encountered, usually for marketing purposes. Second, facial recognition technology can verify a face against a known image. For example, this would allow for confirmation that a face presented at a border checkpoint matches the digital face embedded in a document. It also allows for access control, such as at the entrance of a building with a known and restricted population. This function is typically called "verification." Third, facial recognition

technology allows for identification of a face against a number of known faces within a database. For example, this allows for the technology to see if a criminal or terrorist in a surveillance video matches any mug shot photos of people previously arrested or convicted. This function is typically called "identification."[87]

230.    Facial recognition technology has improved over the past decade. Lower costs and increased accuracy have allowed companies like Amazon to deploy increasingly sophisticated facial recognition software in their applications—but it also has raised serious privacy concerns.

231.    Biometrics present significant potential privacy threats to the individual if they are compromised, such as a heightened risk for identity theft. While biometrics have been touted as a way to improve security and potentially limit fraud, the use of biometrics raise grave concerns about potential constant and surreptitious surveillance of individuals by the government and private entities. Additionally, if a person's biometric data is compromised, the harm could be irreparable because this data would remain compromised. While other types of theft, such as compromising of bank accounts or credit card numbers, can be mitigated by obtaining new account information, people cannot obtain new biometric data facial bone structure or DNA. Additionally, significant privacy concerns surround the use of biometric data. These concerns include employers' ability to discover protected health information; ambiguous standards concerning when biometric information can be shared, including with law enforcement; and multimodal big data storage, in which multiple images and various types of biometrics are stored in a database for widespread use.

232.    Due to the growing concern over the use of biometrics and facial recognition

---

[87] "Face Biometrics." IBIA, https://www.ibia.org/biometrics-and-identity/biometric-technologies/face. Last Accessed 31 Oct. 2022.

technology, state laws, including in Illinois and Texas, prohibit commercial entities from capturing an individual's biometric identifier without his or her consent. Both states also require businesses to protect biometrics using a reasonable standard of care that is the same as, or more protective than, that used for other confidential or sensitive information. They also prohibit selling or disclosing a biometric without consent, with certain exceptions, such as for law enforcement purposes. In addition, at least 19 states restrict using, disclosing or sharing biometric data by either public or private entities, or require security measures, such as encrypting or properly destroying records with biometrics. And at least 20 states have enacted legislation to protect the personal biometric information of students or minors.

## 2.    The Illinois Bioinformation Privacy Act

233.    In 2008, the Illinois General Assembly enacted the Illinois BIPA to enhance the state's "limited State law regulating the collection, use, safeguarding, and storage of biometrics[.]" 740 Ill. Comp. Stat. § 14/5(e). BIPA defines a "biometric identifier" as including a "scan of hand or face geometry." 740 Ill. Comp. Stat. § 14/10. The legislature noted that "[b]iometrics are unlike other unique identifiers that are used to access finances or other sensitive information," because while social security numbers can be changed if compromised, biometric data are "biologically unique to the individual," and "once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions." 740 Ill. Comp. Stat. § 14/5(c).

234.    BIPA defines "biometric information" as:

> a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry. Biometric identifiers do not include writing samples, written signatures, photographs, human biological samples used for valid scientific testing or screening, demographic data, tattoo descriptions, or physical descriptions such as height, weight, hair color, or eye color. Biometric identifiers do not include donated

organs, tissues, or parts as defined in the Illinois Anatomical Gift Act or blood or serum stored on behalf of recipients or potential recipients of living or cadaveric transplants and obtained or stored by a federally designated organ procurement agency. Biometric identifiers do not include biological materials regulated under the Genetic Information Privacy Act. Biometric identifiers do not include information captured from a patient in a health care setting or information collected, used, or stored for health care treatment, payment, or operations under the federal Health Insurance Portability and Accountability Act of 1996. Biometric identifiers do not include an X-ray, roentgen process, computed tomography, MRI, PET scan, mammography, or other image or film of the human anatomy used to diagnose, prognose, or treat an illness or other medical condition or to further validate scientific testing or screening.

740 ILCS 14/10.

235.    Under BIPA, a company may not collect or otherwise obtain a person or a customer's biometric identifier or biometric information without informing the subject in writing and securing a written release. Nor may a company profit from an individual's biometric identifiers and information. Moreover, companies must have a public, written policy establishing a retention schedule for biometric identifiers and information and guidelines for their permanent destruction. BIPA, §§ 14/15(a)–(e).

236.    BIPA provides for a private right of action. For negligent violations of the Act, BIPA provides for liquidated damages of $1,000 or actual damages, whichever is greater for each violation; and in the case of intentional or reckless violations, statutory damages in the amounts of $5,000 or actual damages, whichever is greater for each violation. BIPA also provides for reasonable attorneys' fees and costs, including expert witness fees and other litigation expenses, and any other relief, including an injunction, as the state or federal court may deem appropriate.

### 3.    Other States Restrict Collection and Usage of Biometric Data

237.     Since 2009, Texas has also had a biometric privacy act that prohibits the capture of an individual's biometric identifiers for a commercial purpose unless the individual is first informed and has consented to such data collection, the Capture or Use of Biometric Identifier Act ("CUBI"). The law also limits the sale or disclosure of an individual's biometric information except under limited circumstances. In the law, "biometric identifier" means a retina or iris scan, fingerprint, voiceprint, or recording of hand or face geometry.

238.     A violation of the Texas law is subject to a civil penalty of not more than $25,000 for each violation. The attorney general may bring an action to recover the civil penalty. Unlike BIPA, there is no statutory private right of action under the CBUI, but government enforcement for violation of the CBUI poses enforcement risks in the millions of dollars. Therefore, there is substantial civil exposure for noncompliance.

239.     In 2017, the State of Washington became the third state to enact a targeted biometric privacy law, HB 1493. Since then, the states of Arkansas, California, and New York have expanded cybersecurity data breach notification statutes to include protections for biometric data. The states of Delaware, Michigan, Massachusetts, Arizona, and Alaska currently have legislation pending concerning protecting biometric data.

240.     Underscoring the legal risks and magnitude of exposure, Meta, Inc. (the parent of Facebook Inc. ("Facebook")) recently reached a $650 million settlement for alleged violations of Illinois' BIPA for their use of facial recognition software without permission from affected users. The Texas Attorney General has sued Meta/Facebook for alleged violations of the Texas Business and Commercial Code, which contains provisions governing the collection, retention and disclosure of biometric data.

241.     Given this legal and regulatory landscape, according to defendant Bezos, serving

as the Company CEO, "Privacy is the one aspect of Alexa that Amazon can't afford to screw up."

### 4.   Amazon's Collection and Usage of Biometric Data Violates State Law

242.   Rekognition, which launched in November 2016, is Amazon's core facial recognition product. Rekognition allows users to match new images of faces with existing, known facial images "based on their visual geometry, including the relationship between the eyes, nose, brow, mouth, and other facial features." Rekognition is a cornerstone of many of Amazon's largest consumer products and services, including its photo platform, Amazon Photos, its smart home systems and cameras, and its virtual assistant technology, Alexa.

243.   Amazon is also the largest provider of facial recognition technology to law enforcement agencies. The Company has marketed its Rekognition software to agencies such as the U.S. Immigration and Customs Enforcement and the Federal Bureau of Investigation, to monitor individuals they consider "people of interest." Amazon has also partnered with more than 1,300 law enforcement agencies, allowing them to use footage from their Ring home security cameras in criminal investigations. Amazon has expanded these efforts marketing their facial recognition software to government agencies despite warnings from consumers, employees, members of Congress, and stockholders.

244.   In July 2018, the American Civil Liberties Union of Northern California ("ACLU") published the results of a study it conducted regarding Rekognition's accuracy. According to the study, Rekognition incorrectly matched twenty-eight members of the U.S. Congress to people who had been arrested for a crime. The false matches disproportionately involved people of color. That summer, nearly seventy civil rights and research organizations wrote a letter to Bezos demanding that Amazon stop providing facial recognition technology to governments. In their letter, they called the Company to "stand up for civil rights and civil liberties," stating "Rekognition is a

powerful surveillance system readily available to violate rights and target communities of color." Amazon's own employees demanded the Company to stop selling its Rekognition facial recognition software to law enforcement, citing concerns over the "unique threat to civil rights and especially to the immigrants and people of color under attack by [President Donald J. Trump's] administration."

245.     To improve the accuracy of its facial recognition products and technologies, Amazon purportedly obtained a data set from IBM, referred to as the "Diversity in Faces Dataset" after IBM made it available to for-profit companies in early 2019.

246.     To access the Diversity in Faces Dataset, Amazon used the links provided by IBM to download or otherwise obtain from the Flickr Dataset each photograph in order to associate the biometric identifiers and information provided by IBM with the actual photographs to which the biometric data related. Amazon's collection and use of the Diversity in Faces Dataset allowed it to profit from such data, including data of Illinois residents obtained and used without their consent, by allowing Amazon to improve the effectiveness of its own facial recognition technology and products.

247.     Additionally, Amazon Alexa and Echo devices are designed to record and respond to communications immediately after an individual says a wake word (usually "Alexa" or "Echo"). If the wake word is recognized, Alexa records the ensuing communication and then transmits the recording to Amazon's servers for interpretation and processing before receiving the relevant data in response. Alexa also records surrounding voices and sounds once activated, including those not spoken by the user conversing with Alexa. Amazon uses voice recognition technology to surreptitiously collect, use, and store voiceprints of its users to identify them, as well as using voice pattern data in conjunction with other customer data for its recognition capabilities. Such

recordings are retained as part of a user's account unless a user actively deletes them. Alexa capability can be found on more than 100 million devices sold since January 2020.[88] These include televisions, light bulbs, smart locks, phones, thermostats, appliances, speakers, and vehicles, in addition to Amazon's own line of Echo products.

248.    Finally, as part of Amazon's suite of services offered through AWS to its numerous commercial customers, AWS also stores various types of personal identifying information ("PII"), including biometric information, that is collected by those customers. Such information can include, for example, fingerprints or hand scans of an AWS customer's employees for security and identification purposes. Additionally, AWS stores PII of the individual customers of its commercial AWS customers, such as voiceprints used to identify callers to a call center or even the scanned facial geometry of players of video games.

249.    In and around September 2021, Amazon announced a series of new updates, focusing on the biometric capabilities of some of its hardware products, as well as on the company's AWS marketplace.[89] By way of example, at its Enterprise Connect event on Monday September 27, 2021, the retail giant announced three new capabilities for Amazon Connect for contact centers. According to the company's new data, tens of thousands of AWS customers are supporting more than 10 million contact center interactions a day on Amazon Connect. The new platform updates employ voice biometrics via AWS's caller authentication tool Amazon Connect Voice ID. The biometric solution reportedly provides real-time caller authentication and enables

---

[88] Rubin, Ben Fox. "Amazon's Alexa World Just Got Much Bigger." CNET, 6 Jan. 2020, https://www.cnet.com/home/smart-home/amazon-sees-alexa-devices-more-than-double-in-just-one-year/.

[89] Mascellino, Alessandro. "Amazon Unveils Series of Face and Voice Biometrics Updates." Biometric Update, BiometricUpdate.com, 30Sept. 2021, https://www.biometricupdate.com/202109/amazon-unveils-series-of-face-and-voice-biometrics-updates.

voice access via machine learning by analyzing the caller's speech attributes, like rhythm, pitch, and tone. Another biometric update unveiled by Amazon at its product launch event related to the Echo Show 15, and its face biometrics capabilities. The novel Visual ID biometrics feature enables Alexa devices to show users personalized recommendations, calendars, to-do lists, and more when their faces enter the camera's field of vision.

### G. The Truth Emerges

#### 1. The Individual Defendants' Illegal, Anticompetitive Business Practices Come to Light

250. On April 28, 2020, *CNBC* published an article entitled "GOP Sen. Hawley asks DOJ to open a criminal investigation into Amazon." According to the article, Senator Hawley requested that the DOJ open a criminal investigation into Amazon, citing claims that the Company engaged in "predatory and exclusionary data practices to build and maintain a monopoly" following reports that Amazon used data from third-party sellers to compete with them using its private-label business. Senator Hawley further stated that "Amazon abuses its position as an online platform and collects detailed data about merchandise so Amazon can create copycat products under an Amazon brand." That same day, *States News Service* likewise published an article detailing Senator Hawley's call for action, including the senator's letter to the DOJ, which alleged, inter alia, that "Amazon appears to recognize that using this data to develop its own merchandise is problematic. Indeed, Amazon insists it has adopted policies prohibiting this conduct. Yet Amazon's own employees and documents suggest that what Amazon says in its policies and what Amazon does in practice are two different things. Even if Amazon's statements are true, they are hardly reassuring. Amazon does not deny that it uses precise, intrusive data to create its own

merchandise."[90] On this news, Amazon's stock price fell $61.92 per share, or 2.61%, to close at $2,314.08 per share on April 28, 2020.

251.    On May 1, 2020, the first headline for an article titled, "Amazon's Bezos Faces Call to Testify Before House Panel," went live at 10:34 a.m. The article noted that the members of an antitrust panel for the House Judiciary Committee had requested that defendant Bezos testify regarding concerns that the Company used data from third-party sellers on its site to develop competing products, in contradiction to representations the Company previously made under oath to Congress in July 2019.[91]

252.    Later that day, at 4:33 p.m., *Fox News* published an article titled "Jeff Bezos could testify for Amazon's 'possibly criminally false' statements to Congress, letter reveals."[92]The article reported that "[t]he lawmakers also referenced Amazon's lack of cooperation with Congress' antitrust probe of the company." On this news, Amazon's stock price fell the same day from $2,323.00 per share at 10:34 a.m. to close at $2,286.04, a decline of $36.96 per share or 1.59%.

253.    On July 23, 2020, *The Wall Street Journal* published an article entitled "Amazon Met With Startups About Investing, Then Launched Competing Products." The article reported, in relevant part, that Amazon engaged in the practice of making initial investments or meetings with start-ups for the purpose of securing their proprietary information before launching Amazon's

---

[90] "Senator Hawley Requests Criminal Antitrust Investigation of Amazon," States News Service (Apr. 28, 2020) (available on Lexis Nexis).
[91] Ben Brody, "Amazon's Bezos Faces Call to Testify Before House Panel," Bloomberg (May 1, 2020), available at https://www.bloomberg.com/news/articles/2020-05-01/amazon-s-bezos-called-to-testify-before-house-antitrust-panel#xj4y7vzkg.
[92] Christopher Carbone, "Jeff Bezos could testify for Amazon's 'possibly criminally false' statements to Congress, letter reveals," Fox News (May 1, 2020 4:33pm), available at https://www.foxnews.com/tech/jeff-bezos-testify-amazon-congress.

own competing products. On this news, Amazon's stock price fell $113.36 per share, or 3.66%, to close at $2,986.55 per share on July 23, 2020.

254.    On August 3, 2020, *Bloomberg* published an article entitled "Amazon's Market Power to Be Investigated by New York AG." The article reported that the New York and California Attorneys Generals were joining the FTC's antitrust probe into Amazon. Business Insider reported, the same day, in an article entitled "Amazon is reportedly facing a new antitrust investigation into its online marketplace led by the FTC and attorneys general in New York and California" that the joint probe relates to Amazon's treatment of third-party sellers and competition with its own products. On this news, Amazon's stock price fell $52.79 per share, or 1.67%, to close at $3,111.89 per share on August 3, 2020.

255.    On October 6, 2020, the Subcommittee released a report on Amazon's anticompetitive practices. News agencies noted that the report hinted at a breakup of big tech companies and detailed concerns about the anticompetitive practices of Amazon. On this news, Amazon's stock price fell $99.24 per share, or 3.1%, to close at $3,099.96 per share on October 6, 2020.

256.    On April 6, 2022, *The Wall Street Journal* published an article entitled "SEC Is Investigating How Amazon Disclosed Business Practices." The article reported, in relevant part:

> Federal securities regulators are investigating how Amazon.com Inc. has disclosed some details of its business practices, including how it uses third party-seller data for its private-label business, according to people familiar with the matter.
>
> The Securities and Exchange Commission is probing how the technology giant— the largest U.S. e-commerce retailer and cloud-computing company—handled disclosures of its employees' use of data from sellers on its e-commerce platform, the people said. The SEC's enforcement division has asked for emails and

communications from several senior Amazon executives, according to one of the people.

\* \* \*

As a result of its 16-month investigation into technology companies including Amazon beginning in 2019, the [House Judiciary Committee] proposed a series of bills aimed at reining in tech giants. One of the measures targets Amazon's private- label business, seeking to make it unlawful for the company to give its own products preference over those of competitors, or to use sellers' nonpublic data to compete with them.

\* \* \*

The SEC's probe has been under way for more than a year, one of the people familiar with the matter said.

257.    On this news, Amazon's stock price fell $105.98 per share, or 3.2%, to close at $3,175.12 per share on April 6, 2022.

258.    Predictably, Amazon's investors were upset with these revelations and certain investors filed suit against Amazon, and defendants Jassy, Bezos, Olsavsky, Zapolsky, Sutton and Fildes for purported violations of federal securities laws beginning in May of 2022. *See Joyce v. Amazon.com, Inc. et al.,* Case No. 2:22-cv-617-JHC (the "Securities Action"). The Securities Action is brought on behalf of a "Class" of investors who purchased Amazon stock between February 1, 2019 and April 28, 2022, inclusive, and alleges that the above-named defendants violated federal securities laws by issuing materially false and misleading statements, and/or omitting information necessary to make their public statements not misleading about Amazon's illegal and anti-competitive conduct. A Consolidated Complaint has recently been filed in the Securities Action and motion to dismiss briefing is likely to commence in short order.

**2.      The Emerges About Decreasing Demand for Fast Delivery**

259.    On April 28, 2022, the Individual Defendants caused Amazon to announce the Company's financial results for the first quarter of 2022. The Company reported a $3.8 billion net loss—its first quarterly loss since 2015. In Amazon's earnings release, filed with the SEC that same day on Form 8-K, defendant Jassy admitted that the Individual Defendants were "no longer chasing physical or staffing capacity." Instead, Jassy explained, the Company would turn to "improving productivity and cost efficiencies" in Amazon's "fulfillment network." After two years of vast expansion, Jassy admitted that these improvements "may take some time." Additionally, Jassy said that Amazon was seeing "encouraging progress on . . . delivery speed performance." Jassy admitted, however that shipping speeds were only then "approaching levels not seen since the months immediately preceding the pandemic in early 2020"—despite the fact that faster delivery had repeatedly been the publicly stated basis for Amazon's aggressive fulfillment spending during those two years.

260.    On the Company's first-quarter 2022 earnings conference call with stockholders and analysts that day, defendant Olsavsky disclosed $6 billion of "incremental costs," including $4 billion of costs that corresponded "to the state of the labor force and fulfillment network." Regarding labor, Olsavsky stated that "we've quickly transitioned from being understaffed to being overstaffed, resulting in lower productivity. This lower productivity added approximately $2 billion in cost compared to last year."

261.    Regarding the fulfillment network, Olsavsky stated:

> [W]e currently have excess capacity in our fulfillment and transportation network. [W]e made conscious decisions in 2020 and early 2021 to not let space be a constraint on our business. During the pandemic, we were facing not only unprecedented demand but also extended lead times on new capacity, and we've built towards the high end of a very volatile demand outlook.    We estimate that this overcapacity, coupled with the extraordinary leverage we saw in Q1 of last year resulted in $2 billion of additional costs year over

year in Q1. We do expect the impacts of this fixed cost leverage to
persist for the next several quarters as we grow into this capacity.

262.   Defendant Olsavsky further admitted on the first-quarter 2022 earnings call that
"[i]n the consumer business . . . we currently have some excess capacity in the network that we
need to grow into, so we have brought down our build expectations," adding that "many of the
build decisions were made 18 to 24 months ago, so there are limitations on what we can adjust
midyear." However, as discussed above, what defendant Olsavsky and the Individual Defendants
did not say was that the Company had spent that last nine months reassuring the market that
Amazon's continued, increasing investments in capacity were both necessary to meet short-term
demand for e-commerce and fast delivery, and would add value in the longer term. On the same
call, in response to analyst questions concerning the costs of Amazon's "capacity issues," Olsavsky
stated that "we have a chance to more right- size our capacity to a more normalized demand
pattern." Beyond the reported net loss, the first quarter of 2022 also marked Amazon's slowest
quarterly growth since 2001. As *CNBC* reported, "Amazon's revenue increased 7%      compared
with 44% expansion" in the first quarter of 2021.

263.   The Company's April 28, 2022 disclosure concerning the significant negative
impact of Amazon's fulfillment network and infrastructure spending caused a precipitous decline
in the market price of Amazon common stock.  Specifically, in response to the April 28, 2022
disclosure, Amazon common stock declined from a closing price of $2,891.93 per share on April
28, 2022 to a closing price of $2,485.63 per share on April 29, 2022, a decline of $406.30 per
share, or 14.05%.

264.   Media coverage on Amazon's "first loss in 7 years" noted the Company's
disclosure that "its major investments in warehouses and staff during the coronavirus pandemic
were catching up with it," including defendant Jassy's admission that Amazon was "no longer

chasing physical or staffing capacity," but instead focusing on "improving productivity and cost efficiencies throughout our fulfillment network."[93] For example, on April 29, 2022, *CNN Business* quoted Jassy's disclosure that Amazon was "no longer chasing physical or staffing capacity" but was instead "focused on improving productivity and cost efficiencies," noting his statements on "Amazon's breakneck growth in its consumer business during the pandemic, and the 'doubling' of the company's fulfillment network in the last two years."

265.    Similarly, *Business Insider* reported on April 29, 2022 that "Amazon [was] over capacity after doubling its warehouse space during the pandemic," and that "[s]hares of Amazon fell more than 13%" following Amazon's Q1 2022 Earnings Call, where defendant Olsavsky: (i) "said the company has 'too much space right now' compared to demand" and (ii) "told analysts on Thursday that Amazon went from being understaffed to overstaffed."

266.    Securities analysts reacted with surprise and concern to Amazon's April 28, 2022 earnings report and the Individual Defendants' disclosure that the Company was pulling back on the aggressive expansion it had previously touted, while stressing the resulting significant negative financial consequences. One firm, Wedbush, titled its April 29, 2022 report "We Aren't Buying What Amazon (Management) is Selling," which aptly illustrates the mistrust and sense of betrayal among securities professionals, and Amazon stockholders more generally, upon learning the truth about Amazon's expansion plans.[94]

267.    Wedbush lowered its 12-month price target from $3,950 to $3,500 based on the news of Amazon's losses. Wedbush cited "a previously unforeseen lack of productivity arising

---

[93] Business Insider US, Amazon tumbles 8.5% in premarket after posting first loss in 7 years (April 29, 2022).
[94] Wedbush, "Amazon.com, We Aren't Buying What Amazon (Management) is Selling; PT to $3,500."

from the company's decision to rapidly expand its fulfillment capacity over the last 24 months ($2 billion in incremental costs)." It reported that "lower fulfillment productivity" was "an extraordinarily weak excuse" for the quarterly losses, asking: "The company nearly doubled its fulfillment capacity over a 24-month period and suffered a lack of productivity at the end of that period but not before? Why the rush to expand? Why not double capacity over 30 months, or 36, or 48? How is it that there was no corresponding lack of productivity in Q3 or Q4 last year?" Wedbush concluded that "Fulfillment ate up all of the growth."

268.    JPMorgan's April 29, 2022 report showed further surprise by elite investment firms at Amazon's unanticipated losses. JPMorgan wrote on April 29, 2022 that "With AMZN having doubled its fulfillment network & nearly doubled its workforce to 1.6M employees over the past 2 years, the company now has excess physical capacity & is overstaffed & is pulling back on spending as anticipated. However, that near-term overbuild led to $4B in lower productivity & inefficiencies in 1Q Y/Y, which we did not anticipate."

269.    BNP Paribas analysts also reported on April 29, 2022 that "Amazon delivered a weak set of earnings, missing consensus margin expectations by 150bps with heavy [free cash flow] outflows of over USD16bn, even missing our conservative estimates." As the report explained, the "internal headwinds" included costs of overexpanding the Company's fulfillment network, as "Amazon finds itself with excess capacity," the analysts "take down our growth expectations as cuts take hold," and "[t]he biggest change is that management is no longer 'chasing' fulfillment & transportation CAPEX."

270.    Other analysts were in accord. Susquehanna Financial Group reported on April 29, 2022 that "excess capacity" was "pressuring profitability . . . as AMZN invested heavily in 2H21 and is now working to reverse the fixed cost deleverage and increase productivity. These

headwinds will all persist in 2Q as well." William Blair Equity Research reported on April 28, 2022 that, along with "weaker-than-expected results for its first quarter ending March 2022" the "bigger headline was the company's first quarter loss since 2015, at a loss per share of $7.56, or nearly $16.00 shy of the Street's earnings per share expectations." RBC Capital Markets wrote on April 29, 2022 that Amazon "missed operating income by $1.7B vs. Street which included $2B of headwinds owing to having excess capacity built out." Telsey Advisory Group reported on April 29, 2022 that "the company missed 1Q22 profit projections, primarily due to elevated operating costs and excess capacity," including "internal (controllable) factors," including $2 billion of "excess capacity/deleverage of fixed assets." Moreover, Telsey reported that "Amazon is focused on resizing its cost structure and eliminating inefficiencies, although it may prove challenging to effectively manage costs, given multiple areas of continued investment."

271.    Considering Amazon's inflated fulfillment costs, analysts highlighted the direct connection between Amazon's two years of capacity expansion and the Company's 2022 losses. PhillipCapital analysts likewise reported on May 4, 2022 about the "internal factors: productivity and overcapacity hurt margins" that were disclosed, and more specifically that the "[e]xcess capacity in fulfilment added [$2 billion] costs."

272.    In the months following the April 28, 2022 disclosure, additional details of Amazon's decisions to pull back on its expansion plans have come to light. On May 24, 2022, technology industry news site The Information reported Amazon had "reversed course on an aggressive build-out," and beginning in March 2022, Amazon "canceled plans for nearly 10 million square feet of warehouse space, shelving plans for more than a dozen fulfillment centers and delivery facilities around the U.S. as the company wrestles with a costly space glut on the heels of the pandemic."

273.    By June 2022, the Individual Defendants' actions to reduce capacity began to reveal the true scale of the situation. Noting "clear signs" of Amazon's "excess capacity problem," research analysts such as Evercore ISI Research continued to remark on the "pace and magnitude of" the Company's "capacity reduction." In a report specifically addressing Amazon's excess capacity problems, Evercore analysts focused on the underlying issues and the severity of the problem:

> The two biggest drivers that led to Amazon's current capacity issue – the overbuilding and overstaffing of the company's retail capacity, as disclosed on the Q1 EPS call – include: a) Amazon over extrapolated strong demand trends to persist post Covid. We are currently seeing consumer demand trends normalizing back to pre-Covid levels – roughly 100bps of Online Retail penetration annually vs. 250bps in 2020; and b) Amazon launched a major accelerated shipping build- out program (Next Day, Same Day, and 'Super Same Day') right before Covid.

274.    As a result of the Individual Defendants' breaches of fiduciary duties and other violations of state law, and the precipitous decline in the market value of Amazon stock, the Company has suffered significant losses and damages.

### 3.    The Truth Emerges About Amazon's Violation of the Illinois BIPA and Other State Bioinformation Privacy Laws

275.    In direct violation of Illinois' BIPA statute, Amazon stored and continues to store its employees, its users,' and its clients' users' biometric information without informing them of these practices and without securing the users' written consent. Amazon also violates BIPA by failing to develop a written policy, available to the public, establishing a retention schedule and guidelines for users to permanently destroy biometric identifiers when the initial purpose for collection was satisfied.

276.    These violations have exposed Amazon to substantial harm resulting to date in at least fourteen separate class action lawsuits for violation of BIPA, a sample of which are set forth

below. In connection with these class action lawsuits, Amazon has already expended significant monetary resources and risks astronomical liability when the actions are resolved. These actions are referred to herein collectively as the "Consumer Class Actions".[95]

277.    On June 26, 2019, a state consumer class action lawsuit was filed on behalf of Amazon users in the Circuit Court of Cook County Illinois (the "*Wilcosky* Class Action"). The *Wilcosky* Class Action, which includes a subclass for individuals who do not have Alexa accounts ("bystanders") and a subclass for minors, asserted causes of action under section 14/15(b) and (a) of Chapter 740 of the Illinois Compiled Statutes. Specifically, the plaintiffs asserted that Amazon's Alexa and Echo devices capture, collect and retain voiceprints of any and all people who speak near Alexa devices, regardless of age or affiliation with Amazon. And in an effort to improve the voice and speech recognition technology, Amazon then retains every voice recording created by the user and any individual who happens to be speaking near the Alexa device. Plaintiffs there assert that Amazon never informed them, by written notice or otherwise, that Amazon collected, stored, and used their biometric identifiers and information, or of the specific purpose and length of term for which their biometric identifiers were being collected, stored, and that Amazon does not publicly provide a retention schedule or guidelines for permanently destroying their biometric

---

[95] *Cooper v. Amazon.com Inc. et al.*, No. 1:21CV04633 (N.D. Ill.); *Ragsdale v. Amazon Web Services, Inc.*, No. 1:20CV00560 (N.D. Ill.); *Redd v. Amazon.com, Inc. et al.*, No. 1:20CV06485 (N.D. Ill.); *Hryniewicki v. Amazon Web Services, Inc.*, No. 1:19CV07569 (N.D. Ill.); *Hogan v. Amazon.com Inc.*, No. 2:21CV00905 (W.D. Wash.); *McGoveran v. Amazon Web Services, Inc. et al.*, No. 3:20CV00031 (S.D. Ill.); *Vance v. Amazon.com, Inc.*, No. 2:20CV1084 (W.D. Wash.); *Flores v. Amazon Inc. et al.*, No. 2:21CV00873 (W.D. Wash.); *Flores v. Amazon Inc. et al.*, No. 1:21CV04064 (N.D. Ill.); *Wilcosky v. Amazon.Com, Inc. et al.*, No. 1:19CV05061 (N.D. Ill.); *Mayhall v. Amazon Web Services Inc. et al.*, No. 2:21CV01473 (W.D. Wash.); *Reid v. Amazon.com Inc. et al.*, No. 1:21CV06010 (N.D. Ill.); *Schaeffer v. Amazon.com, Inc. et al.*, No. 3:21CV01080 (S.D. Ill.); *McGoveran v. Amazon Web Services, Inc. et al.*, No. 1:20CV01399 (D. Del.); *Svoboda v. Amazon.com Inc. et al.*, No. 1:21CV05336 (N.D. Ill.); and *Dorian v. Amazon Web Services, Inc.*, No. 2:22-cv-00269 (W.D. Wash.).

data. Plaintiffs seek damages in the amount of $1,000 for negligent and $5,000 for intentional violation of BIPA, per violation. Amazon removed the action to federal district court for the Northern District of Illinois on July 26, 2019.

278.    On October 8, 2019, a putative Class Action Complaint was filed alleging that AWS unlawfully obtained and stored class members' biometrics information and identifiers in violation of BIPA (the "*Hryniewicki* Class Action"). The *Hryniewicki* Class Action asserted causes of action under section 14/15(a)–(b) of Chapter 740 of the Illinois Compiled Statutes. Specifically, the plaintiffs asserted that Amazon offers cloud storage for businesses that handle biometric identifiers and biometric information, and that BIPA regulates both the conduct of the entities that capture biometric data and companies that store data and information derived from those biometric identifiers. AWS failed to implement a publicly available biometric data retention and destruction policy as required by Section 15(a) of BIPA. They also assert that Amazon never informed them, by written notice or otherwise, of the specific purpose and length of term for which their biometric identifiers were being collected, stored, and used and never obtained written consent for the same, all in violation of Section 15(b) of BIPA. Plaintiffs seek damages in the amount of $1,000 for negligent and $5,000 for intentional violation of BIPA, per violation. Amazon removed the action to federal district court for the Northern District of Illinois on November 15, 2019.

279.    On November 15, 2019, a state consumer class action lawsuit was filed in the Circuit Court of Cook County, Chancery Division on behalf of plaintiffs whose biometric data is stored by Amazon (the "*Ragsdale* Class Action"). The Ragsdale Class Action asserted causes of action under section 14/15(a) and (b) of Chapter 740 of the Illinois Compiled Statutes. Specifically, the plaintiffs asserted that as a leading cloud provider in the United States, AWS offers cloud storage services for businesses that handle biometric identifiers and biometric information,

including employers that collect biometric information on their employees. Plaintiffs assert that despite possessing plaintiffs' biometric data, AWS failed to implement a publicly available biometric data retention and destruction policy as required by Section 15(a) of BIPA. They also assert that Amazon never informed them, by written notice or otherwise, of the specific purpose and length of term for which their biometric identifiers were being collected, stored, and used and never obtained written consent for the same, in violation of Section 15(b) of BIPA. On January 24, 2020, AWS removed the action to the federal District Court for the Northern District of Illinois, expressly pleading for purposes of removal that the amount in controversy exceeds the jurisdictional minimum of $5,000,000 and calculating damages as high as $10,000,000.

280.    On October 16, 2020, a federal consumer class action lawsuit was filed against Amazon Web Services Inc. and Pindrop Security Inc. on behalf of Illinois citizens who used Amazon Connect and Pindrop's voice authentication and/or fraud detection technology during the specified class period (the "*McGovern* Class Action"). The *McGovern* Class Action asserted causes of action under section 14/15(a)–(e) of Chapter 740 of the Illinois Compiled Statutes. Specifically, the plaintiffs asserted that Amazon collected, captured, obtained, possessed and disseminated the biometric voice identifiers of plaintiffs for profit and without their consent in violation of BIPA. Plaintiffs further assert that Amazon failed to use reasonable standards of care in storing and protecting Plaintiffs' biometric information and biometric identifiers in violation of BIPA. Plaintiffs seek damages in the amount of $1,000 for negligent and $5,000 for intentional violation of BIPA, per violation.

281.    On September 28, 2020, a state employee class action lawsuit was filed on behalf of Amazon employees in the Circuit Court of Cook County, Illinois County Department, Chancery Division (the "*Jerinic* Class Action"). The *Jerinic* Class Action asserted causes of action against

Amazon.com Inc. and Amazon.com LLC under section 14/15(a), (b) and (d) of Chapter 740 of the Illinois Compiled Statutes. Specifically, the plaintiffs asserted that, as employees, plaintiffs were required to have facial geometry scanned by a facial recognition camera and to have their temperatures taken before entering work and that this information is scanned, tracked, uploaded and stored in violation of BIPA. Plaintiff employees seek damages in the amount of $1,000 for negligent and $5,000 for intentional violation of BIPA, per violation. Amazon removed the action to federal district court for the Northern District of Illinois on October 30, 2020.

282.    On June 11, 2021, Plaintiffs Angela Hogan ("Hogan") and B.H., a minor, brought a putative class action against Amazon.com, Inc. (the "*Hogan* Class Action") in the Circuit County of Cook Illinois, which action was removed to the U.S. District Court for the Northern District of Illinois. A First Amended Complaint was filed in federal court on July 21, 2021. The Hogan Class Action asserted claims for violation of Section 15 (a)–(c) of BIPA and for unjust enrichment. Specifically, the plaintiffs asserted that the biometric identifiers—scans of facial geometry—of untold millions of people were obtained, stored, and analyzed by Amazon's Rekognition from the billions of images uploaded to Amazon Photos daily in violation of BIPA. Plaintiffs seek damages in the amount of $1,000 for negligent and $5,000 for intentional violation of BIPA, per violation. On March 30, 2022, the court denied Amazon's Motion to Dismiss as to the BIPA claims.

283.    These and numerous additional class action lawsuits known to the Board for many years have placed the Company and the Board on notice of mounting and potential catastrophic harm to the Company and its shareholders. Notably, BIPA provides that an aggrieved party can obtain damages on a "per violation"—not a "per person"—basis. Thus, the potential damages recoverable against Amazon are astronomical to the point that Company could be put out of business if the violations are not immediately addressed, stopped, and remedied.

284.   On top of these "Consumer Class Actions," (which include the lawsuits described in this section) Amazon has faced over 75,000 individual arbitration demands for privacy violations by devices deploying Alexa, forcing Amazon to foot the bill for tens of millions of dollars in case initiation fees due under its own arbitration policy, not to mention Amazon's own attorneys' fees as well as damages and attorneys' fees in any arbitration awards.[96]

## VI.   THE INDIVIDUAL DEFENDANTS' FALSE AND MISLEADING RELEVANT PERIOD STATEMENTS

### A.   The Individual Defendants' Relevant Period Statements About The Company's Business Practices

285.   Given the history described above, during the Relevant Period stockholders were keenly focused on Amazon's efforts to exploit its third-party sellers and to aggressively expand the Company's fulfillment capacity and network. With respect to fulfillment, for nearly a year the Individual Defendants repeatedly stated that Amazon's costly expansion efforts were supported by increasing demand for fast delivery, a service that the Individual Defendants stated set it apart from competitors. In reality, however, demand for fast delivery had slowed by July 2021 and likely months earlier. Rather than acknowledge this declining trend in the months that followed, the Individual Defendants instead continued to reaffirm that the Company's expansion strategy was meeting rising demand for faster delivery and doing so even after the U.S. economy began to reopen after COVID-19 lockdowns.

286.   News reports have confirmed that when the Individual Defendants made their misrepresentations concerning expansion, the Individual Defendants had already instituted

---

[96] *See* Michael Corkery, Amazon Ends Use of Arbitration for Customer Disputes, N.Y. Times, (July 22, 2021), https://www.nytimes.com/2021/07/22/business/amazon-arbitration-customer-disputes.html (reporting that each arbitration demand cost Amazon about $2,900 at the outset – which would equal $217 million for 75,000 arbitration demands).

substantial cutbacks. As reported by the June 16, 2022 article in *The Wall Street Journal*, under defendant Jassy's leadership and direction, those cutbacks began to occur in July, September, and December 2021. Technology industry news site *The Information* similarly reported on May 24, 2022 that Amazon had "reversed course on an aggressive build-out," and beginning in March 2022, Amazon "cancelled plans for nearly 10 million square feet of warehouse space, shelving plans for more than a dozen fulfillment centers and delivery facilities around the U.S. as the company wrestles with a costly space glut on the heels of the pandemic."[97]

287.    With regard to third-party sellers, beginning on February 1, 2019, when the Individual Defendants caused Amazon to file its Annual Report with the SEC, the Individual Defendants failed to disclose that the Company exploited its third-party sellers through a myriad of anticompetitive, discriminatory, and abusive tactics, including abruptly suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block purchases of their products, and falsely listing their products as "out of stock" or with delayed shipping times, and sold their products for lower prices and demanded that they pay Amazon for the lost margin.

288.    The Individual Defendants also failed to disclose that Amazon routinely used third-party sellers' data to directly compete with those businesses on Amazon's platform. Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing private-label (Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation. The

---

[97] Paris Martineau, Amazon Quietly Axed Millions of Square Feet of Warehouse Space," The Information (May 24, 2022), available at https://www.theinformation.com/articles/amazon-quietly-axed-millions-of-square-feet-of-warehouse-space.

wrongful use of such third-party seller data was a common practice within the Company. Amazon currently faces significant regulatory inquiries into such practices.

289.    The Individual Defendants also failed to disclose that Amazon routinely favored its own private-label products to the detriment of third-party sellers, including by granting itself access to data and tools that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating third parties' products as "nonessential" while designating Amazon's own similar products as "essential."

290.    The Individual Defendants also failed to disclose that Amazon routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services. Instead, during the Relevant Period, or at least until April 6, 2022, in Amazon's SEC filings, stockholder conference calls, testimony before Congress, and other platforms, the Individual Defendants repeatedly claimed the opposite: that Amazon did nothing but support its third-party sellers.

### 1.   2019 Quarterly and Annual Reports on Form 10-Q and 10-K and Current Reports on Form 8-K and Other Direct Communications to Stockholders

291.    On February 1, 2019, the Individual Defendants caused Amazon to file its Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by defendants Bezos, Olsavsky, Albert, Gorelick, Huttenlocher, McGrath, Rubinstein, Ryder, Stonesifer and Weeks. Appended to the 2018 10-K as exhibits were signed Certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Bezos and Olsavsky, attesting that "I have reviewed this Form 10-K of Amazon.com, Inc." and that "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary

to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

292.    According to the 2018 10-K, North America net sales in 2018 were $141.366 billion, and International net sales in 2018 were $65.866 billion. In the 2018 10-K, the Company stated:

> North America sales increased 33% in 2017 and 2018, compared to the comparable prior years. The sales growth in each year primarily reflects increased unit sales, including sales by third-party sellers . . . . Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, increased in-stock inventory availability, and increased selection.

> International sales increased 23% and 21% in 2017, and 2018, compared to the comparable prior years. The sales growth in each year primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, increased in-stock inventory availability, and increased selection.

293.    The 2018 10-K contained only generic and misleadingly incomplete risk statements that Amazon was "subject to general business regulations and laws, as well as regulations and laws specifically governing the Internet [] [and] e-commerce" and that existing and future laws and regulations covered "competition," among other things. The 2018 10-K merely advised its stockholders that "[e]xisting and future laws and regulations may impede our growth" and failed to disclose the specific and known risks arising from the Company's improper business practices.

294.    The generic and misleadingly incomplete risk statements in the paragraph above were also repeated in Amazon's Forms 10-Q, filed with the SEC on April 26, 2019 (1Q 2019 10-Q), July 26, 2019 (2Q 2019 10-Q), and October 25, 2019 (3Q 2019 10-Q). Appended to the April 26, 2019, July 26, 2019, and October 25, 2019 10-Q Forms were signed Certifications pursuant to

SOX by defendants Bezos and Olsavsky, attesting that "I have reviewed this Form 10-Q of Amazon.com, Inc." and that "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

295.    According to the 1Q 2019 10-Q, North America net sales in 1Q 2019 were $35.812 billion, and International net sales in 1Q 2019 were $16.192 billion. The 1Q 2019 10-Q also contained the following statements:

> North America sales increased 17% in Q1 2019 compared to the comparable prior year period. The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, increased in-stock inventory availability, and increased selection.

> International sales increased 9% in Q1 2019 compared to the comparable prior year period. The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, increased in-stock inventory availability, and increased selection.

296.    According to the 2Q 2019 10-Q, North America net sales in 2Q 2019 were $38.653 billion, and International net sales in 2Q 2019 were $16.37 billion. The 2Q 2019 10-Q also contained the following statements:

> North America sales increased 20% in Q2 2019 and 18% for the six months ended June 30, 2019, compared to the comparable prior year periods. The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, increased in- stock inventory availability, and increased selection.

> International sales increased 12% in Q2 2019 and 10% for the six months ended June 30, 2019, compared to the comparable prior year periods. The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, increased in- stock inventory availability, and increased selection.

297.    According to the 3Q 2019 10-Q, North America net sales in 3Q 2019 were $42.638 billion, and International net sales in 3Q 2019 were $18.348 billion. The 3Q 2019 10-Q also contained the following statements:

> North America sales increased 24% in Q3 2019 and 20% for the nine months ended September 30, 2019, compared to the comparable prior year periods. The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, increased in-stock inventory availability, and increased selection.

> International sales increased 18% in Q3 2019 and 13% for the nine months ended September 30, 2019, compared to the comparable prior year periods. The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, increased in-stock inventory availability, and increased selection.

298.    On April 11, 2019, Amazon filed its Form 8-K with the SEC, signed by defendant Zapolsky ("2019 Form 10-K"). Attached to the Form 8-K was defendant Bezos' 2018 letter to shareholders, signed by defendant Bezos. The 2019 Form 8-K contained the following statements concerning Amazon's third-party sellers:

> ***Third-party sellers are kicking our first party butt. Badly.***

> \* \* \*

> Why did independent sellers do so much better selling on Amazon than they did on eBay? And why were independent sellers able to

> grow so much faster than Amazon's own highly organized first-party sales organization? There isn't one answer, but we do know one extremely important part of the answer:

> We helped independent sellers compete against our first-party business by investing in and offering them the very best-selling tools we could imagine and build. There are many such tools, including tools that help sellers manage inventory, process payments, track shipments, create reports, and sell across borders – and we're inventing more every year. But of great importance are Fulfillment by Amazon and the Prime membership program. In combination, these two programs meaningfully improved the customer experience of buying from independent sellers.

299.    On April 23, 2019, in response to Senator Elizabeth Warren's April 22, 2019 tweet that her plan to break up big tech will prevent "corporations like Amazon from knocking out the rest of the competition," Amazon tweeted: "We don't use individual sellers' data to launch private label products (which account for only about 1% of sales). And sellers aren't being "knocked out" – they're seeing record sales every year".[98]

300.    On April 25, 2019, Amazon hosted an earnings call with stockholders and analysts to discuss the Company's Q1 2019 results (the "Q1 2019 Earnings Call"). When asked to comment on Amazon's efforts to sustain its growth rate in the third-party marketplace business, defendant Olsavsky responded, in relevant part:

> So again, let me reiterate our approach. So main goal here is that it will allow customers to have the broadest selection, the best available price and also the most convenient options on how they receive the item. If we're delivering on those three elements, we're indifferent as to whether it's sold by us or a third- party. We actively recruit sellers to sell on our platform, it's because it adds selection. It adds – If it's in the FBA program, it adds Prime eligible selection.

> We spend billions of dollars a year, as Jeff said, on infrastructure, tools and services, not only to allow sellers to sell, but to help

---

[98] https://twitter.com/amazonnews/status/1120780868614627328.

themselves more successfully. So, we have a vested interest in the success of our sellers. Any growth acceleration or deceleration that you see can be very much tied to the total sales of the customer – that we have the customers in any country.

301.    On July 16, 2019, defendant Sutton testified before the House Judiciary Committee (the "July 16, 2019 Hearing").[99] When asked by Representative Pramila Jayapal whether Amazon "track[s] [the data] and create[s] products that directly compete with those most popular brands that are out there," Sutton responded, in relevant part, that "[Amazon] do[es] not use any of that specific seller data in creating our own private brand products."

302.    At the same hearing, in response to Subcommittee Chairman David N. Cicilline's questioning concerning third-party sellers, defendant Sutton responded, in relevant part:

Our incentive is to help the seller succeed because we rely on them. If we did that, we know they'd go elsewhere. They have many options. So, we apply the same criteria to both, and we do not use their individual data when we're making decisions to launch private brands.

303.    At the same hearing, when asked by Representative Lucy McBath whether Amazon "privilege[s] vendors who use Amazon's Fulfillment services over those who chose not to?," defendant Sutton responded, in relevant part: "We do not favor . . . products that use FBA over others."

304.    At the same hearing, when asked by Subcommittee Chairman David N. Cicilline whether Amazon's algorithm for collecting data was used to support the sale of Amazon-branded

---

[99] Online Platforms and Market Power, Part 2: Innovation and Entrepreneurship: Hearing Before the Subcomm. on Antitrust, Com., & Admin. L. of the H. Comm. on the Judiciary, 116th Cong. 5- 6, 23-24, 38-44, 46-47, 49-51, 64, 66-67, 70-71 (2019) (testimony of Nate Sutton, Assoc. Gen. Couns., Competition, Amazon.com, Inc.), https://www.govinfo.gov/content/pkg/CHRG-116hhrg39901/pdf/CHRG-116hhrg39901.pdf.

products, defendant Sutton responded, in relevant part:

> "[o]ur algorithms, such as the buy box, is [sic] aimed to predict what customers want to buy [. . .] [a]nd we apply the same criteria whether you're a third-party seller or Amazon to that because we want customers to make the right purchase regardless of whether it's a seller or Amazon."

* * *

> The algorithms are optimized to predict what customers want to buy regardless of the seller. We provide the same criteria.

305.    On July 23, 2019, in response to the publication of the *Capitol Forum* article and similar reporting by other media outlets, Chairman Cicilline sent Amazon a letter requesting that the Company supplement defendant Sutton's responses to questions at the July 16, 2019 Hearing because "[i]n several instances, Mr. Sutton responded to questions from [the Subcommittee] by offering other ancillary information or partial and selective responses."[100] Moreover, Chairman Cicilline's letter stated that "[i]n one instance, [defendant Sutton's] answer has been contested by a former Amazon employee, raising questions about the veracity of his responses under oath."

306.    On July 26, 2019, defendant Zapolsky sent a letter[101] in response to Chairman Cicilline's July 23, 2019 letter, which stated, in relevant part:

> [W]hile we prohibit in our private label strategy the use of data related specifically to individual sellers, like other retailers we use aggregated store data (e.g., total sales) and customer shopping behavior (e.g., search volume) to identify categories and products with high customer demand over a given time period. . . .

---

[100] https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/7.22.19%20letter%20to%20amazon%20(dnc).pdf.

[101] https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/07.26.19%20-%20amazon%20response.pdf.

* * *

We prohibit in our private label strategy the use of data related specifically to individual sellers.

* * *

[W]e use aggregated store data on total sales and search volume for categories and products (unless the product is only offered by a single seller, in which case we do not use that data).

* * *

[T]he featured offer algorithm does not favor any particular type of offer, but rather seeks to determine which offer to highlight based on a prediction of which offer customers would choose if they were to compare all offers in detail. . . .

Moreover, we make all offers easily available for all customers to shop. Customers may compare the closest competing offers and add them directly to their shopping cart via the "Other Sellers on Amazon" option [], which

is displayed on the product detail page directly below the featured offer. . . .

307.   On July 25, 2019, Amazon hosted an earnings call with stockholders and analysts to discuss the Company's Q2 2019 results (the "Q2 2019 Earnings Call"). When questioned whether there would be any change in Amazon's business to focus "more towards third-party from first-party," defendant Olsavsky stated, in relevant part:

On your comment, I assume you meant vendors not merchants, but on the move from 1P to 3P, but no there shouldn't be – I can't highlight anything related shifting in channel there, but I would say that we remain indifferent on whether – we're focused on price convenience and selection for our customers. And whether product is a retail offering or third-party offering is not that important to us. As long as it's in stock, as long as it's priced competitively . . . .

> We continue to invest very heavily in our systems both for retail vendors and also for third-party merchants invest billions of dollars a year on behalf of them making Amazon a better place for customers to buy and increasingly not only vendor sales, but also third-party merchant sales.

308.     On October 24, 2019, Amazon hosted an earnings call with stockholders and analysts to discuss the Company's Q3 2019 results (the "Q3 2019 Earnings Call"). When asked to comment on the opportunities and competitiveness for third-party sellers, defendant Olsavsky responded, in relevant part, "[o]n third party I would say we only succeed if the third-party sellers succeeds. So, we're heavily invested in them as they are in us. So, we are constantly investing on their behalf, adding new products and features and you know we are cognizant of their economics as well and we want a business that works for both of us, and we set our fees accordingly."

309.     The statements made during 2019 in the paragraphs above were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading, for several reasons. First, by telling stockholders that Amazon "helped independent sellers compete against our first-party business," the Individual Defendants failed to disclose, among other things, that Amazon routinely retaliated against its third-party sellers—and used the threat of retaliation—through a myriad of anticompetitive, discriminatory, and abusive tactics including abruptly suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block purchases of their products, and falsely listing their products as "out of stock" or with delayed shipping times, and sold their products for lower prices and demanded that they pay Amazon for the lost margin. Second, the above statements also failed to disclose that Amazon routinely used third-party sellers' data to directly compete with those businesses on Amazon's platform. Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing

private-label (Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation. In fact, the wrongful use of such third-party seller data was a common practice within the Company. Amazon currently faces significant regulatory inquiries into such practices. Third, the above statements failed to disclose that Amazon routinely favored its own private-label products to the detriment of third-party sellers, including by granting itself access to data and tools that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating third parties' products as "nonessential" while designating Amazon's own similar products as "essential." Fourth, the Individual Defendants' statements above failed to disclose that Amazon routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services. Finally, the Individual Defendants also failed to disclose that Amazon routinely used third-party sellers' data to directly compete with those businesses on Amazon's platform. Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing private-label (Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation. In fact, the wrongful use of such third-party seller data was a common practice within the Company. Amazon currently faces significant regulatory inquiries into such practices.

### 2. 2020 Quarterly and Annual Reports on Form 10-Q and 10-K and Current Reports on Form 8-K and Other Direct Communications to Stockholders

310.   On January 31, 2020, Amazon filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2019 (the "2019 10-K"). The 2019 10-K was signed by defendants Bezos, Olsavsky, Reynolds, Brewer, Gorelick, Huttenlocher, McGrath, Nooyi, Rubinstein, Ryder, Stonesifer and Weeks. Appended to

the 2019 10-K as exhibits were signed Certifications pursuant to SOX by defendants Bezos and Olsavsky, attesting that "I have reviewed this Form 10-K of Amazon.com, Inc." and that "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

311.     According to the 2019 10-K, North America net sales in 2019 were $170.773 billion, and International net sales in 2019 were $74.723 billion. The 2019 10-K stated:

> North America sales increased 21% in 2019, compared to the prior year. The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, increased in-stock inventory availability, and increased selection.

> International sales increased 13% in 2019, compared to the prior year. The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, increased in-stock inventory availability, and increased selection.

312.     The 2019 10-K contained only generic and misleadingly incomplete risk statements that Amazon was "subject to general business regulations and laws, as well as regulations and laws specifically governing the Internet [] [and] e-commerce" and that existing and future laws and regulations covered "competition," among other things. Amazon merely advised its stockholders that "[u]nfavorable regulations, laws, decisions, or interpretations by government or regulatory authorities applying those laws and regulations" could "impede our growth" and failed to disclose the specific and known risks arising from the Company's improper business practices.

313.    The generic and misleadingly incomplete risk statements in the paragraph above were also repeated in Amazon's Forms 10-Q, filed with the SEC on May 1, 2020 (1Q 2020 10-Q), July 31, 2020 (2Q 2020 10-Q), and October 30, 2020 (3Q 2020 10-Q). Appended to the May 1, 2020, July 31, 2020, and October 30, 2020 Forms 10-Q were signed Certifications pursuant to SOX by defendants Bezos and Olsavsky, attesting that "I have reviewed this Form 10-Q of Amazon.com, Inc." and that "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

> According to the 1Q 2020 10-Q, North America net sales in 1Q 2020 were $46.127 billion, and International net sales in 1Q 2020 were $19.106 billion. The 1Q 2020 10-Q also contained the North America sales increased 29% in Q1 2020 compared to the comparable prior year period. The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand for household staples and other essential products . . . .

> International sales increased 18% in Q1 2020 compared to the comparable prior year period. The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand for household staples and other essential products . . . .

314.    According to the 2Q 2020 10-Q, North America net sales in 2Q 2020 were $55.436 billion, and International net sales in 2Q 2020 were $22.668 billion The 2Q 2020 10-Q also contained the following statements:

> North America sales increased 43% in Q2 2020, and 36% for the six months ended June 30, 2020 compared to the comparable prior year

> periods. The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand, including for household staples and other essential and home products . . . .
>
> International sales increased 38% in Q2 2020 and 28% for the six months ended June 30, 2020 compared to the comparable prior year periods. The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand, including for household staples and other essential and home products . . . .

315.    According to the 3Q 2020 10-Q, North America net sales in 3Q 2020 were $59.373 billion, and International net sales in 3Q 2020 were $25.171 billion. The 3Q 2020 10-Q also contained the following statements:

> North America sales increased 39% in Q3 2020, and 37% for the nine months ended September 30, 2020 compared to the comparable prior year periods. The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand, including for household staples and other essential and home products . . . .
>
> International sales increased 37% in Q3 2020 and 31% for the nine months ended September 30, 2020 compared to the comparable prior year periods. The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand, including for household staples and other essential and home products . . . .

316.    On April 24, 2020, in response to Congressman Jerry Nadler's tweet about an April 23, 2020 *Wall Street Journal* article that alleged that Amazon employees used non-public business information from third-party sellers on its platform to develop competing products: "[i]f true, this

report raises deep concerns about Amazon's apparent lack of candor before the Committee regarding an issue that is central to our investigation," Amazon tweeted:

> @RepJerryNadler. Respectfully, suggestions we misled Congress are unfounded. We've been clear w/ the Committee that Amazon prohibits use of individual sellers' data as WSJ alleged. As w/ any serious allegation of employee misconduct, we are investigating.

317.    On May 1, 2020, members of the Subcommittee sent defendant Bezos a letter in response to an April 23, 2020 *Wall Street Journal* article which alleged that Amazon employees used sensitive business information from third-party sellers on its platform to develop competing products. The letter stated that "[i]f these allegations are true, then Amazon exploited its role as the largest online Marketplace in the U.S. to appropriate the sensitive commercial data of individual Marketplace sellers and then used that data to compete directly with those sellers," and encouraged defendant Bezos to testify before the Subcommittee.

318.    On May 15, 2020, Amazon sent a letter[102] in response to the Subcommittee's May 1, 2020 letter to defendant Bezos, stating, in relevant part:

> Because Amazon is privileged to have third-party sellers who now account for the great majority of sales of physical goods in Amazon's store, we determined years ago to take additional steps to give sellers comfort regarding their individual data. It was purely for that reason that we went beyond any legal requirement—and beyond the protections in place at any other store we are aware of—to begin to implement internal policies to restrict the use of non-public data specific to one particular selling partner to compete directly with sellers. We did this because we thought it was the right thing to do for our selling partners, who are also critical customers of Amazon—we wanted to go the extra mile to protect the trust of third parties selling in our stores.

---

[102] https://judiciary.house.gov/uploadedfiles/letter_from_brian_huseman_to_committeemay_1 5_2020.pdf.

319.    On July 30, 2020, Amazon hosted an earnings call with stockholders and analysts to discuss the Company's Q2 2020 results. During the call, defendant Olsavksy stated:

> Third-party units continue to represent more than half of overall unit volume, helped by improved quarter-over-quarter growth in active sellers. We are more committed than ever to supporting the success of the hundreds of thousands of small and medium-sized businesses to sell their products in Amazon stores.

320.    On September 4, 2020, in response to Chairman Cicilline's question "whether Amazon ever designed the Buy Box algorithm to consider profitability to Amazon as a determining factor in whether to award the Buy Box" to a third-party seller, the Individual Defendants stated: "Amazon does not consider profitability as part of the Featured Merchant Algorithm."

321.    On September 25, 2020, Amazon posted on its official website, that:

> We have strict policies that forbid our own private brand teams from using individual seller data. We train the teams on these policies and audit the teams' compliance with them. Our approach allows us to improve our store while protecting the things sellers care about most: ensuring that their individual pricing plans, inventory levels, and sales histories are not shared with other parties or used to compete with them.
>
> Our continued success depends on providing a great experience – not only for our customers who benefit from wider selection and increased competition that helps keep prices low—but also for independent sellers, which means protecting their proprietary information while providing the data and tools they need to grow their businesses.

322.    On October 6, 2020, Amazon stated on its official website:

> Amazon and third-party sellers benefit each other. [F]lawed regulatory ideas rely on the false narrative that Amazon's interests are not aligned with those of the thousands of small and medium-sized businesses thriving as sellers in our store. The opposite is true: Amazon and sellers complement each other, and together we create a better customer experience than either could create alone. [I]n

addition to great value and low prices for customers—we also have strong financial incentives to support third-party sellers because we typically make the same or more revenue on third-party sales. Clearly, when it comes to Amazon and third-party sellers in our store, it's not zero-sum. Amazon and third-party sellers have a mutually beneficial relationship, and our interests are well aligned. What these misguided notions from some subcommittee staff misunderstand is the fact that third parties having the opportunity to sell right alongside a retailer's products is the very competition that most benefits consumers and has made the marketplace model so successful for third-party sellers.[103]

323.    On November 10, 2020, the European Commission informed Amazon of its preliminary view that Amazon is systematically relying on non-public business data of independent sellers who sell on its Marketplace, to the benefit of Amazon's own retail business, which directly competes with those third-party sellers.

324.     In response, on behalf of Amazon, The Individual Defendants stated the following:

"[w]e disagree with the preliminary assertions of the European Commission and will continue to make every effort to ensure it has an accurate understanding of the facts. No company cares more about small businesses or has done more to support them over the past two decades than Amazon."[104]

325.    The statements made during 2020 in the paragraphs above were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading, for several reasons. First, by telling stockholders that Amazon "helped independent sellers compete against our first-party business," the Individual Defendants failed to disclose,

---

[103] https://www.aboutamazon.com/news/policy-news-views/fringe-notions-on-antitrust-would-destroy-small-businesses-and-hurt-consumers?utm_source=social&utm_medium=tw&utm_term=amznnews&utm_content=HJCReport_Statement&linkId=101370594.
[104] https://www.nytimes.com/2020/11/10/business/amazon-eu-antitrust.html.

among other things, that Amazon routinely retaliated against its third-party sellers—and used the threat of retaliation—through a myriad of anticompetitive, discriminatory, and abusive tactics including abruptly suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block purchases of their products, and falsely listing their products as "out of stock" or with delayed shipping times, and sold their products for lower prices and demanded that they pay Amazon for the lost margin. Second, the above statements also failed to disclose that Amazon routinely used third-party sellers' data to directly compete with those businesses on Amazon's platform. Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing private-label (Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation. In fact, the wrongful use of such third-party seller data was a common practice within the Company. Amazon currently faces significant regulatory inquiries into such practices. Third, the above statements failed to disclose that Amazon routinely favored its own private-label products to the detriment of third-party sellers, including by granting itself access to data and tools that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating third parties' products as "nonessential" while designating Amazon's own similar products as "essential." Fourth, the Individual Defendants' statements above failed to disclose that Amazon routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services. Finally, the Individual Defendants also failed to disclose that Amazon routinely used third-party sellers' data to directly compete with those businesses on Amazon's platform. Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things,

to copy their products by creating competing private-label (Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation. In fact, the wrongful use of such third-party seller data was a common practice within the Company. Amazon currently faces significant regulatory inquiries into such practices.

>3.     **2021 Quarterly and Annual Reports on Form 10-Q and 10-K and Current Reports on Form 8-K and Other Direct Communications to Stockholders**

326.    On February 3, 2021, the Individual Defendants caused Amazon to file its Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2020 (the "2020 10-K"). The 2020 10-K was signed by defendants Bezos, Olsavsky, Reynolds, Alexander, Brewer, Gorelick, Huttenlocher, McGrath, Nooyi, Rubinstein, Ryder, Stonesifer and Weeks. Appended to the 2020 10-K as exhibits were signed Certifications pursuant to SOX by defendants Bezos and Olsavsky, attesting that "I have reviewed this Form 10-K of Amazon.com, Inc." and that "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

327.    According to the 2020 10-K, North America net sales in 2020 were $236.282 billion, and International net sales in 2020 were $104.412 billion. In the 2020 10-K, the Company stated:

> North America sales increased 38% in 2020, compared to the prior year. The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our

customers, including from our shipping offers, and increased demand, including for household staples and other essential and home products . . . .

International sales increased 40% in 2020, compared to the prior year. The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand, including for household staples and other essential and home products . . . .

328.     The 2020 10-K contained only generic and misleadingly incomplete risk statements that Amazon was "subject to general business regulations and laws, as well as regulations and laws specifically governing the Internet [] [and] e-commerce" and that existing and future laws and regulations covered "competition," among other things. The Individual Defendants merely advised the Company's stockholders that "[u]nfavorable regulations, laws, decisions, or interpretations by government or regulatory authorities applying those laws and regulations" could "impede our growth" and failed to disclose the specific and known risks arising from the Company's improper business practices.

329.     The generic and misleadingly incomplete risk statements in the paragraph above were also repeated in Amazon's Forms 10-Q, filed with the SEC on April 30, 2021 (1Q 2021 10-Q), July 30, 2021 (2Q 2021 10-Q), and October 29, 2021 (3Q 2021 10-Q). Appended to the April 30, 2021, July 30, 2021, and October 29, 2021 10-Q Forms were signed Certifications pursuant to SOX by defendants Bezos and Olsavsky for the 1Q 2021 10-Q and by defendants Jassy and Olsavsky for the 2Q 2021 10-Q and 3Q 2021 10-Q, attesting that "I have reviewed this Form 10-Q of Amazon.com, Inc." and that "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

330.    According to the 1Q 2021 10-Q, North America net sales in 1Q 2021 were $64.366 billion, and International net sales in 1Q 2021 were $30.649 billion. The 1Q 2021 10-Q also contained the following statements:

> North America sales increased 40% in Q1 2021, compared to the comparable prior year period. The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand, including for household staples and other essential and home products . . . .

> International sales increased 60% in Q1 2021, compared to the comparable prior year period. The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand, including for household staples and other essential and home products . . . .

331.    to the 2Q 2021 10-Q, North America net sales in 2Q 2021 were $67.550 billion, and International net sales in 2Q 2021 were $30.721 billion. The 2Q 2021 10-Q also contained the following statements:

> North America sales increased 22% in Q2 2021 and 30% for the six months ended June 30, 2021 compared to the comparable prior year periods. The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand . . . .

> International sales increased 36% in Q2 2021 and 47% for the six months ended June 30, 2021 compared to the comparable prior year periods. The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand . . . .

332.    According to the 3Q 2021 10-Q, North America net sales in 3Q 2021 were $65.557 billion, and International net sales in 3Q 2021 were $29.145 billion. The 3Q 2021 10-Q also contained the following statements:

> North America sales increased 10% in Q3 2021 and 23% for the nine months ended September 30, 2021 compared to the comparable prior year periods. The sales growth primarily reflects increased unit sales, including sales by third-party sellers Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand . . .

> International sales increased 16% in Q3 2021 and 35% for the nine months ended September 30, 2021 compared to the comparable prior year periods. The sales growth primarily reflects increased unit sales, including sales by third-party sellers Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand . . . .

333.    On July 29, 2021, Amazon held its second- quarter 2021 earnings conference call. During the call, defendants Olsavsky and Fildes explained that demand for fast delivery "has required" and "will continue to require" a significant investment in the Company's fulfillment network. As defendant Olsavsky stated:

> I'll finish up with some comments on our ongoing investments in operations. As we think about the pull-forward in demand we've seen these past 18-months, it has required and will continue to require a significant amount of investment in our fulfillment network . . . [s]o there's more work to do including additional build outs for our [fulfillment centers] as well as our middle-mile and last-mile capabilities to support our fast-improving delivery offers for customers.

334.    During the same conference call defendant Fildes also tied "current high customer demand" to the Company's aggressive buildout in fulfillment capabilities: "Doug, on your second question, it's Dave here. I'd just say our focus is really squarely on adding capacity to meet the current high customer demand that Brian talked about in his opening remarks."

335.   Later on the call, the Individual Defendants reiterated that Amazon was continuing

to "add [] capacity" and "invest []" in its fulfillment capabilities in order to meet rising demand:

> [Olsavsky]: I would say on the fulfillment side, there are a number of things. First, we're adding a lot of capacity. If you step back, the Amazon fulfilled unit volume, so that's the units coming out of our fulfillment centers, both retail and FBA, have doubled in the past two years. And the AMZL, the delivery arm of our business, has more than doubled in that time period. So you can see there's been very strong multiyear demand here that we are still catching up with from last year So if you've been with us a long time, you know the cadence is that as we add demand – excuse me, as we add capacity, there's a lot of additional costs from hiring to starting up, to training, to getting that building or sort center or delivery station up and running. It usually takes a multi-year period to tame those assets. And we've literally nearly doubled our network here in the last 18 months from a size standpoint. So, there's a lot of that going on, a lot of strong effort by our fulfillment and ops teams to help mitigate the costs.

* * *

> [Fildes]: We're investing in the transportation network to support the demand. A significant part of the capital investments we've been talking about for the past few years and certainly since the pandemic's start has been to support those efforts in middle and last-mile capacity to keep pace and support with that demand. So, as we've been saying here, that work is not done yet. We're continuing to expand. You'll see that investment throughout 2021.

336.   In addition to the above statements, during that same earnings call, defendant

Olsavsky stated:

> As far as the higher-margin areas and whether that's a purposeful strategy, I'd like to say it is, but if you look at what they are third-party is kind of a continuation of strength in our FBA program, in particular, I think the sellers are doing a great job of adding additional selection that's very valuable and reinforces our flywheel, and we'd like to see that and you see that third-party percent of units went up from 53% last year to 56%, and that's a steady mark. We've seen that, as we said, the third-party sellers are doing a great job and we like to see that.

337.    On September 13, 2021, Amazon stated on its official website:

> Amazon remains absolutely committed to helping our third-party selling partners grow and thrive. Last year, Amazon invested more than $18 billion in logistics, tools, services, programs, and people to help small and medium-sized businesses succeed. We offer resources, such as the Amazon Small Business Academy and the recently launched Amazon Black Business Accelerator, to help aspiring sellers from all backgrounds learn how to build their businesses online.

338.    On October 28, 2021, the Individual Defendants caused Amazon to issue a press release (that was later filed with the SEC on Form 8-K and signed by defendant Olsavsky) where defendant Jassy stated that Amazon's "extraordinary investments" in its fulfillment network were needed to "satisfy customer needs":

> We've always said that when confronted with the choice between optimizing for short-term profits versus what's best for customers over the long term, we will choose the latter—and you can see that during every phase of this pandemic . . . .
>
> In the first several months of COVID-19, Amazonians played an essential role, so we worked closely with businesses and governments to leverage AWS to maintain business continuity as they responded to the pandemic. Customers have appreciated this commitment, which is part of what's driving this past quarter's AWS growth acceleration to 39% year over year; but it's also driven extraordinary investments across our businesses to satisfy customer needs—just one example is that we've nearly doubled the size of our fulfillment network since the pandemic began.

339.    During Amazon's Q3 2021 Earnings Call, defendant Olsavsky reiterated in his opening remarks that rising customer demand supported the Company's aggressive expansion, "we've nearly doubled our operations capacity in the past two years to keep up with customer demand" and that the Company's continued investment in capacity was sound:

> [T]here certainly have been challenges to overcome since February of last year. We've nearly doubled our operations capacity in the past 2 years to keep up with the customer demand.

133

\* \* \*

Last quarter we discussed the physical capacity we were adding to meet customer demand. We made strong progress in Q3 to build and open new facilities and as a result for the first time since the pandemic began, we are no longer capacity constrained for physical space in the network. September alone we brought online more than 100 new buildings in the United States including fulfillment centers, sort centers, and last mile delivery stations. For the year, we expect our 2021 footprint additions to exceed last year's build-out, which was also significant. To put this in perspective, we are on track to double our fulfillment network over the two-year period since the pandemic's early days.

Our revenue guidance for the fourth quarter reflects the current trends we are seeing Consumers have started to return to pre-pandemic spending patterns, increasing their mobility and spending more on travel and services in Q2 and Q3, but we are appreciative that the incremental demand that came our way during the pandemic has remained, and that we are continuing to grow on top of that.

340.   During the analyst Q&A portion of the call, defendant Olsavsky again referenced "chasing [] demand" and a "pick up" in demand:

On your first question about whether we've – comparison of doubling the fulfillment capacity to the unit growth, keep in mind also that our fulfillment capacity also includes our transportation delivery capacity. And in the last two years, we've also greatly ratcheted up our ability to deliver ourselves through AMZL and our percent of units that we've delivered through AMZL is over 50% of our units globally. So that's a big – that's a driver as well. I'd also say that while we've been chasing really demand for last two years, we've been doing it – as I said, we're running about 100% pretty much all of last year.

\* \* \*

But yes, we have unfinished business on the one-day promise side . . . But we don't want to be as good as – just as good as we were before the pandemic. We expect that to increase in 2022 and we're going to plan accordingly. And I think you start to see the difference in the growth rate before and after that one day. I won't forecast it too much, but we do – we did see pick-up and we saw really that we

> got into the consideration set for more purchases. When something
> is available in one day or less, now you really don't have to go to a
> store even if you need it very quickly. So, it just opens up more ways
> for us to serve our customers, especially our Prime customers.

341.    On November 1, 2021, the Individual Defendants caused the Company to submit a
Response to Subcommittee's October 18, 2021 Letter. On October 18, 2021, members of the
Subcommittee sent Amazon a letter in response to "recent, credible reporting that directly
contradicts the sworn testimony and representations of Amazon's top executives—including
defendant Bezos—to the Committee about their company's business practices during our
investigation last Congress."[105] The letter stated that the Subcommittee was "providing [the
Company] with a final opportunity to provide exculpatory evidence to corroborate the prior
testimony and statements on behalf of Amazon to the Committee," and encouraged Amazon to
"provide the Committee with sworn, truthful, and accurate responses to this request as we consider
whether a referral of this matter to the Department of Justice for criminal investigation is
appropriate."

342.    The November 1, 2021 letter[106] also stated that Amazon "ha[d] cooperated fully
with the Committee's inquiries and engaged in good faith throughout this process, and the resulting
record fully supports the transparency, candor, accuracy, and truthfulness of all of our statements,
including on the topics raised in your letter," and that the Company "ha[d] in no way lied to or
misled the Committee, and any allegation to the contrary is false and unsupported." Further, the
response letter stated, in relevant part:

> [Amazon's] statements to the Committee regarding this policy have
> been truthful and consistent throughout. At the July 16, 2019,
> hearing our witness stated that Amazon does not use individual

---

[105] https://judiciary.house.gov/uploadedfiles/letter_-_amazon_misrepresentations_10.18.21.pdf.
[106] https://judiciary.house.gov/uploadedfiles/letter_from_brian_huseman_to_committeenov_01_2
021.pdf.

seller data to compete with third party sellers, clarifying specifically that Amazon does not "use any of that specific seller data in creating our own private brand products" and that Amazon does "not use their individual data when we're making decisions to launch private brands."

343.    The statements made during 2021 in the paragraphs above were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading, for several reasons. First, by telling stockholders that Amazon "helped independent sellers compete against our first-party business," the Individual Defendants failed to disclose, among other things, that Amazon routinely retaliated against its third-party sellers—and used the threat of retaliation—through a myriad of anticompetitive, discriminatory, and abusive tactics including abruptly suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block purchases of their products, and falsely listing their products as "out of stock" or with delayed shipping times, and sold their products for lower prices and demanded that they pay Amazon for the lost margin. Second, the above statements also failed to disclose that Amazon routinely used third-party sellers' data to directly compete with those businesses on Amazon's platform. Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing private-label (Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation. In fact, the wrongful use of such third-party seller data was a common practice within the Company. Amazon currently faces significant regulatory inquiries into such practices. Third, the above statements failed to disclose that Amazon routinely favored its own private-label products to the detriment of third-party sellers, including by granting itself access to data and tools that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating third parties' products as "nonessential" while designating Amazon's own similar products as "essential." Fourth, the Individual Defendants' statements above failed to

disclose that Amazon routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services. Finally, the Individual Defendants also failed to disclose that Amazon routinely used third-party sellers' data to directly compete with those businesses on Amazon's platform. Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing private-label (Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation. In fact, the wrongful use of such third-party seller data was a common practice within the Company. Amazon currently faces significant regulatory inquiries into such practices.

### 4. 2022 Quarterly and Annual Reports on Form 10-Q and 10-K and Current Reports on Form 8-K and Other Direct Communications to Stockholders

344.    On February 3, 2022, the Company hosted an earnings call with stockholders and analysts to discuss the Company's Q4 2021 results (the "Q4 2021 Earnings Call"). When asked to discuss why third-party seller services experienced less growth, defendant Olsavsky responded, in relevant part:

> I think the bigger point is that sellers are definitely big winners in Q4. The percentage of units up to 56% was a record for 3P. We continue to invest a lot to make sellers – help sellers be successful on our site. They're a big consumer of advertising as well because they use it to build their brands and add – enable customers to see their selection and make purchases. So, we're very happy with the third-party seller services businesses, and again, looking for ways to help sellers be successful.

345.    During that same earnings call, defendant Olsavsky reaffirmed to stockholders that Amazon's aggressive expansion efforts were supported by increased demand in fast delivery:

[Brian T. Olsavsky:] [W]e continue to see an increase in customer demand and sales during the remainder of 2021, even as the economy opened back up . . . [w]e've invested significantly to keep pace with this demand, including nearly doubling our operations capacity in the past two years, expanding our fulfillment center footprint while adding significant transportation assets to ensure fast, on-time delivery. There are now 1.6 million Amazon employees worldwide, also doubling in the two-year period.

\* \* \*

On the fulfillment center side, that's about 30% of the spend in the last two years. We see that moderating and that will probably now match growth of our underlying businesses. I think there's always things that can kick up that growth rate, things than the square footage. So, there's – we want to have capacity to have a healthy retail and FBA business, because those fuels Prime and one-day delivery and two-day delivery and same-day delivery. So that's very important. But we see the FCPs likely moderating this year. And then the third piece is transportation. We still see additional levels of investment in that in 2022. So, if you wrap that up, we expect CapEx, including equipment finance leases to increase year-over-year. I can't give you the exact percentage, but hopefully, it gives you a little more dynamic on what – how we approach it.

346.    On February 3, 2022, the Individual Defendants caused Amazon to issue a press release (that was later filed with the SEC on Form 8-K and signed by defendant Olsavsky) where defendant Jassy stated that "[w]hen you combine how we're staffing and scaling our fulfillment network to bring even faster delivery to more customers . . . there's a lot to look forward to in the months and years ahead."

347.    On February 4, 2022, the Individual Defendants caused Amazon to file its Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K was signed by defendants Jassy, Olsavsky, Reynolds, Bezos, Alexander, Cooper, Gorelick, Huttenlocher, McGrath, Nooyi, Rubinstein, Stonesifer and Weeks. Appended to the 2021 10-K as exhibits were signed

Certifications pursuant to SOX by defendants Jassy and Olsavsky, attesting that "I have reviewed this Form 10-K of Amazon.com, Inc." and that "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

348.    to the 2021 10-K, North America net sales in 2021 were $279.833 billion, and International net sales in 2021 were $127.787 billion. The 2021 10-K stated:

> North America sales increased 18% in 2021, compared to the prior year. The sales growth primarily reflects increased unit sales, including sales by third-party sellers Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand . . . .

> International sales increased 22% in 2021, compared to the prior year. The sales growth primarily reflects increased unit sales, including sales by third-party sellers Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand . . .

349.    The 2021 10-K contained only generic and misleadingly incomplete risk statements that Amazon was "subject to general business regulations and laws, as well as regulations and laws specifically governing the Internet [] [and] e-commerce" and that existing and future laws and regulations covered "competition," among other things. In the 2021 10-K, the Individual Defendants merely advised the Company's stockholders that "[u]nfavorable regulations, laws, decisions, or interpretations by government or regulatory authorities applying those laws and regulation" could "impede our growth" and failed to disclose the specific and known risks arising from the Company's improper business practices.

350.    The 2021 10-K also stated the following:

In November 2020, the European Commission issued a Statement of Objections alleging that Amazon uses data relating to our marketplace sellers in a manner that infringes EU competition rules. The Statement of Objections seeks to impose unspecified fines and remedial actions. We disagree with the preliminary assertions of the European Commission and intend to defend ourselves vigorously in this matter.

In December 2021, the Italian Competition Authority (the "ICA") issued a decision against Amazon Services Europe S.à r.l., Amazon Europe Core S.à r.l., Amazon EU S.à r.l., Amazon Italia Services S.r.l., and Amazon Italia Logistica S.r.l. claiming that certain of our marketplace and logistics practices in Italy infringed EU competition rules. The decision imposes a fine of €1.13 billion and remedial actions. We believe the ICA's decision to be without merit and intend to defend ourselves rigorously in this matter.

351.    On March 4, 2022, the Individual Defendants caused Amazon to state on its official corporate website the following:

Amazon cares about the success of our small business partners, and we have invested billions of dollars in tools, services, programs, and people to support small and medium-sized sellers' growth. Supporting small businesses is a fundamental part of Amazon's work and an extension of our customer-centric culture

352.    On April 14, 2022, the Individual Defendants caused Amazon to publish a Letter to Shareholders authored by defendant Jassy that was later filed with the SEC on Form 8-K. The shareholder letter repeated the claim that Amazon's aggressive expansion efforts were justified by increasing demand for fast delivery:

This growth also created short-term logistics and cost challenges. We spent Amazon's first 25 years building a very large fulfillment network, and then had to double it in the last 24 months to meet customer demand . . . .

Ironically, just before COVID started, we'd made the decision to invest billions of incremental dollars over several years to deliver an increasing number of Prime customers in one day. This initiative was slowed by the challenges of the pandemic, but we've since resumed our focus here . . . . [W]e believe our over 200 million Price

customers, who will tell you very clearly that faster is almost always better, will love this . . . . This type of iterative innovation is never finished and has periodic peaks in investment years, but leads to better long-term customer experiences, customer loyalty, and returns for our shareholders.

353.    The statements made during 2022 in the paragraphs above were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading, for several reasons. First, by telling stockholders that Amazon "helped independent sellers compete against our first-party business," the Individual Defendants failed to disclose, among other things, that Amazon routinely retaliated against its third-party sellers—and used the threat of retaliation—through a myriad of anticompetitive, discriminatory, and abusive tactics including abruptly suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block purchases of their products, and falsely listing their products as "out of stock" or with delayed shipping times, and sold their products for lower prices and demanded that they pay Amazon for the lost margin. Second, the above statements also failed to disclose that Amazon routinely used third-party sellers' data to directly compete with those businesses on Amazon's platform. Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing private-label (Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation. In fact, the wrongful use of such third-party seller data was a common practice within the Company. Amazon currently faces significant regulatory inquiries into such practices. Third, the above statements failed to disclose that Amazon routinely favored its own private-label products to the detriment of third-party sellers, including by granting itself access to data and tools that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating third parties' products as "nonessential" while designating Amazon's own similar products as "essential." Fourth, the Individual Defendants' statements above failed to

disclose that Amazon routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services. Finally, the Individual Defendants also failed to disclose that Amazon routinely used third-party sellers' data to directly compete with those businesses on Amazon's platform. Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing private-label (Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation. In fact, the wrongful use of such third-party seller data was a common practice within the Company. Amazon currently faces significant regulatory inquiries into such practices.

## VII.     DAMAGES TO AMAZON

354.   As alleged above, the breaches of fiduciary duties described herein gave rise to a myriad of investigations and litigation against Amazon. Those include becoming the subject of a criminal investigation by the U.S. Department of Justice ("DOJ") and a government probe into Amazon's public disclosures regarding its business practices by the SEC. The Company has suffered significant damages, including being named as a defendant in the Securities Action, the Consumer Class Actions, the private arbitrations mentioned above relating to violations of state biometric privacy laws, the Antitrust Actions.[107] As a result, Amazon continues to be subjected to mounting damages by failing to redress the harms complained of herein.

355.   Amazon has suffered additional damages as well. For example, Amazon is suffering, and will continue to suffer, from what is known as the "liar's discount," a term applied

---

[107] These include *District of Columbia v. Amazon.com, Inc.*, No. 2021 CA 001775 (D.C. Sup. Ct.), and *In re Amazon.com, Inc. eBook Antitrust Litigation*, No. 1:21-cv-351-GHW-DCF

to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that Amazon's ability to raise equity capital or debt on favorable terms in the future is now impaired.  Further, as the Securities Action and other related litigation continues to unfold, Amazon will continue to be damaged by the professional fees, costs and expenses incurred because of those matters, not to mention the decline in productivity associated with the distractions that come with exposure to litigation.

356.    The Individual Defendants have not fared nearly so badly, however.  On the contrary, certain of the Individual Defendants have pocketed millions of dollars in compensation not justified by the Company's performance while under their stewardship.  The Company has also incurred costs in connection with benefits paid to these Individual Defendants.

## VIII.        DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

357.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

358.    Plaintiff is a current stockholder of the Company, has continuously held shares of the Company's stock since 2017, and was a stockholder of the Company at all times relevant to the Individual Defendants' wrongdoing alleged herein.

359.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

360.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously pursue this action.

361.    Plaintiff reasserts and realleges each allegation from the complaint as if set forth herein in this section.

362.    The Board currently consists of eleven (11) directors: defendants Bezos, Jassy, Alexander, Cooper, Gorelick, Huttenlocher, McGrath, Nooyi, Rubinstein, Stonesifer and Weeks. A derivative plaintiff need only demonstrate reason to doubt that half of the directors are disinterested or objective in order to establish pre-suit demand excusal.  Plaintiff has adequately alleged that there is reason to doubt that at least six (6) current directors of Amazon are capable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action, for the following reasons:

### A.    Defendants Bezos and Jassy Are Not Independent

363.    There is a reason to doubt that both defendant Bezos and defendant Jassy are capable of independently considering a demand to commence and vigorously prosecute this action, because defendant Bezos' and Jassy's principal professional occupation are their employment as President and CEO of Amazon. Defendant Bezos founded Amazon and until recently (July 2021) served as CEO and President. Defendant Jassy succeeded defendant Bezos as President and CEO of the Company in July 2021, having previously served as a senior executive in charge of Amazon's AWS division. Both defendant Bezos and defendant Jassy has earned and stands to earn millions of dollars in annual salary, bonuses, and other compensation from their positions with Amazon.

364.    Accordingly, defendants Bezos and Jassy are incapable of independently considering a demand to commence and vigorously prosecute this action against those defendants who control his annual compensation. The Company's Proxy Statements on Form DEF 14A also admit that defendants Bezos and Jassy are not independent directors.

**B.**   **Defendants Bezos, Jassy, Alexander, Cooper, Gorelick, Huttenlocher, McGrath, Nooyi, Rubinstein, Stonesifer and Weeks Face a Substantial Likelihood of Personal Liability, Excusing Demand**

365.   The entire current Board, including defendants Bezos, Jassy, Alexander, Cooper, Gorelick, Huttenlocher, McGrath, Nooyi, Rubinstein, Stonesifer and Weeks face a substantial likelihood of personal liability, excusing demand.

366.   The Board was required to ensure that Amazon complied with applicable laws, including both federal antitrust laws and state bioinformation privacy laws. They were also required to ensure that all SEC filings that they signed, which included the Annual Reports on Form 10-K that each director signed during the Relevant Period were truthful, accurate and did not fail to disclose material adverse information from stockholders. The Board was also required to ensure that all necessary information regarding Amazon's legal compliance with these laws was presented to the Board. The Board failed in all these respects.

367.   Amazon's violations of federal antitrust laws, BIPA and other state bioinformation privacy laws are longstanding, have been raised before the current Board, and have been repeatedly disregarded by the current Board. In Amazon's 2019 and 2020 Proxy Statements, the Board even dismissed stockholder concerns specifically raising the illegality and privacy implications of Amazon's facial recognition system, Rekognition. A majority of the current members of the Demand Board – namely, defendants Bezos, Gorelick, Huttenlocher, McGrath, Nooyi, Rubinstein, Stonesifer, and Weeks – were among the directors who dismissed shareholder concerns about BIPA and privacy violations in those Proxy Statements.

368.   In Amazon's 2022 Proxy Statement, the current Board dismissed the risks posed to the Company by Amazon's flouting of consumer privacy rights under the law and responded to

shareholder concerns by attempting to reassure shareholders that: "Our Board has reviewed Amazon Rekognition, along with other programs, as part of numerous AWS business reviews."[108]

369.    Each member of the current Board, by virtue of their positions as trusted fiduciaries of the Company charged with overseeing the Company's business and operations, knew of the Company's anticompetitive practices as well. Amazon derives substantial revenues from its anticompetitive practices, and as such, the Board would necessarily have to have been aware of these improper practices. Moreover, the DOJ was well aware of the Company's anticompetitive practices by March 9, 2022, and media outlets reported that as of April 6, 2022, the SEC Probe was already well underway and had been for more than one year.

370.    Defendant Bezos has been a director since Amazon's founding. Defendant Jassy founded AWS and has served as a senior executive since 2016. Defendant Alexander has been a director since September 2020. Defendant Cooper has been a director since September 2021. Defendant Gorelick has been a director since February 2012. Defendant Huttenlocher has been a director since September 2016. Defendant McGrath has been a director since July 2014. Defendant Nooyi has been a director since February 2019. Defendant Rubinstein has been a director since December 2010. Defendant Stonesifer has been a director since February 1997. Defendant Weeks has been a director since February 2016.

371.    The misconduct complained of herein occurred while each of the above was exercising active oversight of Amazon, its business practices and its legal compliance.

372.    It is well-established that a substantial likelihood of liability exists where there is a conscious disregard of a duty to act.  Demand is regularly excused under Delaware law where,

---

[108] 2022 Proxy Statement at 86.

based on the facts alleged, it is reasonable to infer that directors consciously failed to take such action, in violation of their duties of loyalty and good faith.

373.    Under Delaware law, shareholders are entitled to honest communication from directors, given with complete candor and in good faith.  Communications that depart from this expectation, particularly where it can be shown that the directors involved issued their communication with knowledge that it was deceptive or incomplete, violate the fiduciary duties that protect shareholders.  Such violations are sufficient to subject directors to a derivative claim. Directors who issue false and misleading statements to stockholders are considered to be interested for purposes of pre-suit demand.

374.    Conscious disregard for the truth or falsity of statements issued on behalf of the corporation is a breach of the non-exculpable duties of loyalty and good faith.  When public representations are made to shareholders, directors are duty-bound to ensure that those statements are complete and truthful.  A fiduciary may be held liable for making a material misdisclosure, or if he or she authorizes without fault or knowledge a misleading disclosure, later comes into knowledge of the misleading nature of the previous communication, and knowingly and in bad faith -- in other words, dishonestly -- fails to correct the misleading impression created by the earlier communication.

375.    Based on the facts alleged herein, the only reasonable inference is that: (a) Board knew and approved of or consciously disregarded the issuance of the series of false and misleading statements made during the Relevant Period.

376.    Accordingly, defendants Bezos, Jassy, Alexander, Cooper, Gorelick, Huttenlocher, McGrath, Nooyi, Rubinstein, Stonesifer and Weeks each face a substantial likelihood of liability, excusing demand.

## IX.   CLAIMS

### COUNT I

### Against All Individual Defendants for Breach of Fiduciary Duty

377.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

378.   The Individual Defendants, as current or former Amazon officers and/or directors, owe (or owed) the Company the fiduciary duties of due care, loyalty, good faith, candor, oversight, reasonable inquiry, and supervision.

379.   By virtue of their positions as Amazon directors and/or officers, these Individual Defendants at all relevant times had the power to (and did) control, influence, and cause the Company to engage in the practices complained of herein, including the false and misleading statements alleged herein.

380.   Each Individual Defendant was required to: (a) use his or her ability to control and manage Amazon in a legal, fair, just, and equitable manner; and (b) act in furtherance of the best interests of Amazon rather than his or her own interests.

381.   By their acts alleged herein, including but not limited to causing Amazon to issue false and misleading statements while concealing material adverse information and failing to ensure that the Company maintained adequate internal controls regarding financial disclosures, the Individual Defendants each breached their fiduciary duties.

382.   The Individual Defendants acted in bad faith, willfully, and/or recklessly in violating their fiduciary duties owed to the Company.

383.   Berry has been injured as a direct and proximate result of the Individual Defendants' wrongful conduct.

## COUNT II

### Against the Individual Defendants for Unjust Enrichment

384.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

385.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Amazon.

386.    Plaintiff, as a shareholder and representative of Amazon, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, salaries, benefits and other compensation obtained by these Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.    Directing Amazon to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders holders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

C.      Awarding to Amazon restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

**X.      JURY DEMAND**

Plaintiff demands a trial by jury.

Dated:  February 27, 2023

**OF COUNSEL:**

**SHUMAN, GLENN & STECKER**
Rusty E. Glenn
600 17th Street, Suite 2800 South
Denver, CO 80202
(303) 861-3003
rusty@shumanlawfirm.com

**SHUMAN, GLENN & STECKER**
Brett D. Stecker
326 W. Lancaster Avenue
Ardmore, PA 19003
(303) 861-3003
brett@shumanlawfirm.com

**KASKELA LAW LLC**
D. Seamus Kaskela
Adrienne Bell
18 Campus Boulevard, Suite 100
Newtown Square, PA 19073
(303) 861-3003
skaskela@kaskelalaw.com
abell@kaskelalaw.com

**LONG LAW, LLC**

By:     */s/ Brian D. Long*
        Brian D. Long (#43473828)
        Kennett Pike, Suite 208
        Wilmington, DE 19807
        Telephone: (302) 729-9100
        Email: BDLong@LongLawDE.com


        *Attorneys for Plaintiff*

**LAW OFFICE OF ALFRED G.**
**YATES, JR., P.C.**
Alfred G. Yates, Jr.
Gerald L. Rutledge
1575 McFarland Road, Suite 305
Pittsburgh, PA 15216
(412) 391 – 5164
yateslaw@aol.com